No. 21-1492

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

AZURITY PHARMACEUTICALS, INC., f/k/a CutisPharma, Inc.,

Plaintiff-Appellant,

v.

EDGE PHARMA, LLC, f/k/a Edge Pharmacy Services, LLC,

Defendant-Appellee.

_____

## ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT
## COURT FOR THE DISTRICT OF MASSACHUSETTS

_____

## BRIEF OF PLAINTIFF-APPELLANT

_____

James H. Hulme (1160842)
Nadia A. Patel (1181058)
ARENT FOX LLP
1717 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 857-6000
Facsimile: (202) 857-6395

Valerie C. Samuels (9613)
ARENT FOX LLP
800 Boylston Street, 32nd Floor
Boston, MA 02199
Telephone: (617) 973-6248

_Counsel for Plaintiff-Appellant_

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Azurity Pharmaceuticals, Inc., pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure, states that it is wholly owned by CutisPharma Intermediate Holdings, Inc. and no publicly held corporation owns ten percent (10%) or more of its stock.

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF ISSUES ...................................................................1

STATEMENT OF THE CASE................................................................2

I.     Azurity Produces FDA-Approved FIRVANQ. ..............................6

II.    Statutory and Regulatory Background. ........................................7

III.   Edge Has a History of Non-Compliance with Section 503B Requirements.10

IV.    Edge's False Representations About Its Compliance with Outsourcing Facility Requirements Violated the Lanham Act. .......................12

     A.     The False Compliance Statements .....................................13

     B.     The Impliedly False Registration Statements .....................14

     C.     The False Superiority Statement .......................................15

V.     Relevant Procedural Background ................................................16

SUMMARY OF ARGUMENT ..............................................................18

STANDARD OF REVIEW ...................................................................20

ARGUMENT .......................................................................................21

I.     The District Court's Ruling that Azurity's Lanham Act Claims are Precluded by the FDCA is Contrary to the Supreme Court's Decision in *POM Wonderful*. ...........................................................21

II.    The District Court Erred in Holding that Azurity's Claims are Precluded by the FDCA..............................................................22

     A.     Section 503B's "Essentially a Copy" Provision Does Not Present "Thorny Questions That May Require the FDA's Expertise."...........25

          1.     Azurity's Identical or Nearly Identical Claim is Not Precluded by the FDCA Because It Does Not Require FDA Expertise....26

          2.     The District Court Failed to Consider the Second Aspect of the "Essentially A Copy" Analysis, Ignoring Azurity's Clinically Different Drug Claim Entirely................................................29

     B.     Azurity's Bulk Drug Claim is Not Precluded Because It Requires Only a Binary Factual Determination. ...............................33

III.    The District Court Erred by Wholly Ignoring Edge's False Superiority Statement, Which Provides an Independent, Non-Precluded Basis for Azurity's Lanham Act Claim. ..................................................................36

CONCLUSION ......................................................................................40

CERTIFICATE OF COMPLIANCE.........................................................42

CERTIFICATE OF SERVICE ...............................................................43

ADDENDUM

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Allergan USA Inc. v. Imprimis Pharms., Inc.*,
No. SA CV 171551, 2017 WL 10526121 (C.D. Cal. Nov. 14,
2017), *recon. denied*, 2019 WL 4545960 (Mar. 27, 2019), *appeal
dismissed*, Nos. 19-55756, 19-55999, 2019 WL 6318743 (9th Cir.
Oct. 3, 2019) ................................................................*passim*

*Allergan USA, Inc. v. Prescribers Choice, Inc.*,
364 F. Supp. 3d 1089 (C.D. Cal. 2019) ..............................................24

*Aspinall v. Philip Morris Cos.*,
442 Mass. 381, 813 N.E.2d 476 (2004) ..............................................15

*Athenex Inc. v. Azar*,
397 F. Supp. 3d 56 (D.D.C. 2019), *appeal dismissed sub nom.
Athenex Pharma Sols., LLC v. Azar*, No. 19-5223, 2019 WL
5394642 (D.C. Cir. Oct. 1, 2019) ........................................................8

*Belcher Pharm., LLC v. Hospira, Inc.*,
No. 17-cv-2353, 2018 WL 4643292 (M.D. Fla. Apr. 9, 2018) .........................23

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
627 F. Supp. 2d 384 (D.N.J. 2009) ....................................................38

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*,
284 F.3d 302 (1st Cir. 2002) ............................................................13

*Castrol Inc. v. Pennzoil Co.*,
987 F.2d 939 (3d Cir. 1993) ..............................................................38

*Clorox Co. Puerto Rico v. Proctor & Gamble Com. Co.*,
228 F.3d 24 (1st Cir. 2000) ............................................20, 21, 37, 38

*Commonwealth v. Exxon Mobil Corp.*,
No. 1984CV03333BLS1, 2021 WL 3493456 (Mass. Super. June
22, 2021) ....................................................................................15

iv

*Empire Today, LLC v. Nat'l Floors Direct, Inc.*,
    788 F. Supp. 2d 7 (D. Mass. 2011) ....................................................16

*Ferring Pharms. Inc. v. Braintree Labs., Inc.*,
    38 F. Supp. 3d 169 (D. Mass. 2014) ..................................................38

*Foisie v. Worcester Polytechnic Inst.*,
    967 F.3d 27 (1st Cir. 2020) ...............................................................20

*Genus Lifesciences Inc. v. Lannett Co.*,
    No. 18-cv-07603, 2019 WL 4168958 (N.D. Cal. Sept. 3, 2019) ...............23, 39

*Hope Medical Enterprises, Inc. v. Fagron Compounding Services,*
    *LLC*, No. 19-CV-07748, 2021 WL 753566 (C.D. Cal. Jan. 25,
    2021), *appeal filed*, No. 21-55165 (9th Cir. Feb. 25, 2021) .........................24, 32

*McGrath & Co. v. PCM Consulting, Inc.*,
    Civ. A. No. 11-10930, 2012 WL 503629 (D. Mass. Feb. 15, 2012) .................14

*Meachen v. Iowa Pac. Holdings, LLC*,
    No. 13-CV-11359, 2016 WL 7826660 (D. Mass. Feb. 10, 2016) ......................22

*Nexus Pharmaceuticals, Inc. v. Quva Pharma, Inc.*,
    No. CV 20-07518, 2020 WL 6498970 (C.D. Cal. Oct. 29, 2020),
    *appeal filed*, No. 20-56160 (9th Cir. Nov. 4, 2020) ...................................27, 28

*Par Sterile Prods., LLC v. Fresenius Kabi USA LLC*,
    No. 14 C 3349, 2015 WL 1263041 (N.D. Ill. Mar. 17, 2015) ..........................22

*Pegasystems, Inc. v. Appian Corp.*,
    424 F. Supp. 3d 214 (D. Mass. 2019) ................................................16

*PhotoMedex, Inc. v. Irwin*,
    601 F.3d 919 (9th Cir. 2010) ............................................................23

*POM Wonderful LLC v. Coca-Cola Co.*,
    573 U.S. 102 (2014) ................................................................*passim*

*Spruce Env't Techs., Inc. v. Festa Radon Techs., Co.*,
    248 F. Supp. 3d 316 (D. Mass. 2017) ................................................16

*World Nutrition Inc. v. Advanced Enzymes USA*,
No. CV-19-00265-PHX-GMS, 2021 WL 632684 (D. Ariz. Feb. 18,
2021) .................................................................................................23

**Statutes**

15 U.S.C. § 1125(a) ...........................................................................16

21 U.S.C. § 301, *et seq.* ....................................................................22

21 U.S.C. § 353b .................................................................................4

21 U.S.C. § 353b(a)(2)(A)(i) ........................................................8, 33

21 U.S.C. § 353b(a)(2)(A)(ii) .......................................................8, 33

21 U.S.C. § 353b(a)(5) .........................................................................9

21 U.S.C. § 353b(d)(2)(A) ..........................................................*passim*

21 U.S.C. § 353b(d)(2)(B) ..............................................................9, 29

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1331 ..................................................................................1

28 U.S.C. § 1332(a)(1) .........................................................................1

**Other Authorities**

FDA, Compounding Laws and Policies,
https://www.fda.gov/drugs/human-drug-compounding
/compounding-laws-and-policies (last visited Oct. 6, 2021) ...............7

FDA, Development & Approval Process/Drugs,
https://www.fda.gov/drugs/development-approval-process-drugs
(last visited Oct. 11, 2021) ................................................................37

FDA, Facts About the Current Good Manufacturing Practices,
https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-
about-current-good-manufacturing-practices-cgmps (last visited
Oct. 8, 2021) .........................................................................................7

FDA, Questions and Answers: Outsourcing Facility Registration
(2019), https://www.fda.gov/drugs/human-drug-
compounding/questions-and-answers-outsourcing-facility-
registration ......................................................................................................10

## JURISDICTIONAL STATEMENT

The district court had original subject matter jurisdiction under 28 U.S.C. § 1331 because the case presented federal questions under the Lanham Act, and diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there was complete diversity between the parties.

The district court granted Defendant's motion to dismiss on May 18, 2021, and entered final judgment for Defendant on May 26, 2021. ADD-1. Plaintiff filed a timely notice of appeal on June 24, 2021. J.A. 506.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 to review the final judgment of the district court.

## STATEMENT OF ISSUES

1.      Whether the district court erroneously concluded Plaintiff's Lanham Act claims were precluded by the federal Food, Drug, and Cosmetic Act (the "FDCA") in light of the Supreme Court's ruling in *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 119 (2014).

2.      Whether the district court erroneously concluded that Plaintiff's Lanham Act claims were precluded by the FDCA, when Edge's violations of section 503B of the FDCA can easily be ascertained without delving into thorny questions requiring the Food and Drug Administration's ("FDA") expertise.

3.      Whether the district court erroneously dismissed Plaintiff's separate and independent Lanham Act claim that Defendant was falsely representing that its product is better than "commercially available options [which] are not ideal for use in the hospital setting," when Plaintiff alleged that Defendant's product is not FDA-approved and did not comply with section 503B of the FDCA, and Plaintiff's product is an FDA-approved, commercially available option.

## STATEMENT OF THE CASE

The Plaintiff, Azurity Pharmaceuticals, Inc. ("Azurity"), is a specialty pharmaceutical company that, among other products, provides safe, high-quality FDA-approved pharmaceutical products as part of its broader portfolio of specialty products. One such product is FIRVANQ®, an FDA-approved vancomycin hydrochloride for oral solution. FIRVANQ is used to treat *Clostridium difficile*-associated diarrhea and enterocolitis caused by *Staphylococcus aureus*, including methicillin resistant strains.

The Defendant, Edge Pharma, LLC ("Edge"), is an outsourcing facility that does not produce FDA-approved pharmaceutical products. Instead, it mass-produces vancomycin hydrochloride for oral solution in violation of FDA regulations and in a manner that needlessly endangers public health, while at the same time advertising that it is in compliance with FDA regulations. Azurity brought this action to stop Edge from engaging in false and misleading advertising of its "compounded"

version of a vancomycin hydrochloride for oral solution product, which is unlawfully manufactured and sold when FDA-approved products like FIRVANQ are commercially available.

Compounding drugs involves the act of combining, mixing, or altering the ingredients of a particular drug to create a medication tailored to the needs of an individual patient. For example, a patient who is allergic to a certain dye in an FDA-approved drug needs the medication to be made without the dye. Or, if a patient requires an oral liquid dosage form of a drug and only a pill or capsule form is available on the market, a pharmacist would engage in the act of compounding the pill or capsule to an oral liquid dosage format by crushing it, mixing it with an approved diluent, and providing it to the patient.

Generally, the FDCA and parallel state statutes require drugs to be approved by the FDA and state agencies before they can be sold. These drugs go through rigorous safety and efficacy testing prior to approval. Compounded drugs, however, are exempted from safety and efficacy testing and approval requirements when certain specific conditions are met. Based on the inherent safety risks of compounded products (because they do not go through the rigorous safety and efficacy demonstration that approved drugs must undergo), under applicable law, compounding should only occur in circumstances where the needs of a specific patient are unmet by FDA-approved products.

Furthermore, to address the inherent risks with compounded drugs, and in response to the 2012 meningitis outbreak caused by the compounding of unsafe, contaminated steroid injections by New England Compounding Center ("NECC"), Congress added section 503B[1] to the FDCA, requiring the FDA to establish regulations for outsourced compounders, like Edge, and establishing very specific requirements on when and how they may engage in compounding activities. Two such rules include section 503B's prohibition on facilities like Edge from manufacturing compounded products (a) using bulk drug substances not on a specific list of bulk drug substances approved by the FDA, and (b) that are "essentially a copy" of FDA-approved products.

Edge's vancomycin product is manufactured in a manner that violates section 503B. At all times relevant to the Complaint, and as confirmed by Edge, it manufactured its vancomycin product with an unapproved bulk drug substance. In addition, Edge's vancomycin product is essentially a copy of Azurity's FIRVANQ, in that (a) Edge's product uses an identical or nearly identical vancomycin formulation as FIRVANQ, and (b) Edge does not tailor its product to specific patient needs, as determined by a prescribing practitioner. Thus, hospitals that use Edge's vancomycin product are unnecessarily exposing their patients to a risky, non-

---

[1] Section 503B of the FDCA is codified at 21 U.S.C. § 353b. *See* the full text of the statute at ADD-41–49.

4

compliant, compounded drug, when safe, FDA-approved alternatives (like FIRVANQ) are readily available.

Because Edge fails to comply with section 503B, Edge has in turn violated the Lanham Act and Massachusetts General Laws Chapter 93A by falsely representing that it complies with the FDCA. Edge advertises that, for example, it acts "[a]s your ***compliance partner*** ... dedicated to providing turnkey 503B outsourcing with the highest level of quality"; and that it is "***compliant with*** the . . . state, local, and ***federal regulations*** and guidelines," including the FDCA. J.A. 18 ¶ 61 (emphasis added). Edge also holds itself out as an inspected and licensed facility, falsely implying that its products are safe. In addition, Edge markets its vancomycin product as superior to commercially available alternatives such as FIRVANQ, even though FIRVANQ is an FDA-approved drug, and Edge's product is not.

These representations are false and form a meritorious basis for Azurity's Lanham Act claims. Indeed, Azurity alleges not one, but four theories of liability. On May 18, 2021, however, the district court granted Edge's motion to dismiss and concluded that one of Azurity's four theories was precluded by the FDCA, and on that ground alone, dismissed the *entire* Complaint. ADD-5–6. The district court failed to specifically address the other three theories, including Azurity's claim that Edge falsely advertised its product as superior to Azurity's FIRVANQ — a separate

and independent Lanham Act violation that does not require any application of the FDCA or FDA expertise. *Id.*

As discussed below, the district court's dismissal of the remaining three theories of liability, with no explanation or analysis, is reversible error. Azurity adequately alleges Lanham Act claims based on these three theories. Moreover, contrary to the district court's conclusion, *none* of the four theories alleged by Azurity is precluded by the FDCA. Therefore, Azurity requests that the First Circuit reverse the district court's decision and remand the case for further proceedings including discovery and trial.

## I.     **Azurity Produces FDA-Approved FIRVANQ.**

Azurity produces oral solutions of certain pharmaceuticals to fulfill the needs of pediatric and elderly patients. *See* J.A. 9 ¶ 10. One such product is FIRVANQ. *Id.* ¶ 11. FIRVANQ is approved by the FDA. *Id.* While seeking FDA approval of FIRVANQ, Azurity invested significant time and resources to research, develop, and test FIRVANQ to ensure its safety and effectiveness. J.A. 13 ¶ 35. On January 26, 2018, the FDA approved New Drug Application Number 208910 for FIRVANQ. *Id.* ¶ 33. Azurity began marketing its product immediately, and since September 11, 2019, FIRVANQ is one of only two FDA-approved vancomycin hydrochloride for oral solution. J.A. 14 ¶ 37. FDA approval of FIRVANQ means that consumers and medical professionals can trust its safety and efficacy. J.A. 13 ¶ 35.

By contrast, Edge is a pharmacy that produces compounded drugs. J.A. 12 ¶ 27. As discussed herein, Edge has been compounding its vancomycin product in bulk and marketing it as an alternative to FIRVANQ, rather than as an alternative solely for use by patients who cannot tolerate FIRVANQ. J.A. 13 ¶ 32.

## II.    Statutory and Regulatory Background.

After NECC produced contaminated steroid injections that resulted in a meningitis outbreak killing more than 60 people and infecting hundreds, Congress enacted the Drug Quality and Security Act (the "DQSA") in 2013. J.A. 11 ¶ 20. The DQSA amended the FDCA by adding section 503B. *Id.* Section 503B created a new category of manufacturer called an "outsourcing facility." *Id*. "[O]utsourcing facilities are subject to cGMP [current good manufacturing practice][2] requirements, and may distribute compounded drugs either pursuant to a patient-specific prescription or in response to an order from a health care provider, such as a hospital, that is not for an identified individual patient (e.g., for office stock)."[3]

---

[2] cGMPs, found in Title 21, Parts 210, 211, and 212 of the Code of Federal Regulations, are regulations enforced by the FDA that assure proper design, monitoring, and control of manufacturing processes and facilities. "Adherence to the cGMP regulations assures the identity, strength, quality, and purity of drug products by requiring that manufacturers of medications adequately control manufacturing operations." FDA, Facts About the Current Good Manufacturing Practices, https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practices-cgmps (last visited Oct. 8, 2021).

[3] FDA, Compounding Laws and Policies, https://www.fda.gov/drugs/human-drug-compounding/compounding-laws-and-policies (last visited Oct. 6, 2021).

"Although compounded drugs can serve an important need, they can also pose a higher risk to patients than FDA-approved drugs." J.A. 102. As such, an outsourcing facility may sell compounded drugs without the typical pre-market review and approval from the FDA "but only if it satisfies eleven statutory criteria." *Athenex Inc. v. Azar*, 397 F. Supp. 3d 56, 59 (D.D.C. 2019), *appeal dismissed sub nom. Athenex Pharma Sols., LLC v. Azar*, No. 19-5223, 2019 WL 5394642 (D.C. Cir. Oct. 1, 2019); *see also* J.A. 11 ¶ 21.

One such criterion pertinent to this litigation is that an outsourcing facility may only compound using bulk drug substances that (1) appear on a list established by the FDA "identifying bulk drug substances for which there is a clinical need," (the "503B Bulk Drug List"), 21 U.S.C. § 353b(a)(2)(A)(i); or (2) if "the drug compounded from such bulk drug substance appears on the drug shortage list." *Id*. (A)(ii); J.A. 14–15 ¶ 44. At all times relevant to the Complaint, Edge used an unapproved bulk drug to manufacture its vancomycin product which did not appear on either list. J.A. 16 ¶ 51.

A second relevant criterion is the "essentially a copy" prohibition. Because outsourcing facilities are "subject to a lower regulatory standard, compounded drugs should only be distributed to health care facilities or dispensed to patients to fulfill the needs of patients whose medical needs cannot be met by an FDA-approved drug." J.A. 102. Thus, section 503B prohibits an outsourcing facility from producing

8

a drug that is "essentially a copy of one or more approved drugs." 21 U.S.C. § 353b(a)(5).

A drug may be "essentially a copy" in two ways: (1) it is "identical or nearly identical to an approved drug," 21 U.S.C. § 353b(d)(2)(A); or (2) "there is [no] change [in the drug] that produces for an individual patient a clinical difference, as determined by the prescribing practitioner, between the compounded drug and the approved drug." 21 U.S.C. § 353b(d)(2)(B). "The restrictions on compounding drugs that are essentially copies of approved products ensure that outsourcing facilities do not compound drug products under the exemptions in section 503B for use in patients who could use an approved product," because "[c]ompounding copies of these products would unnecessarily expose patients to drug products that have not been shown to be safe and effective." J.A. 103. The FDA guidance on section 503B states that even an order for office stock must include a change between the compounded drug and be dispensed to patients for whom the change produces a clinical difference — e.g., liquid form for patients who cannot swallow the tablet form of an FDA-approved drug. J.A. 108, 109. Edge is violating section 503B by mass producing a vancomycin oral solution which is nearly identical to FIRVANQ for use by *any* patient, rather than for a limited subset of patients whose physicians have determined they cannot use the FDA-approved drug. J.A. 14 ¶ 41.

9

### III.    Edge Has a History of Non-Compliance with Section 503B Requirements.

Edge registered with the FDA as a purported "outsourcing facility" in January 2014. J.A. 13 ¶ 31. Registering as an outsourcing facility merely requires submitting a form and paying a fee to the FDA.[4] "It does not mean that the facility is making FDA-approved drugs and it does not mean it is in compliance with cGMP requirements, the other conditions of section 503B, or other requirements in the Act."[5]

In fact, Edge has routinely failed to comply with such regulations, despite its representations to the contrary. The FDA inspected Edge in 2015 and sent it a Warning Letter advising that the facility "failed to meet the conditions under section 503B of the FDCA necessary for drugs produced by an outsourcing facility to qualify." J.A. 16 ¶ 53. In addition, the FDA inspector emphasized that "drug products that were intended or expected to be sterile were prepared, packed, or held under insanitary conditions whereby they may have been contaminated with filth or rendered injurious to health, causing them to be adulterated." J.A. 26. A subsequent FDA inspection in 2018 revealed that Edge had not remedied these deficiencies. J.A. 17 ¶ 58.

---

[4] *See* FDA, Questions and Answers: Outsourcing Facility Registration (2019), https://www.fda.gov/drugs/human-drug-compounding/questions-and-answers-outsourcing-facility-registration.

[5] *Id.*

The FDA most recently inspected Edge in March 2020. J.A. 419–36. The 2020 Inspection Report contains fourteen failures or violations observed during the FDA's inspection, many of which directly impact the manufacture of safe, uncontaminated products. Some of the most egregious and dangerous observations include:

- Failure to investigate (1) products that were mislabeled with the incorrect lot number and (2) products that were recalled for "higher than acceptable number of subvisible particles;" J.A. 420;

- Failure to document subculture results and to conduct sterility failure investigation after products failed sterility testing, J.A. 421;

- Failure to maintain "appropriate levels of environmental cleanliness;" J.A. 423;

- Failure to investigate and take "corrective and preventative actions following identification of objectionable microbes," *id.*;

- From September 1, 2018 to March 11, 2020, "a total of 294 environmental monitoring sample recoveries from classified environments were phenotypically identified as mold or fungus;" *id.*;

- Failure to "conduct sterility testing of drug products purported to be sterile according to a validated test method," J.A. 425;

- Failure to adhere to procedures "designed to prevent microbiological contamination of drug products purporting to be sterile," J.A. 427; and

- Inadequate design and maintenance of facility and equipment necessary to ensure sterility, J.A. 429–30.

*See also* J.A. 402–03. The 2020 Inspection Report also notes <u>two</u> violations of section 503B:

- Failure to submit an adverse event report as required by section 503B(b)(5) with respect to an October 9, 2019 customer complaint regarding 3 patients who developed Toxic Anterior Segment Syndrome after using an Edge product; J.A. 433; and

- Failure to label drug products with the statements: "This is a compounded drug," "Not for Resale," or "Office Use Only," as required by section 503B(a)(10)(A). *Id.*

Edge's historical lack of compliance does not result in merely technical infringements of the statutory requirements. Rather, the violations are highly dangerous and go to the very heart of why section 503B was enacted. These types of failures could lead to another outbreak such as that precipitated by NECC in 2012.

With respect to this litigation, Azurity's Lanham Act claims are premised on the fact that Edge's production of vancomycin violates section 503B requirements for two reasons: (1) Edge used unapproved bulk drug substances to manufacture the product; and (2) the drug is "essentially a copy of one or more approved drugs," i.e., Azurity's FIRVANQ. J.A. 14, 16 ¶¶ 43, 51. As a result of these violations, Edge's statements that it complies with section 503B were false at all times relevant to the Complaint.

## IV. Edge's False Representations About Its Compliance with Outsourcing Facility Requirements Violated the Lanham Act.

In its Complaint, Azurity identifies three categories of false statements made by Edge: (1) the statements asserting that Edge complies with section 503B of the FDCA and other FDA regulations (the "Compliance Statements"), J.A. 18 ¶ 61; (2) the statements that Edge is a registered 503B facility (the "Registration Statements"), *id.*; and (3) the statement that Edge's product is superior to other commercially available options (the "Superiority Statement"), J.A. 20 ¶ 66.

12

A.     The False Compliance Statements

Despite its repeated section 503B violations, Edge's website is littered with

misrepresentations about its compliance with the FDCA and regulations. The

Complaint cites to the following three literally false Compliance Statements that are

made on the Edge website:

- "Edge Pharma is a pharmaceutical sterile and non-sterile **503B Outsourcing Facility offering high quality**, innovative solutions for the health care community." (emphasis added).

- "**As your compliance partner**, we are dedicated to providing turnkey **503B outsourcing** with the **highest level of quality**, easy ordering, simple logistics, and excellent customer support." (emphasis added).

- "Our facility is **compliant** with the following state, local, and federal regulations and guidelines:

  USP 795, USP 797, USP 800
  Occupational Safety and Health Administration (OSHA)
  **Food and Drug Administration (FDA)**
  US Pharmacopeia (USP)
  Applicable Good Manufacturing Practice (GMP) Guidelines."

J.A. 18 ¶ 61(a)-(b), (d) (emphasis added).

Contrary to the Compliance Statements, Edge is in violation of section 503B,

and as such, the Compliance Statements are literally false. The First Circuit applies

a presumption of consumer deception to claims of literal falsity. *See Cashmere &*

*Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 314 (1st Cir. 2002). Even if

it did not, such statements are deceptive because they mislead health care providers

and other customers into believing that Edge's vancomycin product complies with

13

state and federal law, and that it is safe, effective, and legal. J.A. 19 ¶ 64. In reality,

Edge's vancomycin product has not been tested for safety and effectiveness, and

Edge is producing unapproved vancomycin in violation of FDA regulations. *Id.* ¶

63.

**B.     The Impliedly False Registration Statements**

Likewise, with the Registration Statements, Edge repeatedly emphasizes on

its website that it is a "registered" and "inspected" 503B outsourcing facility:

- "Edge Pharma is an **FDA-registered and state-licensed, 503B Outsourcing Facility** providing service to hospital pharmacies, outpatient surgery Centers, and clinics."

- "Edge Pharma is a USP 797 and cGMP compliant **FDA-Registered 503B Outsourcing Facility** that specializes in a wide array of sterile and non-sterile compounded medications."

- "As an **FDA registered and inspected 503B Outsourcing facility**, Edge has the ability to react quickly to customer requirements and deliver cost effective solutions."

J.A. 18–19 ¶ 61(c), (e)-(f) (emphasis added). In the first place, because of the FDA

inspection reports, Edge's facility is not cGMP compliant. Edge's facility is

registered with the FDA and has been inspected by the FDA, but even these

statements are impliedly false. Particularly when combined with the Compliance

Statements, the Registration Statements give the impression that (1) Edge is

*complying* with 503B and (2) that the FDA has approved the drugs or given its seal

of approval to Edge's drugs, and therefore the compounded drugs are safe and

effective. Both impressions are false. *See McGrath & Co. v. PCM Consulting, Inc.*,

Civ. A. No. 11-10930, 2012 WL 503629, at *5 (D. Mass. Feb. 15, 2012) (statements

suggesting that "[defendant] is a larger company than it actually is" were sufficient

to allege falsity); *Commonwealth v. Exxon Mobil Corp.*, No. 1984CV03333BLS1,

2021 WL 3493456, at *12–13 (Mass. Super. June 22, 2021) (plaintiff adequately

stated claim for deceptive advertising in violation of G.L.c. 93A where false

statements were not literally false but were alleged to be misleading); *Aspinall v.

Philip Morris Cos.*, 442 Mass. 381, 395, 813 N.E.2d 476, 487 (2004) (false

advertising in the context of G.L.c. 93A "may be true as a literal matter, but still

create an over-all misleading impression through failure to disclose material

information.").

### C.    The False Superiority Statement

In addition, Edge's Superiority Statement was flagrantly false. Prior to the

filing of this case, Edge promoted its vancomycin product as better than other

competitor products by claiming that "commercially available options are not ideal

for use in the hospital setting." J.A. 20 ¶ 66. This statement was false, particularly

because Edge chose not to test its vancomycin product for safety and effectiveness

(i.e., it is not FDA-approved, while commercially available, competitor products like

FIRVANQ are), and Edge did not comply with the requirements of the 503B

"outsourcing facility" exception. *Id.* ¶¶ 67-68. After the Complaint was filed, during

the summer/fall of 2020, Edge removed this false statement from its website. J.A.

15

400–01, 407, 414. The website now states that Edge's vancomycin is an "excellent solution" for acute care facilities. J.A. 401, 414.

As a result of these false representations, Edge violated both the Lanham Act and Chapter 93A of the Massachusetts General Laws and is liable to Azurity for damages.[6]

## V.    Relevant Procedural Background

Azurity's Complaint, filed on February 12, 2020, seeks relief for Edge's unfair competition and false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), and its unfair and deceptive trade practices in violation of Massachusetts General Laws Chapter 93A. J.A. 21–22. Azurity alleges four separate theories of liability:

1) Edge's Compliance Statements and Registration Statements were and still are false because Edge violates section 503B by producing an identical or nearly identical product to FIRVANQ, contrary to the "essentially a copy" provision (the "Identical or Nearly Identical Claim");

2) Edge's Compliance Statements and Registration Statements were and still are false because Edge violates section 503B by mass producing a product with no change or clinical difference from FIRVANQ, contrary

---

[6] "To establish a false advertising claim under Chapter 93A, a plaintiff must prove all of the elements of a false advertising claim under Section 43(a) of the Lanham Act." *Pegasystems, Inc. v. Appian Corp.*, 424 F. Supp. 3d 214, 224 (D. Mass. 2019) (quoting *Empire Today, LLC v. Nat'l Floors Direct, Inc.*, 788 F. Supp. 2d 7, 26 (D. Mass. 2011)). "As a result, '[f]alse advertising claims under the Lanham Act and Chapter 93A rise and fall together.'" *Id.* (quoting *Spruce Env't Techs., Inc. v. Festa Radon Techs., Co.*, 248 F. Supp. 3d 316, 321 (D. Mass. 2017)).

16

to the "essentially a copy" provision (the "<u>Clinically Different Drug Claim</u>");

3)     Edge's Compliance Statements and Registration Statements were false because Edge violated section 503B by using an unauthorized bulk drug substance (the "<u>Bulk Drug Claim</u>"); and

4)     Edge's Superiority Statement — that its product is better than "commercially available options [which] are not ideal for use in the hospital setting" — was false, and provides a separate and independent basis for a Lanham Act claim, because Edge's product is not FDA-approved and did not comply with section 503B (the "<u>Superiority Claim</u>").

On March 20, 2020, Edge filed a motion to dismiss the Complaint, primarily arguing that Azurity's claims are barred by the doctrines of preclusion and primary jurisdiction. J.A. 77. A hearing was held on the motion to dismiss on May 27, 2020. ADD-7–40. In late September, Azurity filed supplemental briefing, informing the district court of the changes to Edge's website and the 2020 inspection report. J.A. 400–36. In December, Edge filed supplemental briefing informing the district court of what Edge perceived to be relevant new authorities. J.A. 454–464.

A year after the hearing, on May 18, 2021, the district court issued a five-page ruling granting the motion to dismiss. ADD-2–6. The district court held that Azurity's claims based on the "essentially a copy" requirements were precluded by the FDCA because they presented "thorny questions that may require the FDA's expertise." ADD-5. On that ground, and that ground alone, the district court dismissed the entire Complaint, including Azurity's Bulk Drug Claim, the Clinically Different Drug Claim, and the independent Superiority Claim. ADD-5–6. Indeed,

17

the district court dismissed these claims with no discussion whatsoever. *Id*. Azurity noticed this appeal on June 24, 2021. J.A. 506.

## **SUMMARY OF ARGUMENT**

Azurity's Complaint alleges four separate theories of Lanham Act liability: (1) the Identical or Nearly Identical Claim; (2) the Clinically Different Drug Claim; (3) the Bulk Drug Claim; and (4) the Superiority Claim. The district court concluded that "[i]t would be inappropriate for the court to resolve plaintiff's Lanham Act claim, which necessitates resolution of 'thorny questions that may require the FDA's expertise. For instance, . . . what the FDCA means by . . . 'essentially a copy' . . .'" ADD–5 (quoting *Allergan USA Inc. v. Imprimis Pharms., Inc.*, No. SA CV 171551, 2017 WL 10526121, at *7 (C.D. Cal. Nov. 14, 2017), *recon. denied*, 2019 WL 4545960 (Mar. 27, 2019), *appeal dismissed*, Nos. 19-55756, 19-55999, 2019 WL 6318743 (9th Cir. Oct. 3, 2019)). On this basis alone, the district court dismissed Azurity's entire Complaint.

The district court's dismissal was erroneous in several ways. First, the Supreme Court in *POM Wonderful LLC*, 573 U.S. at 118–19 established that Lanham Act claims for unfair trade practices are not precluded by the FDCA. Indeed, applying *POM Wonderful*, the district court should have permitted Azurity's claims to proceed.

18

Second, the district court wrongly concluded that FDA expertise is required to determine whether Edge violated section 503B. Azurity alleges two violations of the "essentially a copy" provision of section 503B: (a) Edge's vancomycin product is essentially a copy because it is identical or nearly identical to Azurity's FIRVANQ; and (b) Edge's vancomycin is not produced with a change or clinical difference needed for a specific patient, as determined by a prescribing practitioner. The district court did not differentiate between these two separate alleged violations. The district court also overlooked that in January 2018, the FDA issued detailed industry guidance on compliance with the "essentially a copy" provision (the 2018 Essentially Copies Guidance, discussed in detail below), such that a court need only apply the guidance to resolve Azurity's claims, without requirement of FDA expertise. The guidance sets forth exactly which characteristics of a drug product must be similar, and to what extent, in order to be considered "identical or nearly identical." It also specifies exactly what a prescribing practitioner must indicate in an order for the compounded drug to have a change that results in a clinical difference.

Azurity also alleges that Edge violated section 503B by using an unauthorized bulk drug substance to compound its product. The district court dismissed Azurity's Bulk Drug Claim as precluded with no additional analysis whatsoever, even though, as other courts have concluded, resolution of that claim involves only a binary

19

factual determination: Does vancomycin hydrochloride, the active ingredient in Edge's product, appear on the FDA's bulk drug list or drug shortage list? This yes or no question can easily be resolved by applying FDA industry guidance, without any need for FDA decision-making or expertise.

Third, the district court ignored entirely Azurity's Superiority Claim. Azurity alleges that Edge falsely and deceptively promoted its vancomycin hydrochloride as superior to Azurity's FIRVANQ, when FIRVANQ is an FDA-approved drug, and as a result has been subjected to rigorous safety and effectiveness testing, whereas Edge's product has not. Adjudication of this claim does not even require application of the FDCA, much less FDA expertise. The Superiority Claim is an independent basis supporting Edge's Lanham Act violation.

Accordingly, the district court's dismissal should be reversed, and the case remanded to the district court for further proceedings.

## STANDARD OF REVIEW

The First Circuit reviews district court orders granting a motion to dismiss for failure to state a claim *de novo*. *Clorox Co. Puerto Rico v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 30 (1st Cir. 2000); *see also Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 44 (1st Cir. 2020). This Court "will affirm the dismissal of the complaint if, and only if, accepting all well-pleaded facts as true and drawing all reasonable inferences in favor of the plaintiff, the complaint 'fail[s] to state a claim

20

upon which relief can be granted.'" *Clorox*, 228 F.3d at 30 (quoting Fed. R. Civ. P. 12(b)(6)).

## **ARGUMENT**

## I.     **The District Court's Ruling that Azurity's Lanham Act Claims are Precluded by the FDCA is Contrary to the Supreme Court's Decision in** *POM Wonderful.*

The district court's conclusion that Azurity's Lanham Act claims are precluded is entirely inconsistent with *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 118–19 (2014). In *POM Wonderful*, the Supreme Court examined the intersection of the Lanham Act and the FDCA in connection with POM's claim that Coca Cola's naming, labeling, marketing and advertising of a juice-blend was misleading and deceptive to customers. *Id.* at 110. On appeal, the Ninth Circuit held that POM's claim was precluded by the FDCA, and the Supreme Court disagreed. The Supreme Court explained:

> There is no statutory text or established interpretive principle to support the contention that the FDCA precludes Lanham Act suits like the one brought by POM in this case. Nothing in the text, history, or structure of the FDCA or the Lanham Act shows the congressional purpose or design to forbid these suits. Quite to the contrary, the FDCA and the Lanham Act complement each other in the federal regulation of misleading food and beverage labels. Competitors, in their own interest, may bring Lanham Act claims like POM's that challenge food and beverage labels that are regulated by the FDCA.

*Id.* at 106. The Court expressly held that "the FDCA, by its terms, does not preclude Lanham Act suits" because no "textual provision in either statute discloses a purpose

21

to bar unfair competition claims . . . ." *Id*. at 113. The Supreme Court further concluded that the FDCA and the Lanham Act "complement each other," and that "***Congress did not intend the FDCA to preclude Lanham Act suits***" alleging claims of unfair competition. *Id*. at 120–21 (emphasis added).[7]

Here, Azurity alleges unfair competition claims against Edge pursuant to the Lanham Act. The claims involve drug regulations, rather than food and beverage requirements. Nevertheless, the logic and holding of *POM Wonderful* applies with equal force. There is no provision of the FDCA that precludes Lanham Act suits challenging false representations made by outsourcing facilities regulated by the FDA. Thus, Azurity's Lanham Act claims are not precluded, and the district court's dismissal was erroneous.

## II.    The District Court Erred in Holding that Azurity's Claims are Precluded by the FDCA.

Determining whether Edge's products violate section 503B is not precluded by the FDCA. Only "claims that directly implicate the FDA's rulemaking authority,"

---

[7] Courts in Massachusetts have recognized the holding in *POM Wonderful* as controlling. *See Meachen v. Iowa Pac. Holdings, LLC*, No. 13-CV-11359, 2016 WL 7826660, at *4 (D. Mass. Feb. 10, 2016) ("*POM* held that a false advertising claim under the Lanham Act was not precluded by compliance with regulations promulgated under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq*."); *Par Sterile Prods., LLC v. Fresenius Kabi USA LLC*, No. 14 C 3349, 2015 WL 1263041, at *4 (N.D. Ill. Mar. 17, 2015) (holding that "FDCA does not preclude Lanham Act claims").

"or involve an issue on which the FDA has taken 'positive regulatory action'" may be precluded by the FDCA. *Imprimis*, 2017 WL 10526121, at *7 (citation omitted). On the other hand, questions that are "binary factual determinations" are not precluded. *Id.* (citation omitted). "Courts can evaluate Lanham Act claims that do not require specialized knowledge or interpretation of the FDCA's requirements." *Genus Lifesciences Inc. v. Lannett Co.*, No. 18-cv-07603, 2019 WL 4168958, at *3 (N.D. Cal. Sept. 3, 2019) (quoting *Belcher Pharm., LLC v. Hospira, Inc.*, No. 17-cv-2353, 2018 WL 4643292, at *4 (M.D. Fla. Apr. 9, 2018)); *see also World Nutrition Inc. v. Advanced Enzymes USA*, No. CV-19-00265-PHX-GMS, 2021 WL 632684, at *4 (D. Ariz. Feb. 18, 2021) ("it is plausible that Specialty's allegations of basic, fundamental failure to follow GMP standards do not require the FDA's expertise").

The district court incorrectly concluded that "[b]ecause the FDCA forbids private rights of action under that statute, a private action brought under the Lanham Act may not be pursued when, as here, the claim would require litigation of the alleged underlying FDCA violation in a circumstance where the FDA has not itself concluded that there was such a violation." ADD–5 (quoting *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 924 (9th Cir. 2010)).[8] Indeed, courts have adjudicated several

---

[8] *PhotoMedex*, quoted and relied upon by the district court, pre-dates the Supreme Court's decision in *POM Wonderful*, and therefore does not apply. In addition, the decision in *PhotoMedex* was limited to "the particular circumstances of [the] case,"

cases involving the exact Lanham Act and unfair competition claims Azurity alleges here. In *Imprimis*, the court denied a motion to dismiss, where Allergan alleged that Imprimis mislead consumers and doctors by representing that it complied with the FDCA, when Imprimis was actually violating sections 503A and 503B of the FDCA. *Imprimis*, 2017 WL 10526121, at *8; *see also Allergan USA, Inc. v. Prescribers Choice, Inc*., 364 F. Supp. 3d 1089, 1111 (C.D. Cal. 2019) (adjudicating on summary judgment Lanham Act claims alleging false representation of compliance with section 503B). Likewise, in *Hope Medical Enterprises, Inc. v. Fagron Compounding Services, LLC*, No. 19-CV-07748, 2021 WL 753566 (C.D. Cal. Jan. 25, 2021), *appeal filed*, No. 21-55165 (9th Cir. Feb. 25, 2021), plaintiff's claims that defendants' violations of sections 503A and 503B rendered their compliance representations false were thoroughly evaluated on cross-motions for summary judgment and were set to be adjudicated at trial.

In its Complaint, Azurity presents three different violations of section 503B by Edge that rendered its representations about compliance and the superiority of its vancomycin product false. The district court summarily dismissed all three theories as precluded, without analyzing the specifics of each claim. This was erroneous. "[T]he preclusion question turns on the specific nature of the claim in question."

---

and involved an alleged misrepresentation to the FDA about a medical device, and not representations about compliance with section 503B of the FDCA. 601 F.3d at 922.

*Imprimis*, 2017 WL 10526121, at *7. As discussed in detail below, each of the three theories of liability Azurity alleges relating to Edge's failure to comply with section 503B can be evaluated without the need of FDA expertise or rulemaking authority. The district court erred in dismissing Azurity's Complaint, and the dismissal should be reversed.

### A.    Section 503B's "Essentially a Copy" Provision Does Not Present "Thorny Questions That May Require the FDA's Expertise."

The district court concluded that what the FDCA means by "essentially a copy" in section 503B "necessitates resolution of 'thorny questions that may require the FDA's expertise'" and thus is "inappropriate for the court to resolve." ADD–5. The district court was incorrect. Edge's vancomycin product violates the "essentially a copy" provision in two ways: (1) it is "identical or nearly identical to an approved drug," and (2) it is mass produced without any clinical difference for individual patients. Contrary to the district court's conclusion, both of these theories can be adjudicated without wading into "thorny questions that may require the FDA's expertise." In addition, the district court failed to recognize that Azurity alleges two separate theories of liability relating to the "essentially a copy" prohibition, neither of which is precluded by the FDCA.

1. **Azurity's Identical or Nearly Identical Claim is Not Precluded by the FDCA Because It Does Not Require FDA Expertise.**

Section 503B prohibits outsourcing facilities from compounding drugs that are "essentially a copy of" FDA-approved products. Azurity alleges that Edge violates this provision because its vancomycin product is "identical or nearly identical to an approved drug." 21 U.S.C. § 353b(d)(2)(A). To be "identical or nearly identical to an approved drug," the drugs must have the same (1) active ingredient; (2) route of administration; (3) dosage form; (4) dosage strength; and (5) excipients. J.A. 105. FIRVANQ and Edge's vancomycin product satisfy each of the applicable factors: (1) both contain the active ingredient vancomycin hydrochloride, J.A. 7–8, 14 ¶¶ 3, 40; (2) both are orally administered, J.A. 14 ¶¶ 37, 41; (3) both are liquid, *id.* ¶¶ 39, 41; and (4) both are administered in 125 mg doses. *Id.* ¶ 41. Thus, Azurity alleges the two products are nearly identical.

Whether Azurity and Edge's products are "identical or nearly identical" is a binary factual determination resolved merely by consulting FDA guidance. In January 2018, the FDA issued "Compounded Drug Products That Are Essentially Copies of Approved Drug Products Under Section 503B of the Federal Food, Drug, and Cosmetic Act" (the "2018 Essentially Copies Guidance"), which comprehensively lays out the FDA's policy on how to comply with the "essentially a copy" provision. *See generally*, J.A. 97–114. The guidance states that if a

compounded product and FDA-approved product have the same active ingredient(s), route of administration, dosage form, dosage strength, and excipients, [9] then the compounded drug would be considered "identical or nearly identical." J.A. 105. The guidance goes on to explain in detail each of these characteristics. *See* J.A. 106. Therefore, contrary to the district court's ruling, a court need only apply this guidance in resolving Azurity's Identical or Nearly Identical Claim, without delving into any "thorny questions that may require the FDA's expertise."[10]

In erroneously dismissing this theory of liability, the district court relied on *Nexus Pharmaceuticals, Inc. v. Quva Pharma, Inc.*, No. CV 20-07518, 2020 WL 6498970 (C.D. Cal. Oct. 29, 2020), *appeal filed*, No. 20-56160 (9th Cir. Nov. 4, 2020). In *Quva*, Nexus alleged that the defendants were violating state unfair and

---

[9] The FDA notes in the 2018 Essentially Copies Guidance that "[i]n some cases, information about the excipients contained in an approved drug is not publicly available and not known to the outsourcing facility." J.A. 105, n.15. "In such cases, FDA does not intend to consider whether the compounded drug has the same excipients that the approved drug is labeled to contain in determining whether a compounded drug is identical or nearly identical to an approved drug." *Id.* Here, information about the excipients contained in FIRVANQ is not publicly available, and thus this factor is not applicable.

[10] The district court relied on *Imprimis*, 2017 WL 10526121, at *7 in concluding that what the FDCA means by "essentially a copy" involves thorny questions of FDA expertise. However, the *Imprimis* case was decided *before* the FDA issued the 2018 Essentially Copies Guidance. Indeed, the *Imprimis* court noted that section 503B does not include a definition of "nearly identical to an approved drug," *id.* at *8, but the Essentially Copies Guidance describes in detail what constitutes "nearly identical to an approved drug." J.A. 105–07.

deceptive trade practice laws because they were compounding a drug that was essentially a copy of Nexus's FDA-approved ephedrine sulphate product. The court concluded that Nexus's claims were preempted because Nexus was alleging that defendants' acts were unfair only because they purportedly violated the FDCA. The court explained, "[p]ut another way, Nexus alleges that Defendants' actions constitute unfair competition because they are not following the rules—and those rules are the FDCA rules. Like in *Buckman*, Nexus's claims exist only because of the FDCA's requirements." *Id.* at *3.

*Quva* is quite different from this case. First, *Quva* did not involve alleged Lanham Act violations or false advertising. Instead, Nexus alleged only state law claims. Indeed, the cases never mention *POM Wonderful*, discussed above, where the Supreme Court held that Lanham Act claims are not precluded by the FDCA.

Second, Nexus alleged that the defendants were engaged in unfair competition because of what they *did*, not what they *said*. The claims went solely to the defendants' conduct — that they were selling compounded drugs that violated FDA regulations. Azurity's claim is not that Edge violated the Lanham Act because it violated the FDCA; rather, Azurity claims that Edge *made false representations* about its compliance with the FDCA, and those false representations are the conduct that violated the Lanham Act.

Accordingly, the district court committed reversible error when it concluded that the Identical or Nearly Identical Claim is precluded.

> **2.    The District Court Failed to Consider the Second Aspect of the "Essentially A Copy" Analysis, Ignoring Azurity's Clinically Different Drug Claim Entirely.**

In dismissing the Complaint, the district court looked at only one aspect of the "essentially a copy" analysis. There are two distinct ways to prove a drug is "essentially a copy." One way is pursuant to section 503B(d)(2)(A), as discussed above, where the compounded drug is "identical or nearly identical to an approved drug." 21 U.S.C. § 353b(d)(2)(A). This is the theory that the district court stated required FDA expertise and was therefore precluded (albeit incorrectly). ADD-5.

However, a drug may also be considered "essentially a copy" pursuant to section 503B(d)(2)(B) if a component of the drug is a bulk drug substance that is a component of an approved drug, and if there is no change, as determined by the prescribing practitioner, that produces a clinical difference between the compounded drug and the approved drug. 21 U.S.C. § 353b(d)(2)(B). Edge's use of a bulk drug substance thus requires "a change that produces a clinical difference for an individual patient as determined by the prescribing practitioner." J.A. 108.

The district court wholly overlooked Azurity's allegation that Edge was mass producing vancomycin in a cherry-flavored, liquid, oral dose solution available in 125 mg, 250 mg, and 500 mg doses, without producing any clinical difference for

an individual patient as determined by a prescribing practitioner, thereby violating section 503B(d)(2)(B). J.A. 14 ¶ 41. Indeed, there is no discussion whatsoever as to whether this particular theory is precluded by the FDCA. *See Imprimis*, 2017 WL 10526121, at *7 ("the preclusion question turns on the specific nature of the claim in question—only claims where the law is unclear and the FDA's particular expertise or rulemaking authority is required are precluded by the FDCA."). Rather, the district court summarily dismissed the claim on the grounds that whether a drug is "essentially a copy" under section 353b(d)(2)(A) involves "thorny questions." ADD–5.

Whether a compounded drug is produced with (a) the same bulk drug substance as an approved drug and (b) a change that results in a clinical difference between the compounded drug and approved drug does not involve "thorny questions that may require the FDA's expertise." In fact, the 2018 Essentially Copies Guidance explains the requirements of section 503B(d)(2)(B) in detail. For example, the guidance states that for the purposes of this provision, using the same bulk drug substance includes "compound[ing] from bulk drug substances or from drugs in finished form." J.A. 108.

The Essentially Copies Guidance also identifies exactly how to analyze whether a compounded drug has "a change that produces a clinical difference for an individual patient as determined by the prescribing practitioner." *Id.* In order to

comply with the "prescriber determination of clinical difference" component, the guidance states that an outsourcing facility must "ensure that the determination is ***noted on the prescription or order*** (which may be a patient-specific prescription or a non-patient specific order) for the compounded drug." J.A. 108 (emphasis added). For office stock, the 2018 Essentially Copies Guidance instructs the facility to "obtain a statement from the practitioner that specifies the change between the compounded drug and the comparable approved drug and indicates that the compounded drug will be administered or dispensed only to a patient for whom the change produces a clinical difference, as determined by the prescribing practitioner for that patient." *Id.*

The 2018 Essentially Copies Guidance also states that "a particular format is [not] needed, provided that an order for office stock (i.e., not patient-specific) clearly identifies the relevant change and the clinical difference that the change will produce for patient(s), as determined by the prescriber." J.A. 109. The guidance further provides that "[a]n order that only identifies the product formulation, without more information, would not be sufficient to establish that the determination described by section 503B(d)(2)(B) has been made." *Id.* The guidance goes on to identify specific examples of statements that would be sufficient for office stock and for individual patients. J.A. 109-110.

Thus, to determine if Edge was producing vancomycin with a change that made it clinically different from FIRVANQ, a court need only review Edge's prescriber documentation to confirm whether or not the orders include a statement from the practitioner that specifies the change. Review of prescriptions and orders requires no FDA expertise. And, the FDA has spelled out in the guidance document exactly what the prescriber documentation must say in order to comply with the requirements. As such, the question involves a "binary factual determination[]"; no FDA rulemaking is implicated, and therefore the claim is not precluded. *See Imprimis*, 2017 WL 10526121, at \*7.

Indeed, a Central District of California court in *Hope Medical Enterprises*, 2021 WL 753566, at \*2, came to the very same conclusion. In that case, plaintiff's "essentially a copy" claim was premised on the allegation that the defendants' drug was not clinically different from FDA approved drugs, as evidenced by orders for the product. Defendants argued that the claim was preempted by the FDCA. Judge Cristina Snyder rejected the argument, stating that, "[a]lthough determining whether a compounded drug is essentially a copy of an approved drug may involve application of facts to FDA rules and guidance, ***the question of documentation of such differences***, at issue in the claims here, is not a question of rulemaking authority." 2021 WL 753566, at \*12 (emphasis added).

32

Accordingly, Azurity's Clinically Different Drug Claim is not precluded, and was erroneously dismissed.

### B. Azurity's Bulk Drug Claim is Not Precluded Because It Requires Only a Binary Factual Determination.

The district court likewise dismissed Azurity's Bulk Drug Claim without any discussion or analysis. The "bulk drug" requirements of section 503B are separate and distinct from the "essentially a copy" requirements. Moreover, the bulk drug requirements do not present any "thorny questions" requiring FDA expertise, and therefore the claim is not precluded by the FDCA. The analysis merely requires confirming whether the bulk drug substance used by Edge appears on the relevant FDA lists, and nothing more. As such, dismissal of this claim was clearly erroneous.

Section 503B requires that an outsourcing facility may only compound with a "bulk drug substance" (1) if that substance appears on an FDA list "identifying bulk drug substances for which there is a clinical need," (the "503B Bulk Drug List"), 21 U.S.C. § 353b(a)(2)(A)(i), or (2) if "the drug compounded from such bulk drug substance appears on the drug shortage list." *Id*. (A)(ii). Edge does not meet either of these criteria.

At all times relevant to the Complaint, Edge used vancomycin hydrochloride as its bulk drug substance (also known as the active pharmaceutical ingredient),

which is the same active ingredient used in FIRVANQ. J.A. 7–8, 14 ¶¶ 3, 40.[11] The
FDA has not yet issued a final 503B Bulk Drug List, and instead has a list of bulk
drug substances nominated for placement on the 503B Bulk Drug List (the "503B
Nominated Bulk Drug List"). J.A. 15 ¶¶ 45-47; J.A. 88. Vancomycin hydrochloride
appears on the 503B Nominated Bulk Drug List, but it is listed as a "Category 1"
drug. J.A. 16 ¶ 50. Category 1 drugs are substances that "may be eligible for
inclusion on the 503B bulks list, were nominated with sufficient supporting
information for FDA to evaluate them, and do not appear on any other list." J.A. 90.

A court can easily resolve whether Edge's use of vancomycin hydrochloride
was appropriate or not by consulting the FDA's "Interim Policy on Compounding
Using Bulk Drug Substances Under Section 503B of the Federal Food, Drug, and
Cosmetic Act" ("Interim Bulk Drug Policy"), issued in January 2017. J.A. 83–95.
The guidance expressly states that the FDA's policy is to treat Category 1 drugs as
if "[t]he bulk drug substance **is not on the 503B bulks list**. J.A. 95 (emphasis added).
Thus, the Interim Bulk Drug Policy is clear and unambiguous: vancomycin
hydrochloride was <u>not</u> on the 503B Bulk Drug List, and therefore, when Edge was
using the bulk drug substance, it was not in compliance with section 503B.[12]

---

[11] After Azurity filed its Complaint and sought a preliminary injunction, Edge
stopped using a bulk drug substance to manufacture its vancomycin product, and it
now uses an FDA-approved vancomycin hydrochloride to compound its product.

[12] Edge also failed to satisfy the second exception to the use of a bulk drug substance,
because FIRVANQ is not on the drug shortage list. J.A. 14 ¶ 42. Thus, Edge's

The Central District of California has confirmed that whether an outsourcing facility violates the bulk drug provisions of section 503B can be determined by a court. In *Imprimis*, Allergan alleged that Imprimis made false representations about its compliance with section 503B in violation of the Lanham Act. 2017 WL 10526121. In particular, Allergan alleged that Imprimis was violating 503B by using a bulk drug substance that was not on the Bulks List.

Like Edge did here, Imprimis argued on a motion to dismiss that the FDCA precluded the district court from adjudicating Allergan's claims. The court disagreed and held that determining whether the bulk drug substance used by Imprimis was in violation of 503B simply involved looking at the bulk drug interim lists, and therefore did not involve any particular agency expertise. 2017 WL 10526121, at *8. "[I]t takes no special expertise to [make] a simple factual determination, *i.e.*, checking if Imprimis's compounded drugs appear on a list." *Id.* (internal quotations marks and citation omitted). As a result, the court held that the Lanham Act claim was not precluded.

*Imprimis* directly supports the proposition that whether or not Edge is complying with the bulk drug requirement is *not* a "thorny question[] that may

---

production of vancomycin also failed to comply with this requirement of section 503B.

require the FDA's expertise," and therefore the district court's dismissal of that claim was reversible error.

### III. The District Court Erred by Wholly Ignoring Edge's False Superiority Statement, Which Provides an Independent, Non-Precluded Basis for Azurity's Lanham Act Claim.

The district court dismissed Azurity's *multiple* theories of liability — including its Superiority Claim, which constitutes a separate and independent Lanham Act claim — and concluded that "[i]t would be inappropriate … to resolve [Azurity's] Lanham Act *claim*" because it would involve "thorny questions" involving the interpretation of the FDCA and other FDA policy. ADD–5 (emphasis added) (quoting *Imprimis*, 2017 WL 10526121, at *7). Importantly, however, Azurity's Lanham Act claim based on the Superiority Statement does not implicate the FDCA or any other FDA authority, rendering the district court's ruling incomplete and wrong as a matter of law. Nothing within the district court's Order provides a legal basis for the dismissal of this claim, and for that reason, the district court committed reversible error.

Prior to the filing of the Complaint, Edge's website contained a literally false statement about vancomycin hydrochloride, promoting Edge's product as better than competitor products because such "commercially available options are not ideal for use in the hospital setting." J.A. 20, ¶ 66; J.A. 407. The Superiority Statement is clearly targeted directly at Azurity's product, FIRVANQ. This is evident because

36

FIRVANQ is one of only two commercially available vancomycin products, and was the only commercially available FDA-approved product for much of the relevant time period. Moreover, as an FDA-approved drug (which Edge's is not), FIRVANQ has been proven safe and effective after intense clinical testing and regulatory review. By its inherent nature, an FDA-approved product is presumed to be safer and superior to a compounded formulation using the same active ingredient.[13] FIRVANQ is the preferred choice for use by hospitals when treating patients, as compared to Edge's product. Put another way, this is not a scenario in which a claim of product superiority only vaguely or tangentially describes a competing product. Edge unquestionably placed the Superiority Statement on its website in order unfairly to undercut FIRVANQ and influence the market for vancomycin hydrochloride in Edge's favor. Thus, Edge violated the Lanham Act by claiming that its product was "ideal" for use in a hospital setting, implying that products such as FIRVANQ are not, or was otherwise superior to FDA-approved drugs such as FIRVANQ.

"A specific and measurable advertisement claim of product superiority . . . is not puffery." *Clorox*, 228 F.3d 24 at 38 (citation omitted). Courts have concluded

---

[13] *See* FDA, Development & Approval Process / Drugs, https://www.fda.gov/drugs/development-approval-process-drugs (last visited Oct. 11, 2021) ("FDA approval of a drug means that data on the drug's effects have been reviewed by CDER, and the drug is determined to provide benefits that outweigh its known and potential risks for the intended population.").

that statements like the Superiority Statement can form the basis for Lanham Act claim. *See Ferring Pharms. Inc. v. Braintree Labs., Inc.*, 38 F. Supp. 3d 169, 178 (D. Mass. 2014) (claim of "superior cleansing efficacy" that was backed by study was "not mere 'puffery' upon which no reasonable physician or consumer would rely but is instead a verifiable claim"); *see also Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 941, 946 (3d Cir. 1993) (claim that motor oil provides "longer engine life and better engine protection" was not puffery); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 464 (D.N.J. 2009) (alleged false claims that "explicitly or implicitly address product attributes of importance to customers and make statements that are measurable" were not puffery).

Here, Azurity has alleged a Lanham Act claim with respect to the Superiority Statement that more than suffices to satisfy the notice pleading standard at the motion to dismiss stage. As a matter of law, "[d]ismissal would only be proper if *no* reasonable factfinder could conclude that the advertisements, viewed in the light most favorable to [plaintiff], make a claim of . . . superiority for [defendant's] product." *Clorox Co.*, 228 F.3d at 35 (emphasis added). That lofty threshold is difficult to surpass, and Edge's Superiority Statement — that "commercially available options are not ideal for use in the hospital setting" — cannot plausibly be construed as being so meritless that dismissal is required.

38

Furthermore, the district court failed to conduct any analysis whatsoever on this point.[14] The sole basis for the district court's dismissal of Azurity's claims was that they would require interpretation of "thorny" FDA regulations, which the district court concluded it lacked the expertise to do. In contrast, and with due respect to the district court, the Lanham Act claim based upon the Superiority Statement has no relation whatsoever to any FDA regulations or the FDCA, thus the Court's ruling does not adequately address the claim and cannot properly govern its dismissal. *See Genus Lifesciences Inc.*, 2019 WL 4168958, at *3 ("Courts can evaluate Lanham Act claims that do not require specialized knowledge or interpretation of the FDCA's requirements."). Here, the statement "commercially available options are not ideal for use in the hospital setting" can be evaluated pursuant to the Lanham Act without any consideration of the FDCA or FDA guidance, because those authorities have no bearing on whether Edge improperly described *a competing product*. Indeed, the court need only consider that FIRVANQ is an FDA-approved product, whereas Edge's bulk solution is not, to find that literal falsity exists.

Accordingly, the dismissal of the Superiority Claim without addressing this separate and independent theory of liability was also improper, and the district court's ruling should be reversed for that additional reason.

---

[14] And neither did Edge. In its Motion to Dismiss, Edge completely ignored Azurity's allegations with respect to the Superiority Statement.

## **CONCLUSION**

The district court's dismissal is flawed and unsupportable. Without reviewing the specifics or merits of each of Azurity's theories of liability, the district court dismissed the entire Complaint as precluded by the FDCA. Thus, the court's failure to consider all of Azurity's theories is contrary to Supreme Court precedent and, by itself, is erroneous. The three alleged violations of section 503 may be adjudicated without FDA expertise, merely by applying FDA industry guidance. Edge's false advertisement that its unapproved, compounded product is superior to Azurity's FIRVANQ, a drug that is FDA-approved for safety and effectiveness, provides a separate basis to support Azurity's Lanham Act claim, and does not require any application of the FDCA or FDA expertise. In short, none of Azurity's four theories of liability are precluded by the FDCA. As such, the district court's dismissal should be reversed, and the case remanded for further proceedings.

Dated: October 14, 2021                    Respectfully submitted,

                                           ARENT FOX LLP

                                   By:     */s/ James H. Hulme*
                                           James H. Hulme (1160842)
                                           Valerie C. Samuels (9613)
                                           Nadia A. Patel (1181058)
                                           ARENT FOX LLP
                                           1717 K Street NW
                                           Washington, D.C. 20006
                                           Telephone: (202) 857-6000
                                           Facsimile: (202) 857-6395

                                           *Counsel for Azurity Pharmaceuticals,
                                           Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the typeface requirements of F.R.A.P. 32(a)(5) and the type-style requirements of Rule 32(a)(6). The brief is composed in a 14-point proportional typeface, Times New Roman, and complies with the word limit of Rule 32(a)(7)(B)(i) and contains 9,396 words.


<u>/s/ James H. Hulme</u>

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel certifies that on this 14th day of October 2021, he caused the foregoing brief to be served by ECF to all counsel of record in the instant appeal.

<u>/s/ James H. Hulme</u>

# ADDENDUM

# TABLE OF CONTENTS

ADD Page

Judgment, dated May 26, 2021 ...................................................................... 1

Memorandum & Order, dated May 18, 2021 ........................................................ 2

Transcript of Hearing held before the Honorable Rya W. Zobel,
dated May 27, 2020 ...................................................................................... 7

21 U.S.C. § 353b ........................................................................................ 41

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


AZURITY PHARMACEUTICALS
Plaintiff(s)

v.                                          CIVIL ACTION NO. 20CV10280-RWZ


EDGE PHARMA, LLC
        Defendant(s)

### JUDGMENT IN A CIVIL CASE

ZOBEL, D.J.


[]     **Jury Verdict.**   This action came before the court for a trial by jury.   The
issues have been tried and the jury has rendered its verdict.

[**X**]   **Decision by the Court.**   This action came to trial or hearing before the
Court.   The issues have been tried or heard and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED**

In accordance with the MEMORANDUM AND ORDER entered on 5/18/2021; Judgment is
entered for DISMISSING the case.



                                          Robert Farrell, CLERK


                                          s/ Lisa A. Urso
Dated; 5/26/2021                          Deputy Clerk



        #

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-CV-10280-RWZ

AZURITY PHARMACEUTICALS, INC.

v.

EDGE PHARMA, LLC

MEMORANDUM & ORDER

May 18, 2021

ZOBEL, S.D.J.

Plaintiff, a specialty pharmaceutical company, alleges that defendant, a
compounding facility, has made false representations on its website in violation of the
Lanham Act, 15 U.S.C. § 1125(a)(1), and the Massachusetts consumer protection
statute, Mass. Gen. Laws ch. 93A. It claims that defendant has been compounding an
antibiotic nearly identical to plaintiff's and falsely marketing it as complying with the
Food & Drug Administration's ("FDA") requirements. Defendant has moved to dismiss
the complaint. (Docket # 20).

I.    **Background**

"Drug compounding is often regarded as the process of combining, mixing, or
altering ingredients to create a sterile or non-sterile medication . . . ." FDA, Human Drug
Compounding Progress Report at 4 (Jan. 2017), available at
https://www.fda.gov/media/102493/download. Under the Food, Drug, and Cosmetic Act
("FDCA"), 21 U.S.C. § 301 *et seq.*, compounded drugs are exempt from the FDA's drug

1

ADD-2

approval process. Nevertheless, in 2013 Congress established certain requirements for both compounded drugs and the companies that manufacture them. 21 U.S.C. §§ 353a, 353b.[1] For example, manufacturers can now elect to become "outsourcing facilities" that "compound drugs intended to meet the needs of specific patients for whom an approved or over-the-counter drug is not medically appropriate." Supra, Human Drug Compounding Progress Report at 7. In addition, outsourcing facilities may sell compounded drugs using "bulk drug substance" only if the FDA has identified a clinical need, or if the compounded drug is on the FDA's drug shortage list, 21 U.S.C. § 353b(a)(2)(A)(i)–(ii), and they may not compound drugs that are "essentially a copy" of an FDA-approved drug, id. § 353b(a)(5).

Plaintiff alleges that, as an outsourcing facility, defendant is compounding a product, vancomycin hydrochloride, that does not comply with these requirements, even though the FDA has not cited defendant for non-compliance or pursued an enforcement action against it.[2] Given defendant's alleged violations, plaintiff asserts that statements on defendant's website are false and therefore violate the Lanham Act.

## II.    Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550

---

[1] Although the FDA has not yet promulgated regulations interpreting these requirements, in January 2017 and January 2018 it issued guidance setting out its interim policies.

[2] Plaintiff cites recent FDA inspection reports that identified several compliance violations at defendant's facility, but none of those violations are related to defendant's vancomycin hydrochloride product. (Docket # 1 ¶¶ 5, 53–56, 58; Docket # 41-3).

U.S. 544, 570 (2007)).  For purposes of this motion, the court must accept all factual

allegations in the complaint as true and construe all reasonable inferences in the

plaintiff's favor.  See Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

## III.    Analysis

The Lanham Act provides a remedy for plaintiffs who are injured by

> [a]ny person who, on or in connection with any goods or services, or any
> container for goods, uses in commerce any . . . false or misleading
> description of fact, or false or misleading representation of fact, which . . .
> in commercial advertising or promotion, misrepresents the nature,
> characteristics, qualities, or geographic origin of his or her . . . goods,
> services, or commercial activities . . . .

15 U.S.C. § 1125(a)(1)(B).  To bring a successful Lanham Act claim,

> a plaintiff must demonstrate that (1) the defendant made a false or
> misleading description of fact or representation of fact in a commercial
> advertisement about his own or another's product; (2) the misrepresentation
> is material, in that it is likely to influence the purchasing decision; (3) the
> misrepresentation actually deceives or has the tendency to deceive a
> substantial segment of its audience; (4) the defendant placed the false or
> misleading statement in interstate commerce; and (5) the plaintiff has been
> or is likely to be injured as a result of the misrepresentation, either by direct
> diversion of sales or by a lessening of goodwill associated with its products.

Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 310–11 (1st Cir.

2002).

Plaintiff alleges that defendant's website misrepresents defendant as complying

with the FDCA when it does not.  Plaintiff's Lanham Act claim would require the court to

determine whether defendant is violating the FDCA and the FDA's interim policies,

including whether defendant's vancomycin hydrochloride product is, as plaintiff alleges,

"essentially a copy" of plaintiff's own product.  Again, the FDA itself has not determined

that defendant is violating the requirements plaintiff identifies in its complaint.

3

"Enforcement of the FDCA and the detailed prescriptions of its implementing regulations is largely committed to the FDA," POM Wonderful LLC v. Coca-Cola Co., 573 U.S. 102, 115 (2014), thus "there are some circumstances when the FDCA . . . preclude[s] Lanham Act claims," Hi-Tech Pharms., Inc. v. Hodges Consulting, Inc., 230 F. Supp. 3d 1323, 1330 (N.D. Ga. 2016).  "Because the FDCA forbids private rights of action under that statute, a private action brought under the Lanham Act may not be pursued when, as here, the claim would require litigation of the alleged underlying FDCA violation in a circumstance where the FDA has not itself concluded that there was such a violation." PhotoMedex, Inc. v. Irwin, 601 F.3d 919, 924 (9th Cir. 2010); see Sandoz Pharm. Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 231 (3d Cir. 1990) ("[W]hat the [FDCA] . . . do[es] not create directly, the Lanham Act does not create indirectly, at least not in cases requiring original interpretation of th[is] Act[] or [its] accompanying regulations.").

It would be inappropriate for the court to resolve plaintiff's Lanham Act claim, which necessitates resolution of "thorny questions that may require the FDA's expertise. For instance, . . . what the FDCA means by . . . 'essentially a copy' . . . ." Allergan United States v. Imprimis Pharm., Inc., No. 17-cv-01551, 2017 U.S. Dist. LEXIS 223117, at *20 (C.D. Cal. Nov. 14, 2017) (citing 21 U.S.C. § 353b(a)(5)); see also Nexus Pharm., Inc. v. Quva Pharma, Inc., No. 20-cv-07518, 2020 U.S. Dist. LEXIS 208832, at *10 (C.D. Cal. Oct. 29, 2020) (citing recent FDA testimony on § 353b as "highlight[ing] the fact that determination of whether Defendants' product is 'essentially a copy' . . . in violation of the FDCA, must be left to the FDA"); JHP Pharm., Ltd. Liab. Co. v. Hospira, Inc., 52 F. Supp. 3d 992, 1004 (C.D. Cal. 2014) ("In short, unlike the binary

4

factual determination of whether [a party's] products are, in fact, FDA-approved, the question of legality directly implicates the FDA's rulemaking authority.  The determination . . . whether a drug . . . can be lawfully marketed under the FDCA, involves complex issues of history, public safety, and administrative priorities that Congress has delegated exclusively to the FDA.").  This claim is therefore precluded by the FDCA.[3]

Plaintiff's Chapter 93A claim likewise fails as it is premised on the same allegations.  See Reed v. Zipcar, Inc., 883 F. Supp. 2d 329, 334–35 (D. Mass. 2012) ("Chapter 93A supplies an independent cause of action . . . . [a]s long as a litigant offers separate arguments in support of her Chapter 93A claim . . . ." (citation omitted)), aff'd 527 F. App'x 20 (1st Cir. 2013).

## IV.    Conclusion

Defendant's motion to dismiss (Docket # 20) is ALLOWED.  Plaintiff's motion for preliminary injunction (Docket # 2) is therefore DENIED as moot.

May 18, 2021
DATE

RYA W. ZOBEL
UNITED STATES DISTRICT JUDGE

---

[3] As another court has noted, plaintiff has another avenue available to advance its claims.

If the Plaintiff were to pursue the matter with the FDA through its administrative procedures and obtain a clear statement from the agency that the Defendants are selling their products illegally or otherwise breaking the law, and if the Defendants at that point chose to affirmatively declare in their advertising that their products comply with the law, a federal court could hear a Lanham Act claim for false advertising.

JHP Pharm., 52 F. Supp. 3d at 1004.

ADD-6

```
 1                    UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF MASSACHUSETTS

 3

 4                                      )
 5    AZURITY PHARMACEUTICALS, INC.,    )
                                        )
 6           Plaintiff,                 )
                                        ) Civil Action
 7    v.                                ) No. 1:20-cv-10280-RWZ
                                        )
 8    EDGE PHARMA, LLC,                 )
                                        )
 9           Defendant.                 )
                                        )
10

11
                    BEFORE THE HONORABLE RYA W. ZOBEL
12                    UNITED STATES DISTRICT JUDGE

13

14                            MOTION HEARING
                              VIA TELEPHONE
15

16                             May 27, 2020
                                2:28 p.m.
17

18

19           John J. Moakley United States Courthouse
                           Courtroom No. 12
20                        One Courthouse Way
                      Boston, Massachusetts 02210
21

22                        Linda Walsh, RPR, CRR
                          Official Court Reporter
23           John J. Moakley United States Courthouse
                     One Courthouse Way, Room 5205
24                    Boston, Massachusetts 02210
                         lwalshsteno@gmail.com
25
```

```
 1    APPEARANCES:

 2    On Behalf of the Plaintiff:

 3         ARENT FOX, LLP
           By: James Hulme, Esq.
 4             Nadia Patel, Esq.
           1717 K Street NW
 5         Washington, DC 20006
           202-857-6144
 6         james.hulme@arentfox.com

 7         ARENT FOX, LLP
           By: Valerie Samuels, Esq.
 8         800 Boylston Street, 32nd Floor
           Boston, Massachusetts 02199
 9         617-973-6248
           valerie.samuels@arentfox.com
10
           AZURITY PHARMACEUTICALS, INC.
11         By: Hanok M. George, Esq.
           8 Cabot Road, Suite 2000
12         Woburn, Massachusetts 01801
           617-513-4400
13         hg@hmgeorge.com

14    On Behalf of the Defendant:

15         HODGSON RUSS LLP
           By: Robert J. Fluskey, Jr., Esq.
16         140 Pearl Street
           Buffalo, New York 14202
17         716-848-1688
           rfluskey@hodgsonruss.com
18
           ROBINSON & COLE LLP
19         By: William J. Egan, Esq.
           280 Trumbull Street
20         Hartford, Connecticut 06103
           860-275-8365
21         wegan@rc.com

22    ALSO PRESENT:  Sean Nabi, Esq.
                     Kara Rossi, Esq.
23

24                   Proceedings reported and produced
                      by computer-aided stenography.
25
```

```
1                      P R O C E E D I N G S

2           THE CLERK:  I'm going to just call out the case and

3      the name and the number, and I'm just going to ask counsel to

4      please speak slowly so the court reporter can take down your

5      name.

6           So this is Azurity Pharmacy versus Edge Pharmacy -- is

7      it Pharmaceutical?  I'm sorry.  Pharmaceuticals.  I only had it

8      half on mine.  And Edge Pharma.  I'm sorry.  So it's Civil

9      20-10280.

10          So can I ask plaintiff's counsel to go first with

11     who's on the line, please.

12          MR. HULME:  Good afternoon.  This is James Hulme from

13     Arent Fox, H-u-l-m-e.  And I should have on the line with me

14     Valerie Samuels of Arent Fox, who is co-counsel of record for

15     the plaintiff; Nadia Patel of Arent Fox.  And then, also, Hanok

16     George, who's in-house counsel with Azurity.  He's also

17     co-counsel of record.  And, finally, Sean Nabi, N-a-b-i, who's

18     in-house counsel and a member of the bar of this court.

19          THE COURT:  I'm sorry.  How do you spell "Sean,"

20     S-h-a-w-n or S-e-a-n?

21          MR. HULME:  No, it's S-e-a-n.

22          THE COURT:  And the last name, please?

23          MR. HULME:  Nabi, N-a-b-i.

24          THE COURT:  B as in boy?

25          MR. HULME:  B as in boy.
```

```
1              THE COURT:  And he's in-house counsel?

2              MR. HULME:  Yes.

3              THE COURT:  And for the defendant?

4              MR. FLUSKEY:  Good afternoon.  This is Robert Fluskey.

5    F as in Frank, l-u, S as in Sam, k-e-y, of Hodgson and Russ.

6    And I'm joined by my colleague, Kara Rossi, R-o-s-s-i, also of

7    Hodgson Russ.

8              THE COURT:  He has not filed an appearance?

9              THE CLERK:  She.

10             THE COURT:  She?

11             MR. FLUSKEY:  Kara Rossi has not.  My colleague, Bill,

12   William Egan, Robinson & Cole, had sent an e-mail earlier this

13   week asking for permission for her to listen to the argument.

14             THE CLERK:  Okay.  I thought so.  But she's not

15   participating, correct?

16             MR. FLUSKEY:  She will not be.  I will be arguing the

17   motion.

18             THE CLERK:  Could you say her name again, please.

19             MR. FLUSKEY:  Kara Rossi, R-o-s-s-i.

20             THE CLERK:  Thank you.

21             THE COURT:  And Mr. Egan is not there or he is?

22             MR. EGAN:  Good afternoon, Your Honor.  It's William

23   Egan of Robinson & Cole, also local counsel for Edge Pharma.

24   Thank you.

25             THE COURT:  Anybody else for the defendant?
```

```
 1          MR. FLUSKEY:  That is it.

 2          THE COURT:  So we have three against five.

 3          MR. EGAN:  Your Honor, I anticipate it will be maybe

 4  one against one.

 5          THE CLERK:  Just before we begin argument, could I

 6  just -- before you speak, could you just state who is speaking

 7  so the court reporter will know who it is.

 8          Are the law clerks on the line?

 9          THE COURT:  I told them if they could, they could, but

10  I didn't --

11          THE CLERK:  I sent them one.  I don't have their

12  number.

13          THE COURT:  I do.

14          (Discussion off the record.)

15          THE COURT:  What is presently before me is the

16  defendant's motion to dismiss.  And let me explain to you -- I

17  may be totally wet about this, but the problem I have with the

18  motion is that, as best as I can tell, there are a large number

19  of facts that are implicit in the motion that I don't know the

20  answer to.

21          For example, the plaintiff says that something is

22  nearly identical -- that one product was nearly identical with

23  the other.

24          There is discussion about the underlying

25  product -- now, what's the name of it? -- the vancomycin
```

1    hydrochloride.  And I don't know who made it, to what extent it

2    is the same as or different from FIRVANQ or whatever the other

3    one is called.

4         So I just need some understanding why this motion

5    should be denied simply because there are questions of fact

6    that I simply cannot resolve at this stage of the game.

7         MR. FLUSKEY:  Sure, Your Honor.

8         THE COURT:  The motion, the plaintiff -- the defendant

9    should tell me that.

10        MR. FLUSKEY:  Sure.  Your Honor, this is Rob --

11        THE COURT:  I'm sorry?

12        MR. FLUSKEY:  This is Rob Fluskey for the defendant,

13   Your Honor.  I'm happy to address that question, that concern.

14        THE COURT:  Maybe I'm totally wrong about this, and

15   you're welcome to tell me that.

16        MR. FLUSKEY:  Judge, I'll do my best to explain why we

17   think the 12(b)(6) and 12(b) motion should be granted.

18        I don't think, Your Honor, you need to look beyond the

19   complaint or beyond the case law to hold that the plaintiff has

20   failed to state a claim under the Lanham Act.  And that even if

21   they had stated such a claim, the matter is precluded under a

22   line of case law which holds that in matters like this, the

23   Court should not adjudicate claims that are in the

24   near-exclusive enforcement authority of the FDA.

25        I did attach to the motion certain publicly available

1    FDA guidance of which we've asked the Court to take judicial

2    notice.

3        But the fact questions that you raised, Your Honor,

4    whether or not my client's, Edge's, vancomycin product is

5    essentially a copy of FIRVANQ, the plaintiff's product, it's

6    our contention, Your Honor, that it would be inappropriate for

7    the Court to rule on that issue under the doctrine of

8    preclusion.

9        And before we even get to the preclusion issue, we

10    don't believe the complaint states a Lanham Act claim as a

11    matter of law because the allegedly false statements that are

12    identified in the complaint, specifically Paragraph 61 of the

13    complaint, are a mixture of opinion, puffery, and generalized

14    statements about compliance with the law that are not

15    actionable.

16        So I think, as a threshold matter, the allegedly false

17    statements are not actionable.  And we -- there are some cases

18    directly on point, Your Honor, that we go through in the briefs

19    on that.  And even if the statements could be viewed as

20    factual -- we believe they're not -- under the doctrine of

21    preclusion we believe the Court should not adjudicate the

22    matter.

23        And, Judge, just a bit on the preclusion issue

24    because --

25        THE COURT:  Excuse me.  The preclusion issue is your

```
 1    assertion that it's the FDA that has to decide this?

 2          MR. FLUSKEY:  That's right, Your Honor, at a high

 3    level.

 4          And to drill down on that a bit, under the

 5    preclusion -- so the case law is clear that the FDA has

 6    near-exclusives enforcement authority over FDCA matters, Food,

 7    Drug, Cosmetic Act matters.  Now, it is not -- the District

 8    Court is not per se prohibited from ruling on a Lanham Act case

 9    that touches upon FDCA issues.

10          Under the POM Wonderful case, POM Wonderful v.

11    Coca-Cola, 2014 Supreme Court case, the question of whether

12    preclusion applies on a case-by-case analysis.  But even though

13    it is a case-by-case analysis, there are organizing principles

14    that are clear in the case law.

15          First, the Court should not adjudicate a Lanham Act

16    claim based upon alleged FDCA violations in an area of

17    unsettled law.  The Court should not adjudicate such claims

18    where there is little to no administrative guidance at some

19    point.  And the Court should not address what the case law

20    refers to as authority-complicated FDCA questions as that would

21    place the Court in the tenuous position of trying to anticipate

22    agency guidance.

23          THE COURT:  What's the plaintiff supposed to do when

24    there is no guidance and there is a grievance?

25          MR. FLUSKEY:  It's a matter for the FDA, Your Honor.
```

1  If we were dealing with a case where the defendant, Edge, had

2  made false statements of fact, not a one-sentence comment on

3  its website that it complied with the law, but statements of

4  fact that are verifiably true or false, then we may have a

5  Lanham Act claim that could precede the discovery and could be

6  dealt with on summary judgment, perhaps.  We don't have that

7  here, Your Honor.

8          I mean, if you look at Paragraph 61 of the complaint,

9  Subparagraphs A through E -- A through F, excuse me -- the

10  plaintiff identifies the exact statements at issue.  A through

11  C are clear opinion puffery statements.  For example, Edge

12  contends --

13          THE COURT:  There is disagreement about that.

14          MR. FLUSKEY:  I'm sorry, Your Honor?

15          THE COURT:  There is disagreement about that.

16          MR. FLUSKEY:  Well, there is, Your Honor.

17          So if we look at them, I believe that Edge has it

18  right.  So in 61A, the statement that's challenged is Edge's

19  comment that it offers high quality, innovative solutions.  I

20  believe that's clearly not an actionable statement.  It's an

21  opinion, at most, not a statement of fact.

22          In 61B, the challenge statement is Edge claiming that

23  it's dedicated to providing turnkey 503B outsourcing with the

24  highest level of quality.  That's an opinion at most.

25          Subparagraph C, Edge claims that it's an FDA

1    registered 503B outsourcing facility.  Well, that's just

2    indisputably true, Your Honor.  Even based on the complaint

3    filed by the plaintiffs, no one disagrees that Edge is a

4    licensed outsourcing facility.

5         61D, Your Honor, is the crux of the case.  So in 61D,

6    the plaintiff identified the statement on Edge's website where

7    Edge says, "Our facility is compliant with the following state,

8    local, and federal regulations."  And in the list of

9    regulations is Food and Drug Administration.  That is a

10   generalized statement, an opinion of legal compliance.

11        We believe that case law is clear that a generalized

12   statement like that is an opinion that is not actionable under

13   the Lanham Act, and there's several cases that hold that, Your

14   Honor.  Most notably we cite the *JHP* case for that proposition,

15   *Dial a Car v. Transportation, Inc*, *Greenwich Taxi*, and among

16   others.

17        So all of the statements identified are either

18   opinion, or in the one instance we have a statement of

19   generalized compliance with the law.  So we don't see a Lanham

20   Act claim on the face of the complaint.

21        Now, again, even if Azurity was able to survive that

22   12(b)(6) argument, we believe preclusion is an absolute

23   barrier.  And here's why, Your Honor:  So I explained the

24   organized principles in the preclusion case law, and I think

25   the big picture is clear.  The matter -- the matter should not

1    be adjudicated under the preclusion doctrine if the Court is

2    faced with complicated FDC issues in unsettled areas.  That

3    should be left -- FDCA issues, excuse me.  Those matters should

4    be left to the FDA.  Here --

5          THE COURT:  Are the issues in this case complicated

6    issues?

7          MR. FLUSKEY:  They are, Your Honor.  I was going to

8    explain that next.

9          So we have two alleged FDC violations -- FDCA

10   violations.  Azurity claims that Edge has violated Section 503B

11   of the FDCA in two respects.

12         First, Azurity claims that Edge is manufacturing its

13   vancomycin product using a bulk drug substance and is not on

14   the FDA's bulk drug list.

15         Second, Azurity alleges that Edge and its vancomycin

16   product is essentially a copy of Azurity's FIRVANQ product.

17         Now, I'll take each issue in turn.

18         Under the FDCA, an outsource facility like Edge may

19   compound using a bulk drug substance only if the bulk drug

20   substance is on a list developed by, we call it, the 503B bulks

21   list promulgated by the Department of Health and Human Services

22   or the drug is on a shortage list.

23         Now, there's no dispute here that the drug at issue is

24   not on a shortage list.  However, vancomycin has been nominated

25   for inclusion on the 503B bulks list.  And it is listed by the

1   FDA as a Category I substance.  Your Honor, that's very

2   important on both the preclusion issue and the Lanham Act

3   issue.  Because in 2017, the FDA issued guidance in which it

4   explicitly stated that it would not take action against an

5   outsourcing facility for manufacturing compounded drugs using a

6   Category I bulk drug substance.

7        So, on the matter of preclusion, what we have here is

8   Azurity pursuing what is really an attempt to pursue an

9   enforcement action under the FDCA that the FDA has expressly

10  said it would not pursue.  So if the Court were to entertain

11  that allegation, it would be in direct conflict with the FDA

12  policy judgments, and that's squarely within the preclusion

13  case law.

14       THE COURT:  How do we know it's a policy judgment?

15  They might just decide they didn't have the power to do it or

16  they didn't have the ability to do it.  It doesn't necessarily

17  affect policy.

18       MR. FLUSKEY:  Well, no, I think it does, Your Honor.

19  Because the Category I -- to be a Category I substance, the FDA

20  decided that, first, the drug was nominated for inclusion based

21  on data; and, two, the drug does not pose significant safety

22  risks.

23       And, Judge, I will say that in every relevant case

24  cited by both parties, the Federal Courts have refused to hold

25  a defendant liable as a matter of law under the Lanham Act or

1    the FDCA, for that matter.  So manufacturing with a Category I

2    bulk drug substance, the Courts have expressly refused to do

3    it.  And that includes cases cited by Azurity.  So, on that

4    issue, we believe Edge pleaded the matter is precluded.

5         Now, Judge, I would also note, this is -- I'm wavering

6    into a bit beyond a preliminary injunction motion, but that

7    issue is also moot on a go-forward basis because, as we

8    explained in opposition to our preliminary injunction motion,

9    Edge no longer uses a bulk Edge substance.  But --

10        THE COURT:  The preliminary injunction motion is not

11   before me, is it?  I mean, I know it's filed, but is it to be

12   decided, as well?

13        THE CLERK:  Yes.

14        MR. FLUSKEY:  And, Judge, I shouldn't blur the line

15   there, I think.  I think Edge pleaded the -- blurred the line

16   between the two motions.  Edge pleaded the Court should not be

17   adjudicating Edge's prior use of a Category I bulk drug

18   substance.  We believe it would interfere with the FDA guidance

19   on point.  And we believe all the cases support that position.

20        Now, there is another alleged FDCA violation.  Azurity

21   also contends that Edge's vancomycin product is essentially a

22   copy of Azurity's FIRVANQ product.  Now, why should that -- why

23   is that plan precluded?

24        Your Honor, we -- the statute 503B defined essentially

25   a copy as identical or nearly identical to.  The FDA had issued

1  no regulations to define what that means.  There are no

2  regulations on point.  The statute doesn't define what that

3  means.  And, to my knowledge, there's not a single reported

4  decision that defines what that means.

5         What we have is 2018 nonbinding guidance issued by the

6  FDA, which I've attached in my declaration, that sets forth,

7  somewhat complicated, five-factor test, where the FDA said that

8  it will consider.  The FDA, not a court, it will consider five

9  factors in determining whether or not a compounded drug is

10  identical or nearly identical to an approved drug.  That is a

11  classic example, we believe, Your Honor, of a matter that is

12  precluded.

13        We do not have regulations on point.  We have no case

14  law on point.  We only have nonbinding guidance that would

15  require the Court to wade into complicated, technical issues on

16  whether two drugs are the same or not.  And, Judge, you don't

17  have to take my word for it on that.  The one case the parties

18  have cited that even mentions this is essentially a copy test

19  is a case cited by Azurity.  It is *Allergan v. Imprimis*

20  *Pharmaceuticals*, Your Honor.  It's a Central District

21  California case in 2017.

22        Now, Azurity cites that case because on the issues

23  before the Court there, the Court denied the defendant's

24  preclusion arguments.  The issues there were different.  It

25  involved 503A.  However, the case supports Edge's position and

1    here's why:  In analyzing the preclusion question, the Court

2    gave examples of the type of authority-complicated FDCA

3    questions that should not be adjudicated by a court.  And on

4    its list of issues right before preclusion, it included the

5    very issue we have here, determining whether or not a

6    compounded drug is essentially a copy of an FDA-approved drug.

7         And the reason for that is clear, Your Honor.

8    Adjudicating that FDCA issue would require the court to reach a

9    conclusion in unsettled areas of law and to anticipate guidance

10   that doesn't exist or, at best, try to interpret how the FDA

11   might address the issue.

12        So on the complaint and on the case law, without even

13   getting into the evidence or giving of the fact issues, we do

14   not believe that this case can proceed.  While the case is

15   presented as a Lanham Act false advertisement case, we believe

16   it's a clear attempt to pursue a private Lanham action under

17   the FDCA; and, of course, there's no private right of action

18   under the FDCA.

19        THE COURT:  Okay.  Thank you.  Who will argue for the

20   plaintiff?

21        MR. HULME:  Good afternoon, Your Honor.  This is James

22   Hulme.

23        THE COURT:  I'll hear you.

24        MR. HULME:  Thank you.

25        In fact, thank you for accommodating counsel to appear

```
 1    by telephone in these rather strange times.

 2            I'd like to just take a step back.

 3            THE COURT:  You wouldn't want to be at the courthouse.

 4    You might be sick, and we might get sick.

 5            MR. HULME:  No, I have not even been to a store

 6    personally since the middle of March.  I'm trying to be quite

 7    cautious about this and take it quite seriously.

 8            To take a step back -- and I will address

 9    Mr. Fluskey's points.  I just want to start with the whole

10    reason for compounding and why the Act was amended in 2013 and

11    what the FDA had said about that.  The FDA pointed out on its

12    website --

13            THE COURT:  Excuse me.  Mr. Hulme, can I go back for

14    just a moment?

15            MR. HULME:  Sure.

16            THE COURT:  The issue in this case is surrounding some

17    product called vancomycin hydrochloride, however it is

18    pronounced.

19            MR. HULME:  Vancomycin.

20            THE COURT:  I'm sorry?

21            MR. HULME:  Vancomycin.

22            THE COURT:  Hydrochloride.

23            MR. HULME:  Right.

24            THE COURT:  Now, that is the product made by the

25    plaintiff initially?
```

1          MR. HULME:  We have an FDA-approved product of

2    vancomycin hydrochloride, yes, that's correct.  And it's gone

3    through the full FDA approval process for drugs that, as you

4    know, is long, tedious, and very expensive.

5          THE COURT:  Right.  So what is it that the plaintiff

6    says the defendant may have said is nearly identical?  Is that

7    the stuff called FIRVANQ or something like that?

8          MR. HULME:  No.  FIRVANQ is the plaintiff's product,

9    Your Honor.  That is our product.  That's the trademark's name

10   for our product.

11         THE COURT:  I read the papers as best I could, but I

12   really was not clear about them.  So what is the nearly

13   identical product that the defendant makes?

14         MR. HULME:  They are selling vancomycin hydrochloride.

15   They are both an oral solution.  Ours is sold in --

16         THE COURT:  The user and theirs is already coming in a

17   liquid form?

18         MR. HULME:  Yes.  Our FIRVANQ is sold in two bottles,

19   and it needs to be reconstituted by typically the hospital to

20   provide an oral solution that is then given to the patients.

21   The defendant's product comes already in an oral solution that

22   is in a syringe that is given to the patients.

23         THE COURT:  What is it that causes vancomycin

24   hydrochloride to belong exclusively to the plaintiff?

25         MR. HULME:  Well, it has to be an approved drug.  And

1    ours is approved and theirs is not.  So what the defendant is

2    trying to do, we allege, is --

3        THE COURT:  Just please stay with me for a moment.  I

4    need to just get it.

5        MR. HULME:  Sure.

6        THE COURT:  So plaintiff has an approved vancomycin

7    hydrochloride, and the plaintiff sells it in a bottle,

8    accompanied by another bottle that has liquid into which it

9    gets dissolved or --

10       MR. HULME:  Yes.  It is then mixed together to provide

11   the oral dosage for the patient.

12       THE COURT:  Okay.  Now, the defendant has this nearly

13   identical product.  Which part is nearly identical, the

14   vancomycin hydrochloride that the defendant uses or the fact

15   that they're both something that you ultimately drink?

16       MR. HULME:  Well, they both have the identical active

17   drug ingredient, which is the vancomycin.  So that is the same.

18       THE COURT:  Is that the hydrochloride?

19       MR. HULME:  Well, I'm shortening it.  Yes.  Vancomycin

20   hydrochloride is the chemical name for the active drug

21   component.  People typically refer to it just by its first

22   name, vancomycin.

23       THE COURT:  And that product -- that substance is used

24   in the same quantities in each of these two products or

25   different?

1          MR. HULME:  Yes.  No, it's the same dosage.  It's the

2   same oral administration.  It's for the same purpose, typically

3   to treat --

4          THE COURT:  One is sold in two pieces, and one is sold

5   already assembled between vancomycin hydrochloride and whatever

6   the liquid is?

7          MR. HULME:  That is correct, Your Honor.  That is

8   correct.

9          And, again, ours is approved -- has been tested by the

10  FDA for its safety, its efficacy, and so on and so forth, and

11  defendant's product has not.

12         THE COURT:  What rights does the plaintiff start with

13  to the vancomycin hydrochloride?  What gives the plaintiff the

14  right to exclude everybody else from using their product?

15         MR. HULME:  Well, no, we do not exclude others.  There

16  is one other FDA-approved vancomycin hydrochloride product on

17  the market now, and that is also an FDA-approved drug.

18         What gives us the right to bring this lawsuit, we

19  maintain, is that it was never intended in 2013 by the Congress

20  or the FDA to allow compounding pharmacies to basically compete

21  generally with FDA-approved products.  And that's the key.

22         The exception for compounding was to allow the

23  formulation of a vancomycin product that could not be taken by

24  a patient.  The patient could not take the FDA-approved product

25  and instead must have a specially compounded version of it.

1    For example, because the patient is allergic to the dye that is

2    in my client's product, so it's permitted then, obviously for

3    that reason, to have a compounded vancomycin product specific

4    for that patient.  And that is the key to the understanding of

5    all of this.

6         THE COURT:  But the compounding pharmacy is not

7    allowed to manufacture large amounts of it and sell them in

8    gross?

9         MR. HULME:  Exactly, exactly.

10        In fact, Your Honor, I highly recommend that the Court

11   review the FDA guidance that has been in the record as ECF

12   21-2.  This is the 2018 guidance that Mr. Fluskey was talking

13   about.  This goes to the compounded drug products that are

14   essentially copies of approved drug products.  As far as we've

15   determined, no court has had the opportunity to consider this

16   document.

17        The cases that we've discussed were all decided either

18   before it was issued or they did not have it before them.

19   Because I think it's very important there what the FDA says in

20   that document is that, "Compounded drug products serve an

21   important role for patients whose clinical needs cannot be met

22   by an FDA-approved drug product" -- this is on Page 3 -- "such

23   as for a patient who has an allergy and needs a medication to

24   be made without a certain dye contained in the FDA-approved

25   drug product, or an elderly patient who cannot swallow a pill."

1    Obviously, that wouldn't apply in this case.

2        And the FDA continues, "Because they are subject to a

3    lower regulatory standard, compounded drugs should only be

4    distributed to health care facilities and dispensed to patients

5    to fulfill the needs of patients whose medical needs cannot be

6    met by an FDA-approved drug.  The restrictions on compounding

7    drugs that are essentially copies of approved products ensure

8    that outsourcing facilities do not compound drug products under

9    the exemptions in Section 503B for use in patients who could

10   use an approved product.  Compounding copies of these products

11   would unnecessarily expose patients to drug products that have

12   not been shown to be safe and effective."  And I will get into

13   it.  That's exactly what Edge is doing here.

14       THE COURT:  So that's the issue, that Edge is a

15   compounding pharmacy, and it is selling in bulk?

16       MR. HULME:  Yes.  Yes.  And it's advertising in bulk.

17   At the same time, it --

18       THE COURT:  I must tell you, I have familiarity with

19   this business since I had the multi-district case against the

20   Framingham pharmacy.

21       MR. HULME:  Yes, okay.

22       THE COURT:  However, not that you're telling me about

23   now.

24       MR. HULME:  Right, right.

25       THE COURT:  Now I understand what this case is about.

1          MR. HULME:  The statutory change, as the FDA has

2    recognized, was prompted in large part by the NECC case in

3    Massachusetts where there were more than 60 deaths that

4    resulted from the compounding issues.  And we are here today --

5          THE COURT:  Not from the compounding issues.  They

6    came because the state was selling the stuff improperly to

7    people who shouldn't have had it -- I mean, doctors.

8          MR. HULME:  Right, right.  Exactly.  This -- the

9    compounded drugs have nowhere near the level of scrutiny than

10   an FDA-approved drug has to either the drug itself or to the

11   manufacturing facility and things like that.

12         THE COURT:  And they made the stuff in dirty places so

13   the stuff came out dirty.

14         MR. HULME:  And as you know, we've attached the rather

15   sorted inspection history of Edge here as an exhibit to the

16   complaint as further evidence that it's not in compliance with

17   Section 503B, whereas it holds itself out to be.

18          So the entire purpose of compounding is not to permit

19   a company like Edge to generally engage and market an

20   alternative to FDA-approved drugs.  It is supposed to be

21   limited for patients that cannot take the FDA drug.  And that's

22   just crystal clear, in black and white in the law and in the

23   FDA guidance that was issued in 2018 that Mr. Fluskey referred

24   to.

25          And, in fact, we think -- he said that the preclusion

1    doctrine doesn't apply when you have little -- when you have

2    administrative guidance.  And here we have a very detailed

3    administrative guidance for the Court that no other court has

4    had the benefit of.

5            So let me talk about the three violations.  It's

6    actually two.  One has two subsets.  And it's the last one that

7    is probably the most significant one.

8            The first is violation because they are including a

9    bulk drug substance, which is the vancomycin hydrochloride, to

10   mass produce their product.  And --

11           THE COURT:  Excuse me.  I really am trying to

12   understand this.  I sound like Rachel Maddow sometimes.

13           What about the argument that the defendant makes that

14   this is an issue for the FDA to decide, not for a plaintiff who

15   is aggrieved?

16           MR. HULME:  Well, I think, Your Honor, the *Imprimis*

17   court decision from Judge Carter; that is, *Allergan versus*

18   *Imprimis*, which has been cited to the Court -- it's 2017

19   Westlaw 10526121 -- addressed and disposed of that issue, I

20   think, in a well-reasoned opinion by the court there, that

21   there is no issue of preclusion or administrative deference

22   here because we're dealing with fundamental issues of law and

23   do not require the expertise of the FDA.

24           As the court said, it only claims where the law is

25   unclear, and the FDA's particular application rulemaking

1    authorities required are precluded by the FDA.  In this

2    case --

3         THE COURT:  And the clear law here is that they cannot

4    sell in bulk?

5         MR. HULME:  That is correct.  Now, they claim they

6    have changed that and that they're no longer doing it.  And I

7    think that has two significant consequences for today.

8         One, it can be an admission that what they were doing

9    wrong was a violation of law because they have now changed it

10   almost weeks after the lawsuit was filed.  And they're no

11   longer using, they claim, the bulk substance, which is an

12   admission of what they were doing before was violating the law.

13        And this goes to the issue that Mr. Fluskey was

14   talking about, about the FDA announcing that even though they

15   have not completed the bulk drug list, that they're going to

16   decline to enforce for the present time, provided other

17   conditions are met.

18        However, the FDA has made it clear that the Category I

19   drugs are not on the 503 bulk list as of the present time.

20   This vancomycin has been nominated for inclusion, and the FDA

21   has said it has sufficient information but it has not yet put

22   it on the bulks list, and the FDA has said they will evaluate

23   these drugs.

24        But as Judge Carter pointed out in the *Imprimis* case,

25   and I'll quote, "Find the FDA's decision to decline enforcement

1    of certain Section 503A and 503B requirements does not help

2    *Imprimis,* and as the executive agency, the FDA has discretion

3    to enforce the law.  But the lack of enforcement does not make

4    *Imprimis's* actions legal."

5            Well, that's exactly the case here.

6            The fact that the FDA has decided that if certain

7    conditions are met it will not enforce doesn't mean that what

8    Edge is doing here is lawful, because it's not because -- or it

9    wasn't lawful.  It is no longer doing it.  The bulk drug

10   substance is not on the 503 bulks list as of the present time.

11   So that is violation number one that we believe exists.  And

12   this all then goes to the statements they make about their

13   conduct that I will get to after I go through the other two

14   violations.

15           The next violation --

16           THE COURT:  How does this relate to the Lanham Act?

17           MR. HULME:  No.  The violation of the Lanham Act goes

18   to the statements that they're making about their own conduct.

19   This is the violation of the FDCA, which we think is -- just as

20   Judge Carter found is black and white, and he did not find a

21   need to defer to the FDA in this case.  And it was, also, as

22   you see under 503A and 503B.

23           So that he decided that it was appropriate for the

24   court to consider the case and allow it to proceed.  So he

25   rejected both the primary jurisdiction and the argument to

defer to FDA's expertise because you didn't need it.  And he

did not have advantage of the 2018 guidance that is now in the

record before you at 21-2 because it did not exist yet.

And that goes to the second violations, and this is

essentially a copy issue.  And Mr. Fluskey identified the five

elements, and that's on Page 6 of ECF 21-2.

And they are active ingredients, they're identical;

both are the vancomycin hydrochloride.

The route of administration, that's identical.  It's

both oral administration to the patient.

The dosage form, that's also identical.  It's oral, an

oral preparation.  They tried to claim that because the

hospital gets it in powdered form and have to mix it, it's

different.  But this is focused on what the patient is getting

and not what the health care provider receives.

And the important thing here is how is it administered

to the patient because the entire focus of the FDA is patient

safety.  It's not -- it's not hospital convenience or cost or

anything like that.

Dosage strength, again, identical.

And then excipients, which are the inactive

ingredients.  There are some minor variations in the inactive

ingredients in both the FIRVANQ and the defendant's product,

but we believe they are not material.  And the FDA has pointed

out that it would not consider -- this is in Footnote 15 of ECF

1    21-2 -- that it would not consider whether the compounded drug

2    has the same excipients or not in determining whether or not it

3    is identical or nearly identical.  In fact, it makes little

4    sense because someone could change a nonmaterial excipient and

5    then argue that it's not an identical drug.  So that's the --

6    why it's essentially a copy.

7         But there's an even important reason, and this is

8    something that Mr. Fluskey didn't say anything about.  And

9    incredibly, the defendant said nothing about it in its papers

10   even though it's in the complaint and it's been briefed.  And

11   that is, on Page 7 of 21-2, at the bottom, the FDA says, "As

12   described below, if the compounded drug product is not

13   considered identical or nearly identical under Section

14   503B(d)(2)(A), it would then be evaluated under Section

15   503B(d)(2)(B)."  Now, we've briefed this several times in our

16   papers, and Edge has never said word one about it.

17        What the FDA says -- and this goes to the

18   customization point, I'll call it.  On Page 8, "A compounded

19   drug product is essentially a copy of an approved drug if a

20   component of the compounded drug product is a bulk drug

21   substance" -- that's the vancomycin.  A bulk drug substance,

22   another term for that is active pharmaceutical ingredient --

23   "that is also a component of an approved drug," so they both

24   have vancomycin in them.  And this is the key language:

25   "Unless there is a change that produces, for an individual

1   patient, a clinical difference, as determined by the

2   prescribing practitioner, between the compounded drug and the

3   comparable approved drug."  This is what Edge is not doing.

4   And it's clear as a matter of law that they're not doing it.

5          The FDA continues on to say, "Note that the clinical

6   difference identified on either a patient-specific prescription

7   or order, or a nonpatient specific order, must be produced by

8   the 'change' between the outsourcing facility's product and the

9   approved drug.  Other factors such as the lower price are not

10  sufficient to establish that the compounded product is not

11  essentially a copy of the approved drug."  That's on Page 11.

12         And the FDA also points out that an order that only

13  identifies the product formulation without more information

14  would not be sufficient to establish that the determination

15  described by Section 503B(d)(2)(B) has been made.  So that's

16  actually language that is in the statute where it says

17  "Unless" -- this is 21 U.S.C. 353B(2)(B) -- "Unless there is a

18  change that produces for an individual patient a clinical

19  difference, as determined by the prescribing practitioner,

20  between the compounded drug and the comparable approved drug."

21         As I said, Edge has been strangely silent about this

22  throughout the case even though it's referenced in Paragraph 24

23  of the complaint and in the various briefs.

24         And, in fact, I would ask the Court to look at

25  Mr. Chatoff's declaration, which Edge filed at ECF 25.  And

1    nowhere does he claim that the -- that Edge is selling its

2    product only for patients that cannot take the FDA-approved

3    vancomycin.  And that's critical because that's not what Edge

4    is doing.  In fact, we specifically briefed this in our reply

5    brief in the preliminary injunction at ECF 34 on Page 6, we had

6    a long discussion.  And in response Edge said not one word

7    about this.

8          And I submit that the reason they're silent at this

9    point, it's an admission that they do not comply with this 503B

10   because they're generally selling their vancomycin product.  If

11   you look at the website, you see it's just a general sales

12   pitch that this is more convenient and a better product.  But

13   under 503B and this guidance, they cannot sell to the

14   hospitals' convenience, which is what they're doing.  They

15   can't sell to the hospitals' costs, which may be what they're

16   doing.

17         503B was never intended for an end run around the FDA

18   drug approval process for the general sale of the approved

19   drugs, and we think that's clear as a matter of law on the face

20   of this complaint; and in the affidavit of Ms. Monahan that

21   we've attached; and, indeed, in Mr. Chatoff's affidavit that

22   the defendant has provided.

23         And they're putting patients at risk, we believe.

24   Because if you look at the regulatory history, they've had

25   numerous FDA inspections, one open from 2018 that is still

1    open; warning letters; and, therefore, they're not in

2    compliance with 503B but yet they're advertising -- and this is

3    what I want to get to now -- is replete with claims that --

4              THE COURT:  I hope you're coming to the conclusion of

5    your argument.

6              MR. HULME:  Yes, I am.

7              That they refer themselves as the compliance partner,

8    turnkey 503B outsourcing, that they offer the highest quality,

9    that their facility is compliant with the Food and Drug

10   Administration, that it's FDA registered, an FDA-registered

11   503B outsourcing facility, and specifically commercially

12   available options are not ideal for use in the hospital

13   setting.  Well, that is contrary to what 503B stands for, and

14   it is literally false statements about their compliance with

15   503B because what they're doing is not complying with 503B,

16   specifically as to the third violation that I indicated.

17             So we think on that basis, the motion to dismiss

18   should be denied.  And certainly as to the Violation 1 and

19   Violation I'll call it 2A, at a minimum, there would be

20   discovery on that because of the FDA's attached conditions

21   where it would be premature to dismiss the case on that.

22             I will say, also, the parties had agreed to proceed

23   with the preliminary injunction argument, and I'm prepared to

24   present that.  But I will defer to the Court on that.

25             THE COURT:  I don't think you need to.  Is there

1    anything more from the defendant?

2             MR. FLUSKEY:  Yes, Your Honor, if I could respond to

3    two points.  Your Honor, I'm sorry.

4             THE COURT:  Five minutes.

5             MR. FLUSKEY:  Okay.  Your Honor, you asked a really

6    important question, to me the most important question we've

7    heard.  You asked plaintiff's counsel how is this a violation

8    of the Lanham Act.  Now, I don't think you received a clear

9    answer.

10            Judge, the reason why that's an important question is

11   that the only route in this court the plaintiff had is the

12   Lanham Act.  And what we've heard through plaintiff's counsel's

13   argument is that Azurity is asking this Court to litigate an

14   FDCA issue.  We heard plaintiff's counsel talk about what an

15   FDA's intent is, what the policy purpose is behind the FDCA.

16   We've heard quotations from footnotes from nonbinding guidance.

17   None of that is appropriate for litigation under the Lanham Act

18   in the District Court.

19            This is why, Your Honor, we believe the matter is

20   subject to the preclusion doctrine, because issues of FDA

21   intent and FDA policy are not -- there's no place for it in

22   this court because there is no private right of action under

23   the FDCA.

24            The statements that supposedly support the Lanham Act

25   claim are opinion or generalized comments about administrative

1    law, and they are not actionable.

2         And a real quick point, Your Honor, on the *Imprimis*

3    case, which counsel relied on, in the *Imprimis* case, Your

4    Honor, the defendant was manufacturing using a non-Category I

5    bulk drug substance.  That is not the case here.  And it was

6    that court that noted, as I have explained in my opening

7    argument, that determining whether or not a compounded drug is

8    essentially a copy of an approved drug is subject to

9    preclusion.

10        The comments about Edge and this product posing a

11   danger, Your Honor, they're not really motion to dismiss

12   arguments, but I just need to clarify the record.  Edge is

13   audited and inspected by the FDA regularly.  It has never

14   received any type of sanction or warning letter for the

15   vancomycin product at issue here.  It never has.

16        There is no evidence that the product being sold by

17   Edge has harmed a single patient, none at all.  That's

18   atmospherics supported by no evidence.

19        So, Your Honor, we just -- we believe on the pleadings

20   and on the law, the case cannot proceed because there is no

21   Lanham Act violation, and even if the plaintiff had identified

22   material statements of fact that could be actionable under

23   Section 43 of the Lanham Act, the matter would be precluded

24   because I believe this argument has made clear this case is

25   about minute complicated disputes in nonbinding FDA guidance,

1   which is not proper to be adjudicated in the District Court.

2          THE COURT:  Thank you both very much.  I will take the

3   papers.

4          I would hope that while I'm looking at the papers and

5   trying to figure out what to do, that you would talk to each

6   other and see whether you can resolve this matter.  Okay?

7          MR. HULME:  Thank you, Your Honor.

8          THE COURT:  And let us know that it's been resolved as

9   soon as you've done it.  Thank you very much.

10          MR. FLUSKEY:  Thank you, Your Honor.

11          MR. HULME:  Thank you.

12          (Adjourned at 3:21 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3               I, Linda Walsh, Registered Professional Reporter

4     and Certified Realtime Reporter, in and for the United States

5     District Court for the District of Massachusetts, do hereby

6     certify that the foregoing transcript is a true and correct

7     transcript of the stenographically reported proceedings held in

8     the above-entitled matter, to the best of my skill and ability.

9               Dated this 29th day of May, 2020.

10

11

12          /s/ Linda Walsh

13          Linda Walsh, RPR, CRR

14          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

United States Code Annotated
  Title 21. Food and Drugs (Refs & Annos)
    Chapter 9. Federal Food, Drug, and Cosmetic Act (Refs & Annos)
      Subchapter V. Drugs and Devices
        Part A. Drugs and Devices (Refs & Annos)

21 U.S.C.A. § 353b

§ 353b. Outsourcing facilities

Effective: November 27, 2013
Currentness

**(a) In general**

Sections 352(f)(1), 355, and 360eee-1 of this title shall not apply to a drug compounded by or under the direct supervision of a licensed pharmacist in a facility that elects to register as an outsourcing facility if each of the following conditions is met:

**(1) Registration and reporting**

The drug is compounded in an outsourcing facility that is in compliance with the requirements of subsection (b).

**(2) Bulk drug substances**

The drug is compounded in an outsourcing facility that does not compound using bulk drug substances (as defined in section 207.3(a)(4) of title 21, Code of Federal Regulations (or any successor regulation)), unless--

**(A)(i)** the bulk drug substance appears on a list established by the Secretary identifying bulk drug substances for which there is a clinical need, by--

**(I)** publishing a notice in the Federal Register proposing bulk drug substances to be included on the list, including the rationale for such proposal;

**(II)** providing a period of not less than 60 calendar days for comment on the notice; and

**(III)** publishing a notice in the Federal Register designating bulk drug substances for inclusion on the list; or

**(ii)** the drug compounded from such bulk drug substance appears on the drug shortage list in effect under section 356e of this title at the time of compounding, distribution, and dispensing;

ADD-41

**(B)** if an applicable monograph exists under the United States Pharmacopeia, the National Formulary, or another compendium or pharmacopeia recognized by the Secretary for purposes of this paragraph, the bulk drug substances each comply with the monograph;

**(C)** the bulk drug substances are each manufactured by an establishment that is registered under section 360 of this title (including a foreign establishment that is registered under section 360(i) of this title); and

**(D)** the bulk drug substances are each accompanied by a valid certificate of analysis.

**(3) Ingredients (other than bulk drug substances)**

If any ingredients (other than bulk drug substances) are used in compounding the drug, such ingredients comply with the standards of the applicable United States Pharmacopeia or National Formulary monograph, if such monograph exists, or of another compendium or pharmacopeia recognized by the Secretary for purposes of this paragraph if any.

**(4) Drugs withdrawn or removed because unsafe or not effective**

The drug does not appear on a list published by the Secretary of drugs that have been withdrawn or removed from the market because such drugs or components of such drugs have been found to be unsafe or not effective.

**(5) Essentially a copy of an approved drug**

The drug is not essentially a copy of one or more approved drugs.

**(6) Drugs presenting demonstrable difficulties for compounding**

The drug--

**(A)** is not identified (directly or as part of a category of drugs) on a list published by the Secretary, through the process described in subsection (c), of drugs or categories of drugs that present demonstrable difficulties for compounding that are reasonably likely to lead to an adverse effect on the safety or effectiveness of the drug or category of drugs, taking into account the risks and benefits to patients; or

**(B)** is compounded in accordance with all applicable conditions identified on the list described in subparagraph (A) as conditions that are necessary to prevent the drug or category of drugs from presenting the demonstrable difficulties described in subparagraph (A).

**(7) Elements to assure safe use**

In the case of a drug that is compounded from a drug that is the subject of a risk evaluation and mitigation strategy approved with elements to assure safe use pursuant to section 355-1 of this title, or from a bulk drug substance that is a component

ADD-42

of such drug, the outsourcing facility demonstrates to the Secretary prior to beginning compounding that such facility will utilize controls comparable to the controls applicable under the relevant risk evaluation and mitigation strategy.

**(8) Prohibition on wholesaling**

The drug will not be sold or transferred by an entity other than the outsourcing facility that compounded such drug. This paragraph does not prohibit administration of a drug in a health care setting or dispensing a drug pursuant to a prescription executed in accordance with section 353(b)(1) of this title.

**(9) Fees**

The drug is compounded in an outsourcing facility that has paid all fees owed by such facility pursuant to section 379j-62 of this title.

**(10) Labeling of drugs**

**(A) Label**

The label of the drug includes--

**(i)** the statement "This is a compounded drug." or a reasonable comparable alternative statement (as specified by the Secretary) that prominently identifies the drug as a compounded drug;

**(ii)** the name, address, and phone number of the applicable outsourcing facility; and

**(iii)** with respect to the drug--

**(I)** the lot or batch number;

**(II)** the established name of the drug;

**(III)** the dosage form and strength;

**(IV)** the statement of quantity or volume, as appropriate;

**(V)** the date that the drug was compounded;

**(VI)** the expiration date;

ADD-43

**(VII)** storage and handling instructions;

**(VIII)** the National Drug Code number, if available;

**(IX)** the statement "Not for resale", and, if the drug is dispensed or distributed other than pursuant to a prescription for an individual identified patient, the statement "Office Use Only"; and

**(X)** subject to subparagraph (B)(i), a list of active and inactive ingredients, identified by established name and the quantity or proportion of each ingredient.

**(B) Container**

The container from which the individual units of the drug are removed for dispensing or for administration (such as a plastic bag containing individual product syringes) shall include--

**(i)** the information described under subparagraph (A)(iii)(X), if there is not space on the label for such information;

**(ii)** the following information to facilitate adverse event reporting: www.fda.gov/medwatch and 1-800-FDA-1088 (or any successor Internet Web site or phone number); and

**(iii)** directions for use, including, as appropriate, dosage and administration.

**(C) Additional information**

The label and labeling of the drug shall include any other information as determined necessary and specified in regulations promulgated by the Secretary.

**(11) Outsourcing facility requirement**

The drug is compounded in an outsourcing facility in which the compounding of drugs occurs only in accordance with this section.

**(b) Registration of outsourcing facilities and reporting of drugs**

**(1) Registration of outsourcing facilities**

**(A) Annual registration**

Upon electing and in order to become an outsourcing facility, and during the period beginning on October 1 and ending on December 31 of each year thereafter, a facility--

ADD-44

**(i)** shall register with the Secretary its name, place of business, and unique facility identifier (which shall conform to the requirements for the unique facility identifier established under section 360 of this title), and a point of contact email address; and

**(ii)** shall indicate whether the outsourcing facility intends to compound a drug that appears on the list in effect under section 356e of this title during the subsequent calendar year.

**(B) Availability of registration for inspection; list**

**(i) Registrations**

The Secretary shall make available for inspection, to any person so requesting, any registration filed pursuant to this paragraph.

**(ii) List**

The Secretary shall make available on the public Internet Web site of the Food and Drug Administration a list of the name of each facility registered under this subsection as an outsourcing facility, the State in which each such facility is located, whether the facility compounds from bulk drug substances, and whether any such compounding from bulk drug substances is for sterile or nonsterile drugs.

**(2) Drug reporting by outsourcing facilities**

**(A) In general**

Upon initially registering as an outsourcing facility, once during the month of June of each year, and once during the month of December of each year, each outsourcing facility that registers with the Secretary under paragraph (1) shall submit to the Secretary a report--

**(i)** identifying the drugs compounded by such outsourcing facility during the previous 6-month period; and

**(ii)** with respect to each drug identified under clause (i), providing the active ingredient, the source of such active ingredient, the National Drug Code number of the source drug or bulk active ingredient, if available, the strength of the active ingredient per unit, the dosage form and route of administration, the package description, the number of individual units produced, and the National Drug Code number of the final product, if assigned.

**(B) Form**

Each report under subparagraph (A) shall be prepared in such form and manner as the Secretary may prescribe by regulation or guidance.

ADD-45

**(C) Confidentiality**

Reports submitted under this paragraph shall be exempt from inspection under paragraph (1)(B)(i), unless the Secretary finds that such an exemption would be inconsistent with the protection of the public health.

**(3) Electronic registration and reporting**

Registrations and drug reporting under this subsection (including the submission of updated information) shall be submitted to the Secretary by electronic means unless the Secretary grants a request for waiver of such requirement because use of electronic means is not reasonable for the person requesting waiver.

**(4) Risk-based inspection frequency**

**(A) In general**

Outsourcing facilities--

**(i)** shall be subject to inspection pursuant to section 374 of this title; and

**(ii)** shall not be eligible for the exemption under section 374(a)(2)(A) of this title.

**(B) Risk-based schedule**

The Secretary, acting through one or more officers or employees duly designated by the Secretary, shall inspect outsourcing facilities in accordance with a risk-based schedule established by the Secretary.

**(C) Risk factors**

In establishing the risk-based schedule, the Secretary shall inspect outsourcing facilities according to the known safety risks of such outsourcing facilities, which shall be based on the following factors:

**(i)** The compliance history of the outsourcing facility.

**(ii)** The record, history, and nature of recalls linked to the outsourcing facility.

**(iii)** The inherent risk of the drugs compounded at the outsourcing facility.

**(iv)** The inspection frequency and history of the outsourcing facility, including whether the outsourcing facility has been inspected pursuant to section 374 of this title within the last 4 years.

ADD-46

**(v)** Whether the outsourcing facility has registered under this paragraph as an entity that intends to compound a drug that appears on the list in effect under section 356e of this title.

**(vi)** Any other criteria deemed necessary and appropriate by the Secretary for purposes of allocating inspection resources.

**(5) Adverse event reporting**

Outsourcing facilities shall submit adverse event reports to the Secretary in accordance with the content and format requirements established through guidance or regulation under section 310.305 of title 21, Code of Federal Regulations (or any successor regulations).

**(c) Regulations**

**(1) In general**

The Secretary shall implement the list described in subsection (a)(6) through regulations.

**(2) Advisory committee on compounding**

Before issuing regulations to implement subsection (a)(6), the Secretary shall convene and consult an advisory committee on compounding. The advisory committee shall include representatives from the National Association of Boards of Pharmacy, the United States Pharmacopeia, pharmacists with current experience and expertise in compounding, physicians with background and knowledge in compounding, and patient and public health advocacy organizations.

**(3) Interim list**

**(A) In general**

Before the effective date of the regulations finalized to implement subsection (a)(6), the Secretary may designate drugs, categories of drugs, or conditions as described such [1] subsection by--

**(i)** publishing a notice of such substances, drugs, categories of drugs, or conditions proposed for designation, including the rationale for such designation, in the Federal Register;

**(ii)** providing a period of not less than 60 calendar days for comment on the notice; and

**(iii)** publishing a notice in the Federal Register designating such drugs, categories of drugs, or conditions.

**(B) Sunset of notice**

ADD-47

Case: 21-1492    Document: 00117798337    Page: 101    Date Filed: 10/15/2021    Entry ID: 6452735

§ 353b. Outsourcing facilities, 21 USCA § 353b

Any notice provided under subparagraph (A) shall not be effective after the earlier of--

**(i)** the date that is 5 years after November 27, 2013; or

**(ii)** the effective date of the final regulations issued to implement subsection (a)(6).

**(4) Updates**

The Secretary shall review, and update as necessary, the regulations containing the lists of drugs, categories of drugs, or conditions described in subsection (a)(6) regularly, but not less than once every 4 years. Nothing in the previous sentence prohibits submissions to the Secretary, before or during any 4-year period described in such sentence, requesting updates to such lists.

**(d)** [2] **Definitions**

In this section:

**(1)** The term "compounding" includes the combining, admixing, mixing, diluting, pooling, reconstituting, or otherwise altering of a drug or bulk drug substance to create a drug.

**(2)** The term "essentially a copy of an approved drug" means--

**(A)** a drug that is identical or nearly identical to an approved drug, or a marketed drug not subject to section 353(b) of this title and not subject to approval in an application submitted under section 355 of this title, unless, in the case of an approved drug, the drug appears on the drug shortage list in effect under section 356e of this title at the time of compounding, distribution, and dispensing; or

**(B)** a drug, a component of which is a bulk drug substance that is a component of an approved drug or a marketed drug that is not subject to section 353(b) of this title and not subject to approval in an application submitted under section 355 of this title, unless there is a change that produces for an individual patient a clinical difference, as determined by the prescribing practitioner, between the compounded drug and the comparable approved drug.

**(3)** The term "approved drug" means a drug that is approved under section 355 of this title and does not appear on the list described in subsection (a)(4) of drugs that have been withdrawn or removed from the market because such drugs or components of such drugs have been found to be unsafe or not effective.

**(4)(A)** The term "outsourcing facility" means a facility at one geographic location or address that--

**(i)** is engaged in the compounding of sterile drugs;

ADD-48

**(ii)** has elected to register as an outsourcing facility; and

**(iii)** complies with all of the requirements of this section.

**(B)** An outsourcing facility is not required to be a licensed pharmacy.

**(C)** An outsourcing facility may or may not obtain prescriptions for identified individual patients.

**(5)** The term "sterile drug" means a drug that is intended for parenteral administration, an ophthalmic or oral inhalation drug in aqueous format, or a drug that is required to be sterile under Federal or State law.

**(d)** [2] **Obligation to pay fees**

Payment of the fee under section 379j-62 of this title, as described in subsection (a)(9), shall not relieve an outsourcing facility that is licensed as a pharmacy in any State that requires pharmacy licensing fees of its obligation to pay such State fees.

## CREDIT(S)

(June 25, 1938, c. 675, § 503B, as added Pub.L. 113-54, Title I, § 102(a)(2), Nov. 27, 2013, 127 Stat. 588.)

## Footnotes

| | |
|---|---|
| 1 | So in original. |
| 2 | So in original. Two subsecs. (d) enacted. |

21 U.S.C.A. § 353b, 21 USCA § 353b

Current through PL 117-45.

---

**End of Document**                                                            © 2021 Thomson Reuters. No claim to original U.S. Government Works.

ADD-49