No. 21-1492

# United States Court of Appeals
# For the First Circuit

---

AZURITY PHARMACEUTICALS, INC. f/k/a CutisPharma, Inc.,
*Plaintiff-Appellant*

v.

EDGE PHARMA, LLC f/k/a Edge Pharmacy Services, LLC,
*Defendant-Appellee*

---

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
CASE NO. 1:20-CV-10280-RWZ
HON. RYA W. ZOBEL

## BRIEF OF DEFENDANT-APPELLEE
## EDGE PHARMA, LLC

Linda L. Morkan (CA1# 1134819)
ROBINSON & COLE LLP
William J. Egan
Julianna M. Charpentier
One Boston Place, 25th Floor
Boston, MA 02108
(617) 557-5900
lmorkan@rc.com

Robert J. Fluskey, Jr. (*pro hac vice*)
HODGSON RUSS LLP
The Guaranty Building
140 Pearl Street
Suite 100
Buffalo, NY 14202-4040
(716) 856-4000
RFluskey@hodgsonruss.com

*Counsel for Defendant-Appellee
Edge Pharma, LLC*

Dated: November 30, 2021

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, defendant-appellee Edge Pharma, LLC states and represents that it is a privately-held company. Its parent companies are Edge Pharmacy Holdings, LP, Edge Management, Inc., and Janus Pharma, Inc. No publicly-held company owns ten percent or more of the stock of Edge Pharma, LLC.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT REGARDING ORAL ARGUMENT .............................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................................2

STATEMENT OF THE CASE.................................................................3

    I.    The Parties and Their Products ............................................3

        A.    Azurity and FIRVANQ............................................3

        B.    Edge's Compounding Services and its Vancomycin Product ..................................................................4

    II.    The Regulatory Framework and The FDA's Interim, Non-Binding Policy Guidance .......................................6

    III.    Azurity's Baseless Effort to Pursue a Private FDCA Enforcement Action .........................................................8

        A.    Alleged FDA Violation No. 1: "Bulk Drug Substance.............9

        B.    Alleged FDA Violation No. 2: "Essentially a Copy................11

        C.    Azurity's False Allegations of Public Harm............................12

            1.   The 2015 FDA Letter and the 2018 Form 483 Report ......12

            2.   The March 2020 Inspection Report ...................................13

        D.    Azurity's Lanham Act and Chapter 93A Claims Against Edge....................................................................15

    IV.    Edge's Motion to Dismiss .................................................17

# TABLE OF CONTENTS (CONT.)

**Page**

V.    The District Court's Memorandum and Order Granting Dismissal ..............................................................................19

SUMMARY OF THE ARGUMENT ....................................................20

ARGUMENT ........................................................................................21

I.    The Plaintiff's Lanham Act Claims Are Precluded Because They Require Litigation of Alleged FDCA Violations.....................21

    A.    The FDCA Prohibits Private Rights of Action .......................21

    B.    *POM Wonderful* Does Not Permit Misuse of the Lanham Act as a Vehicle for Private FDCA Claims ...........................23

    C.    A Lanham Act Claim May Evade FDCA Preclusion Only in Narrow Circumstances..........................................................26

    D.    The District Court Appropriately Declined to Supplant the FDA's Regulatory Function................................................28

        1.    Azurity's bulk drug contentions conflict with the FDA's policy choices and judgment...................................29

        2.    Azurity's "identical or nearly identical" contentions conflict with the FDA's policy choices and judgment ......30

            a.    The FDA has expressly requested that courts refrain from interpreting Section 503B's "essentially a copy" requirement.................................30

            b.    Azurity cannot show that all five relevant drug characteristics are the same, as required by the FDA guidance ...........................................................35

            c.    The documentation of clinical difference contentions were never pled, are unpreserved, and are based on mere recommendations and suggestions in the interim guidance ............................36

# TABLE OF CONTENTS (CONT.)

**Page**

       d.   Azurity's Remaining Authority is Distinguishable or Inapposite ................................................................40

II.   The Complaint Fails to State a Lanham Act Claim, Even in the Absence of Preclusion .........................................................43

     A.   Edge's So-called "Superiority" Statement and Other Statements About Product Quality Constitute Non-Actionable Puffery ..................................................43

     B.   Edge's Generalized Statements About Compliance with Administrative Law Are Not Actionable ................................49

     C.   Edge's Indisputably Truthful Statements Are Not Actionable .................................................................53

CONCLUSION ........................................................................55

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE</u>

**Cases**

*Allergan USA Inc. v. Imprimis Pharmacies., Inc.*,
No. 17-cv-01551, 2017 WL 10526121
(C.D. Cal. Nov. 14, 2017).....................................................24, 27, 30, 34-35, 40

*Amarin Pharma, Inc. v. International Trade Comm'n*,
923 F.3d 959 (Fed. Cir.), *cert. denied*, 140 S. Ct. 642, 205 L. Ed.
2d 385 (2019)..............................................................................................24-27

*Athenex Inc. v. Azar*,
397 F. Supp. 3d 56 (D.D.C. 2019)..............................................................11, 39

*Belcher Pharms., LLC v. Hospira, Inc.*,
No. 8:17-CV-2353-T-30JSS, 2018 WL 4643292 (M.D. Fla. Apr. 9,
2018) ................................................................................................................40

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
627 F. Supp. 2d 384 (D.N.J. 2009)..................................................................47

*Buckman Co. v. Plaintiffs' Legal Committee*,
531 U.S. 341 (2001)....................................................................................22, 25

*Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Ave.*,
284 F.3d 302 (1st Cir. 2002)............................................................................54

*Castrol Inc. v. Pennzoil Co.*,
987 F.2d 939 (3d Cir. 1993) ............................................................................47

*Catheter Connections, Inc. v. Ivera Med. Corp.*,
No. 2:14-CV-70-TC, 2014 WL 3536573 (D. Utah July 17, 2014) .............23, 26

*Clorox Co. Puerto Rico v. Proctor & Gamble Com. Co.*,
228 F.3d 24 (1st Cir. 2000)..............................................................................47

*Coastal Abstract Service, Inc. v. First American Title Ins. Co.*,
173 F.3d 725 (9th Cir. 1999) ...........................................................................50

*Cochran v. Quest Software, Inc.*,
328 F.3d 1 (1st Cir. 2003)................................................................................37

## TABLE OF AUTHORITIES - cont'd

PAGE

*Conrad v. Russell*,
  No. 11-cv-570-bbc, 2011 WL 3877000 (W.D. Wis. Sept. 1, 2011)...................45

*Cook, Perkiss & Liehe, Inc. v. Northern California Collection Service Inc.*, 911 F.2d 242 (9th Cir. 1990) ......................................................................46

*Dial A Car, Inc. v. Transp., Inc.*,
  884 F. Supp. 584 (D.D.C. 1995), *aff'd*, 82 F.3d 484 (D.C. Cir. 1996) .......................................................................................................... 51-52

*Employers Insurance Co. of Wausau v. OneBeacon American Insurance Co.*, 744 F.3d 25 (1st Cir. 2014).........................................................37

*Euro-Pro Operating LLC v. TTI Floor Care North America*,
  No. 12-10568-DJC, 2012 WL 2865793 (D. Mass. July 11, 2012) ....................45

*Ferring Pharmaceuticals, Inc. v. Braintree Laboratories, Inc.*,
  38 F. Supp. 3d 169 (D. Mass. 2014)................................................................47

*Genus Lifesciences Inc. v. Lannett Co.*,
  No. 18-cv-07603, 2019 WL 4168958 (N.D. Cal. Sept. 3, 2019) ................27, 41

*Gillette Co. v. Norelco Consumer Products Co.*,
  946 F. Supp. 115 (D. Mass. 1996)....................................................................45

*Greenwich Taxi, Inc. v. Uber Technologies, Inc.*,
  123 F. Supp. 3d 327 (D. Conn. 2015)...............................................................51

*Hi-Tech Pharmacies, Inc. v. Hodges Consulting, Inc.*,
  230 F. Supp. 3d 1323 (N.D. Ga. 2016)..............................................................24

*Hope Medical Enterprises, Inc. v. Fagron Compounding Servs., LLC*,
  No. 2:19-CV-07748, 2021 WL 753566 (C.D. Cal. Jan. 25, 2021)....................38

*Impact Applications, Inc. v. Concussion Management, LLC*,
  No. GJH-19-3108, 2021 WL 978823 (D. Md. Mar. 16, 2021) ................... 48-49

## TABLE OF AUTHORITIES - cont'd

PAGE

*Intermountain Stroke Center, Inc. v. Intermountain Health Care, Inc.*,
   638 F. App'x 778 (10th Cir. 2016) ..............................................44, 54

*JHP Pharmacy, LLC v. Hospira, Inc.*,
   52 F. Supp. 3d 992 (C.D. Cal. 2014) ......................................... 22-24, 26, 31, 38

*Kurin, Inc. v. Magnolia Medical Technologies, Inc.*,
   No. 3:18-cv-1060-L-LL, 2019 WL 5422931 (S.D. Cal. Oct. 23,
   2019) ...........................................................................................22, 26

*Language Line Servs., Inc. v. Language Services Associates, LLC*,
   No. C 10-02605, JW, 2011 WL 5024281 (N.D. Cal. Oct. 13, 2011).................50

*Lister v. Bank of America., N.A.*,
   790 F.3d 20 (1st Cir. 2015)......................................................... 43-44

*McGrath & Co. v. PCM Consulting, Inc.*,
   No. 11-10930-DJC, 2012 WL 503629 (D. Mass. Feb. 15, 2012) .....................54

*Metropolitan Regional Information Systems, Inc. v. American Home
   Realty Network, Inc.*, 948 F. Supp. 2d 538 (D. Md. 2013)................................50

*Mobileye, Inc. v. Picitup Corp.*,
   928 F. Supp. 2d 759 (S.D.N.Y. 2013) ..............................................49

*Nexus Pharmaceuticals,, Inc. v. Central Admixture Pharmacy
   Services, Inc.*, 8:20-cv-01506-CJC-JDE, 2020 WL 6555052 (C.D.
   Cal. Oct. 19, 2020)..............................................................................32

*Nexus Pharmaceuticals, Inc. v. Leiters, Inc.*,
   Case No. 2:20-cv-07328-CJC(JDEx), 2020 WL 10356606 (C.D.
   Cal. Oct. 29, 2020)................................................................. 18, 31-34

*Nexus Pharmaceuticals, Inc. v. Quva Pharma, Inc.*,
   Case No. 2:20-cv-07518-CJC(JDEx), 2020 WL 6498970 (C.D.
   Cal. Oct. 29, 2020)................................................................. 18, 24, 33-34

## TABLE OF AUTHORITIES - cont'd

PAGE

*Nexus Pharmaceuticals, Inc. v. U.S. Compounding, Inc.*,
  No. CV-20-07331-CJC(JDEx), 2021 WL 342573 (C.D. Cal. Jan. 7,
  2021) .................................................................................................... 21-22

*Par Sterile Product, LLC v. Fresenius Kabi USA LLC*,
  No. 14 C 3349, 2015 WL 1263041 (N.D. Ill. Mar. 17, 2015) ...........................41

*PhotoMedex, Inc. v. Irwin*,
  601 F.3d 919 (9th Cir. 2010) ......................................................... 26-27

*Pizza Hut, Inc. v. Papa John's International, Inc.*,
  227 F.3d 489 (5th Cir. 2000) ......................................................... 44-46

*POM Wonderful LLC v. Coca Cola Co.*,
  573 U.S. 102 (2014) ................................................ 19, 22-26, 30, 33, 42

*Rosaura uilding Corp. v. Municipality of Mayaguez*,
  778 F.3d 55 (1st Cir. 2015) .............................................................37

*Sandoz Pharmacy Corp. v. Richardson-Vicks, Inc.*,
  902 F.2d 222 (3d Cir. 1990) ..............................................23, 27, 51

*Sustainable Sourcing, LLC v. Brandstorm, Inc.*,
  No. 12-cv-30093-MP, 2016 WL 3064055 (D. Mass. May 31, 2016) ...............46

*United States v. Genendo Pharm., N.V.*,
  485 F.3d 958 (7th Cir. 2007) .............................................................21

*United States v. Sage Pharm., Inc.*,
  210 F.3d 475 (5th Cir. 2000) .............................................................21

*Verisign, Inc. v. XYZ.COM LLC*,
  848 F.3d 292 (4th Cir. 2017) .............................................................46

*Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*,
  516 F. Supp. 2d 270 (S.D.N.Y. 2007) ...............................................54

## TABLE OF AUTHORITIES - cont'd

PAGE

*World Nutrition Inc. v. Advanced Enzymes USA*,
    CV-19-00265-PHX-GMS, 2021 WL 632684 (D. Ariz. Feb. 18,
    2021) ..........................................................................................42

*Yan v. ReWalk Robotics Ltd.*,
    973 F.3d 22 (1st Cir. 2020)........................................................ 43-44

**Statutes, Rules, & Regulations**

15 U.S.C. § 1125(a)(1) (Lanham Act) ..............................................*passim*

21 U.S.C. § 332 ....................................................................................22

21 U.S.C. § 334 ....................................................................................22

21 U.S.C. § 337(a) ..........................................................................22, 25

21 U.S.C. §§ 353a ...................................................................................7

21 U.S.C. § 353b(a)(2)(A)(i) ..................................................................9

21 U.S.C. § 353b(a)(2)(A)(ii) .................................................................9

21 U.S.C. § 353b(a)(5).......................................................................9, 12

21 U.S.C. § 353b(d)(1)............................................................................5

21 U.S.C. § 353b(d)(2)..................................................................9, 12, 32

21 U.S.C. § 503(b) ...............................4, 7-9, 12-13, 16-17, 19, 28, 31-35

Mass. Gen. Laws Chapter 93A .......................................................16, 28

21 C.F.R § 207.3 ..................................................................................11

Federal Rule of Appellate Procedure 32(a)(5)(a) ...................................56

Federal Rule of Appellate Procedure 32(a)(6)........................................56

Federal Rule of Appellate Procedure 32(a)(7)(B) ..................................56

## <u>TABLE OF AUTHORITIES - cont'd</u>

<u>PAGE</u>

Federal Rule of Appellate Procedure 32(f)................................................................56

Federal Rule of Civil Procedure 12(b)(1) ...............................................................17

Federal Rules of Civil Procedure 12(b)(6) ........................................................3, 17

Federal Rule of Evidence 407 ..................................................................................49

**Other Authorities**

5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR
    COMPETITION §§ 27:67, 27:56 (5th Ed. 2021) ...................................................45

https://firvanq.com/about-firvanq.html ...................................................................15

www.azurity.com/about-us .........................................................................................3

www.fda.gov/drugs/guidance-compliance-regulatory-
    information/human-drug-compounding ...................................................5, 7, 52

www.fda.gov/drugs/human-drug-compounding/registered-
    outsourcing-facilities .........................................................................................53

www.fda.gov/inspections-compliance-enforcement-and-criminal-
    investigations/inspection-references/fda-form-483-frequently-
    asked-questions ...................................................................................................15

www.fda.gov/inspections-compliance-enforcement-and-
    criminalinvestigations/inspection-references/fda-form-483-
    frequently-asked-questions .................................................................................13

## STATEMENT REGARDING ORAL ARGUMENT

While the issues presented on this appeal are straightforward, as highlighted by the district court's succinct and authoritative ruling on the motion to dismiss, defendant-appellee Edge Pharma, LLC respectfully suggests that the Court may be aided by oral argument.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     The Food and Drug Administration (the FDA) has nearly exclusive enforcement authority of the Federal Food, Drug, and Cosmetic Act (the FDCA). A Lanham Act claim that is based on FDCA violations is therefore precluded when its adjudication would conflict with the FDA's policy choices or otherwise undermine agency judgment. Plaintiff-appellant Azurity Pharmaceuticals, Inc. alleges that Edge Pharma, LLC violated Section 43 of the Lanham Act, because Edge violated the FDCA. The FDCA provisions relied upon by Azurity are subject to interim, non-binding guidance, and the FDA has not yet issued final regulations. The FDA has also inspected Edge, but not found any of the violations cited in Azurity's complaint. The District Court correctly held that Azurity's Lanham Act claims were precluded by the FDCA.

2.     Courts have held that one of the FDCA provisions relied upon by Azurity presents complex, thorny questions, which are not appropriate for litigation in district court. The FDA has expressly cautioned against enforcement of the provision in private litigation. The other FDCA rule cited by Azurity is subject to complex interim guidance that is currently under FDA review. The district court correctly held that Azurity's FDCA allegations could not be resolved without interfering with the FDA's policy-making authority.

3.      To state a claim for false advertising under the Lanham Act, a plaintiff must identify false statements of fact. Opinion and puffery are not actionable. In its complaint, Azurity identifies only opinions, layperson commentary regarding legal compliance, and truthful statements. This Court can affirm the judgment below on alternative grounds and dismiss Azurity's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## STATEMENT OF THE CASE

### I.    The Parties and Their Products

#### A.    Azurity and FIRVANQ

Azurity is a pharmaceutical company that sells a form of vancomycin hydrochloride under the brand name "FIRVANQ." Joint Appendix (JA) 9 (¶ 11). Vancomycin is an antibiotic indicated for the treatment of serious infections. The drug has been available for decades and is often administered to patients in hospitals. JA 213 (¶ 13). Azurity's predecessor, RxM Therapeutics, LLC, obtained approval for FIRVANQ in January 2018, and Azurity began selling the product in 2018 or 2019. JA 13 (¶¶ 33-34); www.azurity.com/about-us.

Azurity sells FIRVANQ in a kit. Each kit includes a bottle of vancomycin hydrochloride USP powder and a bottle of grape-flavored diluent. Before administering the drug, one must pour the grape-flavored diluent into the

vancomycin hydrochloride USP powder and dissolve the powder into the diluent.
JA 14 (¶¶ 38-39); JA 213 (¶ 15) & JA 280-81.

**B.    Edge's Compounding Services and its Vancomycin Product**

Edge is a registered "outsourcing facility" under Section 503B of the FDCA.
JA 13 (¶ 31); JA 211 (¶ 5); JA 81 (¶ 6); JA 152. Edge first registered with the FDA
in January 2014. JA 211 (¶ 5).

As an outsourcing facility, Edge produces drugs through the process of
"compounding," which involves "combining, admixing, mixing, diluting, pooling,
reconstituting, or otherwise altering . . . a drug or bulk drug substance to create a
drug." 21 U.S.C. § 353b(d)(1); JA 211 (¶ 6). Compounded drugs serve a critical
role for patients whose clinical needs cannot be met by an FDA-approved drug
product, such as, for example, a patient who has an allergy to a dye that is
contained in an FDA-approved drug product, or a patient who needs a medicine in
a liquid form that is not available in an FDA-approved product. JA 211 (¶ 7);
JA 102.

For many years, individual healthcare providers and pharmacists have
engaged in compounding. JA 211 (¶ 6). Unlike the individual healthcare provider
or pharmacist, outsourcing facilities register with the FDA, they compound drugs
under the strict oversight of the FDA, and they produce products in

4

quality-controlled environments. JA 212 (¶ 9). All outsourcing facilities, including

Edge, are regularly inspected and audited by the FDA for compliance.

JA 212 (¶ 10); JA 81 (¶ 6); JA 151-56; www.fda.gov/drugs/guidance-compliance-

regulatory-information/human-drug-compounding. The FDA has inspected Edge at

least four times since its founding in 2013 as part of the agency's standard

inspection/audit process. The most recent inspection/audit began in March 2020.

JA 212 (¶ 10).

Given the critical need for compounded drugs, outsourcing facilities are

permitted to sell such drugs directly to hospitals and healthcare professionals

without obtaining individual patient prescriptions and FDA pre-market approval.

Hospitals acquire most of their compounded drugs from outsourcing facilities. JA

212 (¶ 9); JA 225. Edge provides several critically-important medicines to

hospitals, including, for example, drugs used for anesthesia in the operating room

and drugs used to treat hospitalized cardiac patients. Edge's production processes

are managed by an experienced team of Ph.D. scientists, pharmacists, and

engineers. JA 212-13 (¶¶ 11-12).

In 2018, Edge began making and selling a compounded vancomycin

product. JA 213 (¶ 14). Edge's product is manufactured and sold in a different

dosage form than FIRVANQ. Edge does not sell vancomycin in a kit containing

vancomycin powder and a grape-flavored diluent. Edge produces a liquid, oral

dose solution of vancomycin that is sold in a single-dose syringe. Edge's

vancomycin product enables the healthcare provider to administer the drug in an

oral form, without mixing and reconstitution. JA 214 (¶ 16); JA 217 (¶ 27).

This difference is very significant, especially in a hospital setting. Each

FIRVANQ kit is designed for a single patient. It contains one course of treatment

with multiple doses. JA 214 (¶ 16); JA 267-70. But in a hospital, it is not

uncommon to administer less than the full course of medicine before the patient is

discharged or recovers. If the hospital wishes to use the remaining medicine for

another patient, the hospital must engage in the process of compounding, which

would require the hospital to comply with various compounding standards. Many

hospitals cannot meet these standards, and as a result, they cannot use FIRVANQ

in this fashion. JA 214 (¶ 16); JA 225, 234-39. These problems do not exist with

Edge's vancomycin product because, as explained above, Edge's product is sold in

a ready-to-administer single-dose syringe. JA 214 (¶ 16).

## II.    The Regulatory Framework and
         The FDA's Interim, Non-Binding Policy Guidance

Before marketing a drug, the FDCA requires pre-approval by the FDA. As

noted above, compounded drugs are excluded from the FDCA's pre-approval

requirements. *See* Memorandum and Order of the District Court, 5/18/21, at 2,

Addendum (ADD) at 3. However, in 2013, Congress passed the Drug Quality and

Security Act, which added Section 503B to the FDCA. Section 503B established

certain requirements for compounded drugs and created the new category of drug

manufacturer called an "outsourcing facility." *See* 21 U.S.C. §§ 353a, 503b; *see*

*also* ADD 3. Outsourcing facilities must be registered with the FDA, and they are

regularly subjected to inspection and auditing. JA-212 (¶ 9); JA 81 (¶ 6); JA 151-

56; www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-

compounding.

    The FDA has not yet issued regulations under Section 503B. The FDA has

only issued interim and non-binding policy guidance. Two such non-binding policy

documents are relevant to this action. *First*, in January 2017, the FDA published its

"Interim Policy On Compounding Using Bulk Drug Substances Under Section

503B of the Federal Food, Drug, and Cosmetic Act" ("Interim Bulk Drug Policy").

*See* JA-80 (¶ 2) & JA 83-95 (complete copy of guidance). *Second*, on January

2018, the FDA issued a guidance document entitled "Compounded Drug Products

That Are Essentially Copies of Approved Drug Products Under Section 503B of

the Federal Food, Drug, and Cosmetic Act" ("Essentially-a-Copy Guidance"). *See*

JA-80 (¶ 3) & JA 97-114 (complete copy of guidance). Both documents contain

only "nonbinding recommendations." *See* JA 86, 100.

7

III.    **<u>Azurity's Baseless Effort to Pursue<br>a Private FDCA Enforcement Action</u>**

Unhappy with Edge's lawful competition against its branded drug product, Azurity filed this case on February 12, 2020. While Azurity purports to assert false advertising claims under Section 43(a) of the Lanham Act, Azurity seeks a regulatory remedy that falls squarely within the province of the FDA—an injunction barring Edge's sale of vancomycin. JA 8-9 (¶¶ 7-8) ("Azurity seeks . . . a declaration that Edge is unlawfully producing and selling vancomycin . . . . Azurity also seeks a preliminary and permanent injunction prohibiting Defendant from further manufacturing, marketing, and selling vancomycin . . . ."). When it filed its complaint, Azurity moved for a preliminary injunction and asked the Court to ban Edge's distribution of oral vancomycin. JA 53.

Azurity alleges that Edge's vancomycin product violates Section 503B of the FDCA in two respects: (1) Edge is purportedly compounding its vancomycin product using a "bulk drug substance" that does not appear on the so-called "503B Bulks List" (defined below), in violation of 21 U.S.C. Section 353b(a)(2)(A)(i); and (2) Edge's vancomycin product is "essentially a copy" of an FDA-approved drug—namely, FIRVANQ—which purportedly violates 21 U.S.C. Sections 353b(a)(5) and 353b(d)(2). JA 5-17 (¶¶ 22-23, 43-51).

8

**A.    Alleged FDA Violation No. 1: "Bulk Drug Substance"**

According to Azurity, under Section 503B of the FDCA, an outsourcing facility may compound drug products using a "bulk drug substance" only if: (1) the bulk drug substance appears on a list established by the Secretary of Health and Human Services that identifies bulk drug substances "for which there is a clinical need" (the "503B Bulks List"); or (2) the drug compounded from the bulk drug substance appears on a drug shortage list. JA 11 (¶ 22) (citing 21 U.S.C. Section 353b(a)(2)(A)(i) & (ii)).

Azurity posits—upon alleged information and belief—that Edge is violating this FDCA provision because Edge is allegedly compounding vancomycin with a bulk drug substance that does not appear on the 503B Bulks List. *Id.* Yet, in its own pleading, Azurity acknowledges three facts that contradict this legal conclusion: (1) the FDA has only received nominations for the 503B Bulks List; (2) vancomycin has been nominated for inclusion on that list; and (3) the FDA considers vancomycin a "Category 1" substance. JA 15-16 (¶¶ 45-50); *see also* JA 81 (¶ 4) & JA 138, 141.

Under the FDA's 2017 Interim Bulk Drug Policy, a Category 1 substance is a substance that has been nominated for inclusion on the 503B Bulks List, with sufficient supporting information to enable evaluation, and which has not been identified by the FDA as presenting a significant safety risk in compounding. JA

15 (¶¶ 46-48); *see also* JA 90, 93 (relevant pages of the Interim Bulk Drug Policy).

Quoting an incomplete passage from the Interim Bulk Drug Policy, Azurity

contends that a Category 1 substance, like vancomycin, must be treated "as if 'the

bulk drug substance is not on the 503B bulks list.'" JA 16 (¶ 49, quoting Interim

Bulk Drug Policy at JA 95). But in the very next sentence of the Interim Bulk Drug

Policy, the FDA expressly states that it "**does not intend to take action against an**

**outsourcing facility for compounding a drug product from a [Category 1]**

**bulk drug substance**," if certain manufacturing requirements are met. JA 95

(emphasis added); *see also* JA 93.

Thus, according to Azurity's own Complaint—and the plain language of the

Interim Bulk Drug Policy—Azurity seeks to enforce a "bulk drug substance"

provision of the FDCA under circumstances in which the FDA has expressly

declined to take any enforcement action.

This issue is also moot because Edge no longer uses a "bulk drug substance"

to compound its vancomycin oral solution product. Edge now uses an

FDA-approved vancomycin drug product as a starter in the compounding process

that is made by Samson Medical Technologies, L.L.C. *See* JA 215 (¶ 20) & JA

280-81.

10

A finished drug product—like the one Edge now uses—is not a "bulk drug substance" within the meaning of the FDCA. *See* JA 89 (noting that "[f]inished drug products are not eligible for the 503B bulks list because they do not meet the definition of a bulk drug substance in 21 CFR 207.3"); *see also Athenex Inc. v. Azar*, 397 F. Supp. 3d 56, 60 (D.D.C. 2019) ("[Section] 503B authorizes two ways in which to bulk compound a drug . . . . 'sterile-to-sterile compounding' [where] an outsourcing facility starts with an FDA-approved drug, disassembles it, and alters it into a finished drug product for sale . . . [and] 'bulk compounding,' [which] starts with a 'bulk drug substance.'").

### B.    Alleged FDA Violation No. 2: "Essentially a Copy"

According to Azurity, under Section 503B, an outsourcing facility may not compound using a non-FDA-approved substance if the drug that is produced is "essentially a copy of one or more approved drugs." JA 11 ¶ 23 (citing 21 U.S.C. § 353b(a)(5)). A drug is "essentially a copy of an approved drug" if it is "identical or nearly identical" to an approved drug that is not on a drug shortage list. 21 U.S.C. § 353b(d)(2).

Azurity concludes—upon information and belief—that Edge's vancomycin product is essentially a copy of Azurity's FIRVANQ product. JA 11, 14 (¶¶ 23, 43). Azurity pleads no facts describing how Edge's vancomycin product is identical or nearly identical to Azurity's FIRVANQ product. JA 14-22 (¶¶ 36-83).

## C.    Azurity's False Allegations of Public Harm

In its complaint and brief to this Court, Azurity falsely asserts that Edge's compounding business and production of vancomycin pose a risk to public health. *See* JA 8, 16-17; App. Br. 10-11. Azurity's attempt to defame Edge's business underscores the fundamental problem with Azurity's case: despite close oversight and multiple inspections and audits, the FDA has ***never*** required corrective action for Edge's oral vancomycin product, and the FDA has ***never*** found that Edge has violated the bulk drug substance or "essentially a copy" provisions of the FDCA.

### 1.    The 2015 FDA Letter and the 2018 Form 483 Report

In its complaint, Azurity refers to a letter that Edge received from the FDA in 2015 and an FDA Form 483 inspection report received in 2018. Azurity contends that this letter and report prove that Edge does not comply with Section 503B. Azurity also implies that the report somehow relates to the compounding process for Edge's vancomycin oral solution. JA 16-17 (¶¶ 53-58). Azurity is wrong on both points.

The 2015 letter was issued before Edge began producing its vancomycin product. The letter addressed labeling on certain products, the timing of certain report submissions, and certain sterility procedures. The 2018 Form 483 inspection report addressed certain laboratory issues and labeling requirements for certain drugs. Edge's vancomycin oral solution was ***not*** one of the drugs addressed in the

report. JA 220-21 (¶ 37).[1] Edge cooperated with the FDA and remedied the issues identified in the 2015 letter and the 2018 Form 483 inspection report. Neither the letter nor the report even suggested that Edge was improperly compounding any drug product using a "bulk drug substance" that does not appear on the 503B Bulks List or that any of Edge's products were "essentially a copy" of an FDA-approved drug. Neither the letter nor the report revoked or suspended Edge's 503B registration status. JA 220-21 (¶ 37).

## 2.    The March 2020 Inspection Report

Azurity attached as an exhibit to one of its supplemental briefs below a March 30, 2020 FDA inspection report of Edge's facility (the "March Report"). JA 402-03, 420-36. Azurity implies that the March Report somehow supports its claims. Azurity also argues that the March Report includes "violations" that "pose a risk to public health and safety." JA 402-03; App. Br. at 10-12. Azurity is wrong on all points.

First, not one of the observations in the March Report is directed to Edge's oral vancomycin product. The FDA inspected Edge's facility from March 4

---

[1]    A Form 483 inspection report does not constitute a final agency determination of whether any condition is in violation of the FDCA. *See* www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions.

through March 30, 2020, and the FDA did not require any corrective action with respect to Edge's production, marketing, or labeling of oral vancomycin. JA 452-53 (¶¶ 2-5); JA 420-36.

Second, the March Report does not support any of the "non-compliance" allegations presented by Azurity in this case. Nothing in the March Report even suggests that Edge has improperly compounded any drug using a "bulk drug substance" or manufactured a product that is "essentially a copy" of an FDA-approved drug. JA 452-53 (¶¶ 2-5); JA 420-36.

Third, the March Report does not include "violations" that pose a risk to public health and safety. As the first page of the March Report makes clear: "This document lists observations made by the FDA representative(s) during the inspection of your facility. They are inspectional observations, and do not represent a final Agency determination regarding your compliance. If you have an objection regarding an observation, or have implemented, or plan to implement, corrective action in response to an observation, you may discuss the objection or action with the FDA representative(s) during the inspection or submit this information to FDA at the address above." JA 420. Edge has responded to the March Report and is working with the FDA to address the agency's observations as part of the FDA

14

oversight process. The March Report does not revoke or suspend Edge's 503B registration status. JA 453 (¶¶ 4-5).

As Azurity knows, FDA reports with inspectional observations are a common, recurring part of the oversight process, and numerous drug companies receive them. JA 212 (¶ 10), 220-21 (¶¶ 36-37); *see* www.fda.gov/inspections-compliance-enforcement-and-criminalinvestigations/inspection-references/fda-form-483-frequently-asked-questions. In fact, Azurity's predecessor, CutisPharma, Inc., was the subject of significant FDA inspectional observations in 2020 with respect to FIRVANQ—the very drug at issue here. *See* JA 449-51.

In a January 2020 report, the FDA noted, among other things, that CutisPharma failed to adequately investigate customer complaints involving "foreign material," "leaking containers," and a "hazy appearance." JA 450. The FDA also observed that the "accuracy, sensitivity, specificity and reproducibility" of certain test methods for FIRVANQ had not been properly established and that "there is a failure to thoroughly review any unexplained discrepancy and the failure of a batch or any of its components to meet any of its specifications . . . ." JA 449. Despite these FDA observations, Azurity continues to market and sell FIRVANQ as FDA approved and FDA compliant. *See* https://firvanq.com/about-firvanq.html.

### D.    Azurity's Lanham Act and Chapter 93A Claims Against Edge

Because it has no private right of action under the FDCA (*see infra*), Azurity

seeks to convert its FDCA allegations into a Lanham Act case. To that end,

Azurity contends that Edge violated Section 43(a) of the Lanham Act because

Edge violated Section 503B of the FDCA. JA 18-19 (¶¶ 60-63).

Azurity's case is based on the following syllogism: Edge markets itself as an

approved 503B outsourcing facility that complies with FDA rules; Edge does not

comply with these rules with respect to vancomycin production; therefore, Edge is

engaged in false advertising and promotion. *Id*.

Azurity identifies Edge's allegedly false advertising statements in paragraph

61 of its complaint. JA 18-19. The advertising statements identified by Azurity fall

into three non-actionable categories: (1) puffery and opinion, where Edge tells

consumers that it offers "high quality, innovative solutions, " provides "turnkey

503B outsourcing with the highest level of quality," and "react[s] quickly to

customer requirements and deliver[s] cost effective solutions" (*see* JA 18-19 (¶¶

61(a),(b), (f)); generalized statements of legal compliance, where Edge tells

consumers that its "facility is compliant with . . . state, local, and federal

regulations and guidelines" and that it is a "USP 797 and cGMP compliant

FDA-Registered 503B Outsourcing Facility" (*id.* ¶¶ 61(d), (e)); and indisputably

true statements, where Edge tells consumers that it is an "FDA-registered and state-licensed, 503B Outsourcing Facility." *Id.* ¶¶ 61(a), (c)).

Azurity also alleges that Edge presented a purportedly false "superiority statement" on its website by stating that "commercially available options [for oral vancomycin] are not ideal for use in the hospital setting." JA 20 (¶ 66). This vague opinion is not a statement of fact. It is, at most, non-actionable puffery.

## IV.   **Edge's Motion to Dismiss**

Edge moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Edge presented three primary arguments: (1) Azurity failed to state a claim under the Lanham Act because the allegedly false advertising statements constituted non-actionable puffery, generalized statements of legal compliance, and indisputably truthful statements; (2) Azurity's claims were precluded because the district court's adjudication of them would usurp the FDA's policymaking authority; and (3) under the doctrine of primary jurisdiction, the district court should defer to the FDA's regulatory oversight. JA 162-81.

Contrary to Azurity's misleading implication, all the purportedly false advertising statements, including the so-called "superiority claim," were fully briefed below. *See, e.g.*, JA 169 (Edge discussing Lanham Act authorities on superiority statements), JA 357 (Azurity addressing superiority statement), JA 394

17

(Edge addressing superiority statement), JA 441-42 (Edge addressing superiority statement).

After initial briefing, Edge submitted a supplemental memorandum and additional authority in further support of its motion to dismiss because, in October 2020, two highly-relevant and persuasive decisions were released by a federal court in California: *Nexus Pharmaceuticals, Inc. v. Leiters, Inc.*, Case No. 2:20-cv-07328-CJC(JDEx), 2020 WL 10356606 (C.D. Cal. Oct. 29, 2020) and *Nexus Pharmaceuticals, Inc. v. Quva Pharma, Inc.*, Case No. 2:20-cv-07518-CJC(JDEx), 2020 WL 6498970 (C.D. Cal. Oct. 29, 2020). JA 454-63. The court in those cases dismissed the plaintiff's unfair competition and consumer protection claims, which were based on alleged violations of Section 503B, and held that such claims were impliedly preempted by the FDCA.

The court in *Leiters* and *Quva* relied on a declaration from the FDA, which cautioned against judicial interpretation of the "essentially a copy" provision of Section 503B with respect to a compounding process that uses an FDA-approved product as a starter—the very circumstance at issue here. JA 454-63, 482-93. *See infra* for further discussion**.**

18

**V.**     **The District Court's Memorandum and Order Granting Dismissal**

In a succinct but thorough decision, the district court held that Azurity's claims were precluded by the FDCA and dismissed the case. The court correctly recognized that enforcement of the FDCA and the "detailed prescriptions of its implementing regulations is largely committed to the FDA." ADD 4-6 (citing *POM Wonderful LLC v. Coca Cola Co.*, 573 U.S. 102, 115 (2014)). Relying on multiple authorities, including statements from the FDA itself, the court recognized that Azurity's "essentially a copy" allegations presented "thorny questions that may require the FDA's expertise." ADD 5-6 (citing cases).

The court also noted that, despite regular oversight and inspections, the FDA has not determined that Edge is violating any of the requirements identified in Azurity's complaint, nor has the FDA included any corrective measures in any of its inspection reports regarding Azurity's manufacture of vancomycin. *Id*. at 3-4.

## SUMMARY OF THE ARGUMENT

This is not really a Lanham Act case. Azurity's purported false advertising claims are a thinly-disguised attempt to weaponize the FDCA as a means of reducing lawful competition.

The FDCA contains no private right of action. A disgruntled business competitor lacks the authority to enforce the statute. Yet Azurity's Lanham Act case requires proof of FDCA violations. To succeed, Azurity must establish that Edge is violating the FDCA's "bulk drug substance" and "essentially a copy" provisions. And if it succeeds, Azurity wants a regulatory remedy—*i.e.*, a ban on Edge's sale of vancomycin.

The district court properly held that litigating these issues before it would necessarily interfere with the FDA's policy judgments and enforcement authority. The FDCA rules on which Azurity relies are subject only to interim, non-binding guidance. The FDA has publicly declined enforcement of the "bulk drug substance" practice at issue here and has urged the courts not to adjudicate the "essentially a copy" standard in anticipation of further guidance. The FDA has also exercised its oversight authority by inspecting Edge's facility on multiple occasions and finding no violation of the rules cited by Azurity and no transgressions relating to Edge's vancomycin product. The district court correctly held that Azurity's case is precluded by the FDCA.

20

Even if preclusion does not apply, Azurity's case still fails, as this Court can affirm dismissal on alternative grounds—namely, Azurity's failure to state a Lanham Act claim. Azurity has not identified any false statements of fact presented by Edge. Azurity's complaint cites only puffery, opinion, and indisputably truthful assertions. Under settled law, Azurity's disagreement with Edge regarding the comparative benefits of the companies' competing products is simply not actionable.

## ARGUMENT

### I.    The Plaintiff's Lanham Act Claims Are Precluded Because They Require Litigation of Alleged FDCA Violations

#### A.    The FDCA Prohibits Private Rights of Action

"The FDCA's comprehensive scheme of drug regulation is designed to ensure the nation's drug supply is safe and effective." *United States v. Sage Pharm., Inc.*, 210 F.3d 475, 479 (5th Cir. 2000); *see also United States v. Genendo Pharm., N.V.*, 485 F.3d 958, 960 (7th Cir. 2007) (noting "the FDCA's comprehensive scheme regulating the manufacture, sale, and importation of prescription drugs"); *Nexus Pharms., Inc. v. U.S. Compounding, Inc.*, No. CV-20-07331-CJC(JDEx), 2021 WL 342573, at *2 (C.D. Cal. Jan. 7, 2021) ("[T]he FDCA subjects the drug industry to a comprehensive regulatory authority.").

Under this comprehensive scheme, the FDA has "nearly exclusive enforcement authority" with respect to the FDCA. *POM Wonderful*, 573 U.S. at 109. Among other powers, Congress vested the FDA with responsibility for investigating FDCA violations and equipped the agency with a panoply of enforcement mechanisms, including injunction proceedings, civil and criminal penalties, and seizure. 21 U.S.C. §§ 332-34, 372. "Private parties may not bring enforcement suits." *Id.*; *see also* 21 U.S.C. § 337(a). "The FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit . . . ." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001). "[I]f someone believes the FDCA is being violated, a private lawsuit is generally not the way to address it." *U.S. Compounding*, 2021 WL 342573, at *2.

A private claim under the Lanham Act is therefore precluded where its adjudication would "directly conflict[] with the agency's policy choice" or otherwise "undermin[e] an agency judgment." *POM Wonderful*, 573 U.S. at 120; *Kurin, Inc. v. Magnolia Med. Techs., Inc.*, No. 3:18-cv-1060-L-LL, 2019 WL 5422931, at *3 (S.D. Cal. Oct. 23, 2019) (holding certain false advertising claims to be precluded where resolving whether medical device had been misclassified would "require[] the Court to improperly interpret and enforce FDA regulations"); *JHP Pharm., LLC v. Hospira, Inc.*, 52 F. Supp. 3d 992, 1004 (C.D. Cal. 2014) (finding preclusion as to whether drug was being sold illegally as inquiry

implicating FDA's rule making authority and "complex issues of history, public safety, and administrative priorities that Congress has delegated exclusively to the FDA"); *Catheter Connections, Inc. v. Ivera Med. Corp.*, No. 2:14-CV-70-TC, 2014 WL 3536573, at *6 (D. Utah July 17, 2014) (holding preclusion as to claim that defendant was falsely advertising medical device as "FDA approved"). "[W]hat the [FDCA] ... do[es] not create directly, the Lanham Act does not create indirectly, at least not in cases requiring original interpretation of th[is] Act[ ] or [its] accompanying regulations." *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 231 (3d Cir. 1990).

### B. *POM Wonderful* Does Not Permit Misuse of the Lanham Act as a Vehicle for Private FDCA Claims

Azurity insists that the District Court's ruling is "entirely inconsistent" and "contrary to" *POM Wonderful*, a beverage labeling case where the defendant's regulatory compliance was not at issue. App. Br. at 21. But, as the Federal Circuit has emphasized, *POM Wonderful* "did not open the door to Lanham Act claims that are based on proving a violation of the FDCA itself":

> [Appellant] views *POM Wonderful* as rejecting the view that the FDCA precludes Lanham Act claims. But this reads *POM Wonderful* too broadly. Although *POM Wonderful* held that the FDCA does not categorically preclude a Lanham Act claim based on a product (e.g., a label) that is regulated by the FDCA, **the court did not open the door to Lanham Act claims that are based on proving FDCA violations. The allegations underlying the Lanham Act claim in *POM Wonderful* did not require proving a violation of the FDCA itself**.

*See id.* at 117, 134 S. Ct. 2228 ("But POM seeks to enforce the Lanham Act, not the FDCA or its regulations."). This stands in stark contrast to the allegations in our case, which are based solely on alleged violations of the FDCA's requirements.

*Amarin Pharma, Inc. v. Int'l Trade Comm'n*, 923 F.3d 959, 969 (Fed. Cir.), *cert. denied*, 140 S. Ct. 642, 205 L. Ed. 2d 385 (2019) (emphasis added).

Further, Azurity's insinuation that the district court somehow overlooked *POM Wonderful* and relied on now superseded precedent is simply not true. To the contrary, in finding preclusion, the district court not only cited *POM Wonderful* but also analyzed Azurity's claims under *Allergan USA Inc. v. Imprimis Pharms., Inc.*, No. 17-cv-01551, 2017 WL 10526121 (C.D. Cal. Nov. 14, 2017)—the very same post-*POM* authority that Azurity seeks to rely upon in arguing that preclusion is inapplicable here. *Cf.* ADD 4-5; App. Br. at 18, 23-25, 27, 30, 32, 35-36. In addition, the district court relied on at least two other post-*POM* decisions. ADD 4-5 (citing *Hi-Tech Pharms., Inc. v. Hodges Consulting, Inc.*, 230 F. Supp. 3d 1323 (N.D. Ga. 2016); *JHP Pharm.*, 52 F. Supp. 3d at 1004).

In the same vein, Azurity wastes considerable ink faulting the district court for citing to *Quva*, 2020 WL 6498970, because that case involved the pre-emption of state law claims, not preclusion of Lanham Act claims. App. Br. at 28. But Azurity overlooks that the Supreme Court in *POM Wonderful* emphasized the relevance of preemption principles in applying the preclusion doctrine. *POM*

24

*Wonderful*, 573 U.S. at 111-12 ("Although the Court's pre-emption precedent does not govern preclusion analysis in this case, its principles are instructive insofar as they are designed to assess the interaction of laws that bear on the same subject.").

*POM Wonderful* does not allow the misuse of the Lanham Act as a means for vindicating private claims under the FDCA. The FDCA expressly vests near-exclusive authority to enforce its provisions in the FDA. 573 U.S. at 109; *see also* 21 U.S.C. § 337(a). Private claims are not authorized. *Buckman Co.*, 531 U.S. at 349 n.4. And nothing in *POM Wonderful* purports to override Congress' intent that the FDA, and not private parties, be entrusted with vindicating the important public health and safety interests protected under the statute.[2]

---

[2]     If anything, the relevance of *POM Wonderful* to the specific issues in this case is somewhat doubtful. By its own terms, the holding in *POM Wonderful* is limited to food and beverage labels, 573 U.S. at 113 ("In consequence, food and beverage labels regulated by the FDCA are not . . . off limits to Lanham Act claims"), and the Supreme Court has never extended it to cases involving pharmaceutical regulation like this one. To the contrary, *POM Wonderful* emphasizes "the less extensive role the FDA plays in the regulation of food than in the regulation of drugs." *Id.* at 109. Additionally, as the Federal Circuit has pointed out, the plaintiff's claims in *POM Wonderful*—also unlike here— "did not involve require proving a violation of the FDCA itself." *Amarin*, 923 F.3d at 969 (citing *POM Wonderful*, 573 U.S. at 117).

### C.   A Lanham Act Claim May Evade FDCA
### Preclusion Only in Narrow Circumstances

A private claim under the Lanham Act is precluded where its adjudication
would "directly conflict[] with the agency's policy choice" or otherwise
"undermin[e] an agency judgment." *POM Wonderful*, 573 U.S. at 120; *Kurin*, 2019
WL 5422931, at *3 (holding certain false advertising claims to be precluded where
resolving whether medical device had been misclassified would "require[] the
Court to improperly interpret and enforce FDA regulations"); *JHP Pharm.*, 52 F.
Supp. 3d at 1004 (finding preclusion as to whether drug was being sold illegally as
inquiry implicating FDA's rule making authority and "complex issues of history,
public safety, and administrative priorities that Congress has delegated exclusively
to the FDA"); *Catheter Connections*, 2014 WL 3536573, at *6 (holding preclusion
as to claim that defendant was falsely advertising medical device as FDA
approved).

A plaintiff thus "fails to state a cognizable claim" under the Lanham Act
"where that claim is based on proving violation of the FDCA and where the FDA
has not taken the position that the articles at issue do, indeed, violate the FDCA."
*Amarin*, 923 F.3d at 968 (concluding that *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919
(9th Cir. 2010) provides the applicable standard where "the alleged violations are
based entirely on—and could not exist without—the FDCA," with respect to

26

claims brought under Tariff Act alleging Lanham Act violations); *PhotoMedex,*
601 F.3d at 924 ("Because the FDCA forbids private rights of action under that
statute, a private action brought under the Lanham Act may not be pursued when,
as here, the claim would require litigation of the alleged underlying FDCA
violation in a circumstance where the FDA has not itself concluded that there was
such a violation."); *Sandoz,* 902 F.2d at 231 ("[W]hat the [FDCA] ... do[es] not
create directly, the Lanham Act does not create indirectly, at least not in cases
requiring original interpretation of th[is] Act[] or [its] accompanying
regulations.").

The authorities relied upon by Azurity are not to the contrary. As Azurity
concedes, courts are precluded from anticipating agency action with respect to
"thorny questions that may require the FDA's expertise." App. Br. at 25. These
include "'claims that directly implicate the FDA's rulemaking authority' 'or
involve an issue on which the FDA has taken 'positive regulatory action.'" *Id.* at
22-23 (citing *Imprimis*, 2017 WL 10526121, at *7). Similarly, questions that are
not "binary factual determination" are precluded. *Id.* at 23 (citing *Imprimis*, 2017
WL 10526121, at *7). Likewise, Courts should not evaluate Lanham Act claims
that require "'specialized knowledge or interpretation of the FDCA's
requirements.'" *Id*. (citing *Genus Lifesciences Inc. v. Lannett Co.*, No. 18-cv-
07603, 2019 WL 4168958, at *3 (N.D. Cal. Sept. 3, 2019)).

### D.   The District Court Appropriately Declined to Supplant the FDA's Regulatory Function

Azurity acknowledges that its case turns on whether Edge complies with Section of 503B of the FDCA. In a nutshell, Azurity asserts: "Because Edge fails to comply with Section 503B, Edge has in turn violated the Lanham Act and Massachusetts General Laws Chapter 93A by falsely representing that it complies with the FDCA." App. Br. at 5.

More specifically, in its complaint, Azurity alleges that Edge does not comply with the FDCA in two ways. First, Azurity asserts that Edge compounds with a "bulk drug substance" that is not on the FDA 503B Bulk Drug List. Second, relying on the non-binding 2018 Essentially-A-Copy Guidance, Azurity contends Edge's product is "identical or nearly identical to an approved drug" because it purportedly shares fives characteristics with Azurity's FIRVANQ product. Azurity now asserts, for the first time on this appeal, that Edge has not obtained documentation of "clinical difference," consistent with a separate prong of the "essentially a copy" analysis of the same non-binding 2018 guidance. App. Br. at 24-25; *see also* JA 105-08.

Edge vigorously disputes any non-compliance. But irrespective of the merits, the district court properly concluded that it could not determine these issues

28

without either creating a conflict with the FDA's policy choices or undermining its policy judgment.

### 1.    Azurity's bulk drug contentions <br> conflict with the FDA's policy choices and judgment

Adjudicating Azurity's first point of "non-compliance" would undoubtedly interfere with an FDA policy judgment. The FDA has classified vancomycin as a "Category 1" bulk drug substance. This means that the drug is "eligible for inclusion on the 503B bulks list," it was nominated for the list "with adequate supporting information," and it "ha[s] not been identified by FDA as presenting significant safety risks." JA 15-16 (¶¶ 44-51); JA 138, 141. The FDA has also expressly declared that it "**does not intend to take action against an outsourcing facility**" that compounds a drug using a Category 1 bulk drug substance provided certain conditions—that are not at issue here—are met. JA 95 (emphasis added); *see also* JA 93.

Undeterred by these facts, Azurity points out that Category 1 bulk drug substances are, by definition, not on the 503B Bulks List. App. Br. at 34. But, as we have seen, the FDA has made clear that it does not intend take action against outsourcing facilities that compound using Category 1 substances. Azurity thus is seeking relief from the Court that would "directly conflict[] with the agency's

policy choice" and otherwise "undermin[e] an agency judgment." *POM Wonderful*, 573 U.S. at 120.

Further, Azurity's reliance on *Imprimis*, App. Br. at 35-36, is misplaced because in that case the defendant compounded with a bulk drug substance that was not on the FDA's Category 1 list, and thus there was no conflict with FDA policy. *Imprimis*, 2017 WL 10526121, at *7-8. In short, Azurity's arguments only underscore how it is pursuing an impermissible private FDA enforcement action, under the guise of the Lanham Act, in circumstances where the FDA has expressly stated it would not pursue enforcement.

### 2. Azurity's "identical or nearly identical" contentions conflict with the FDA's policy choices and judgment

#### a. The FDA has expressly requested that courts refrain from interpreting Section 503B's "essentially a copy" requirements

Azurity insists that Edge's vancomycin product violates Section 503B because it is "identical or nearly identical to an approved drug." App. Br. at 25-30. But this determination would require the Court to opine on unsettled, highly-technical subject matter and exercise discretionary policy judgments for the FDA. Section 503B itself does not define what it means for a compounded drug to be "identical or nearly identical to an approved drug." Further, the guidance on which Azurity seeks to rely states in no uncertain terms that it "do[es] not establish

30

legally enforceable responsibilities," and "should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidelines means that something is suggested or recommended, but not required." JA 100. Azurity is inviting this Court to do precisely what preclusion forbids: anticipate, and thus undermine, the FDA's rule making authority by wading into "complex issues of history, public safety, and administrative priorities that Congress has delegated exclusively to the FDA." *JHP Pharm.*, 52 F. Supp. 3d at 1004.

Moreover, the FDA has urged courts to refrain from interpreting Section 503B's "essentially a copy" provision, of which the "identical or nearly identical" analysis is one of two statutory prongs. *See* 21 U.S.C. § 353b(d)(2). Specifically, the FDA's Acting Director of the Division of Compounded Drugs, Maria Edisa Gozun, submitted a Declaration in similar federal litigation confirming that the "FDA has not taken any compliance or enforcement action . . . in which FDA relied on the 'essentially a copy' provisions set forth in Section 503B of the FDCA with respect to outsourcing facilities that compound drug products using FDA-approved drug products -- rather than bulk drug substances -- as a starting point." JA 484 (¶ 8); JA 482-94 (complete declaration with exhibits); *see Leiters*, 2020 WL 10356606 at *4, n.2 (taking judicial notice of declaration submitted in

31

*Nexus Pharm., Inc. v. Cent. Admixture Pharmacy Servs., Inc.*, 8:20-cv-01506-CJC-

JDE, 2020 WL 6555052 (C.D. Cal. Oct. 19, 2020)).

Gozun also stated that the FDA intends to clarify and revise its guidance

relating to the application of the "essentially a copy" test:

> FDA publicly announced on September 10, 2020, that it has received
> questions and comments related to its policies for applying the 503B
> 'essentially a copy' provisions when outsourcing facilities compound
> drugs starting with an FDA-approved drug product rather than a bulk
> drug substance. FDA plans to address these comments in an upcoming
> revision to its guidance for outsourcing facilities.

JA 484-85 (¶ 9); *see also id.* at 497-98 (9/10/20 press release).

Notably, in authorizing Gozun's testimony, the FDA emphasized that her

testimony was critical to ensure consistent interpretation of FDA guidance:

> FDA has determined that authorizing the requested testimony would be
> in the public interest and promote the objectives of the FDCA and the
> agency . . . FDA believes that the requested testimony furthers the
> objectives of the FDCA and the agency as it relates to an action where
> a private party seeks to enforce provisions of the FDCA that have not
> served as the basis for an FDA enforcement action and may require
> further FDA interpretation. The agency has publicly announced that it
> is planning to address questions and comments related to its policies for
> applying the 'essentially a copy' provisions when outsourcing facilities
> compound drugs starting with FDA-approved drug products in a
> forthcoming revision to its guidance for outsourcing facilities.
> **Accordingly, FDA believes that the requested testimony is in the
> public interest because it would discourage an interpretation of the
> relevant provisions that could be potentially inconsistent with
> FDA's interpretation and future enforcement actions**.

JA 493 (FDA letter) (emphasis added).  32

Relying in part on Gozun's testimony, the court in *Leiters* and *Quva*

dismissed the plaintiff's state-law unfair competition claims. In doing so, the court

recognized "the exclusive right to enforce these issues" under the FDCA and noted

that "[t]he FDA authorized Ms. Guzman's testimony because it 'would be in the

public interest and promote the objectives of the FDCA and the agency . . . because

it would discourage an interpretation of the relevant provisions that could be

inconsistent with FDA's interpretation and future enforcement actions.'" *Leiters,*

2020 WL 10356606, at *4; *Quva*, 2020 WL 6498970, at *4.[3]

Here, Azurity alleges that Edge's conduct violates the FDCA. Azurity's

claims exist only because of the FDCA's requirements of Section 503B, which the

FDA has the exclusive authority to enforce. In this way, the premise of Azurity's

claims is no different from that of the plaintiff in *Leiters* and *Quva* which sought to

pursue a private right of action under the FDCA under the guise of state-law unfair

competition and deceptive practices statutes.

---

[3]     As discussed, Azurity seeks to distinguish *Quva* because it concerned the
preemption of state law claims, not preclusion of Lanham Act claims. App. Br. at
28. But as the Supreme Court emphasized in *POM Wonderful*, the principles of
preemption law, while not governing with respect to preclusion, "are instructive
insofar as they are designed to assess the interaction of laws that bear on the same
subject." *POM Wonderful*, 573 U.S. at 111-12.

Azurity relies heavily on *Imprimis*. But *Imprimis* actually supports preclusion here and was also relied upon by the court in finding preclusion in *Leiters* and *Quva*. The *Imprimis* court noted that the exact type of issues raised by Azurity with respect to the "essentially a copy" provision of 503B present the type of "thorny" questions that must be left to the FDA:

> Allergan's claims do not require the Court to resolve thorny questions that may require the FDA's expertise. For instance, the Court does not need to interpret what the FDCA means by . . . 'essentially a copy'. . . or determine whether a drug should be included on the 503B bulks list.

*Imprimis*, 2017 WL 10526121, at *7 (emphasis added).

On appeal, Azurity attempts to circumvent this clear statement by noting that *Imprimis* predated the FDA's 2018 guidance on "essentially a copy." App. Br. at 27 n.10. But this argument overlooks that *Leiters* and *Quva*, which follow *Imprimis* on precisely this point, are 2021 cases that post-date the 2018 Essentially-a-Copy Guidance. Furthermore, the 2018 guidance expressly states that it "do[es] not establish legally enforceable responsibilities" and "should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited." JA 100.

Accordingly, this Court should affirm the decision of the district court, which correctly recognized that "[i]t would be inappropriate . . . to resolve plaintiff's Lanham Act claim, which necessitates resolution of 'thorny questions

that may require the FDA's expertise. For instance, . . . what the FDCA means by .

. . 'essentially a copy.'" ADD 5 (quoting *Imprimis*, 2017 WL 10526121, at *20).

### b. Azurity cannot show that all five relevant drug characteristics are the same, as required by the FDA guidance

Azurity insists that Edge's vancomycin product violates Section 503B

because it is "identical or nearly identical to an approved drug." JA 11-12 (¶ 23).

The FDA has not issued regulations on this statutory provision. At this stage, the

question is addressed only by the FDA's 2018 Essentially-a-Copy Guidance

document, which is non-binding. JA 100. That document states that the FDA

"intends to consider" a compounded drug product identical or nearly identical to an

approved drug based on the evaluation of five different drug characteristics, all of

which must be same. JA 105.

Here, at least two of the five relevant characteristics are distinct. JA 217-18

(¶¶ 26-28). The excipients in FIRVANQ and Edge's vancomycin product are

different. JA 217-18 (¶ 28); JA 282-300. This fact alone precludes Azurity's

essentially-a-copy argument. Azurity argues that the district court should ignore

the excipient factor, claiming that FIRVANQ's excipients are not

publicly-available. App. Br. at 27, n. 9. But Azurity is clearly incorrect. The

excipients are identified in the FDA's publicly-available summary of the new drug

application for FIRVANQ (*see* JA 218-19 (¶ 28) & JA 288), and in the patent

covering the drug. JA 308-37.

Similarly unavailing is Azurity's argument that FIRVANQ and Edge's

vancomycin product have the same dosage form because they are delivered to the

patient in a liquid solution. JA 377-89. While the route of administration may be

the same (oral solution by mouth), the products are made and sold in different

physical forms—FIRVANQ is powder and diluent, and Edge's product is a

single-dose syringe of oral solution. JA 217 (¶ 27). FDA documentation indicates

that powder-for-solution and solution are two different dosage forms. JA 304, 306.

Azurity cannot point to any competent evidence in the record to support its dosage

form theory. It presented only a conclusory affidavit from its Marketing Director

that does not even address the issue. JA 74-76. Edge, on the other hand, presented

a detailed affidavit from a licensed pharmacist who examined the issue based on

personal knowledge and FDA documentation. JA 216-18.

### c. The documentation of clinical difference contentions were never pled, are unpreserved, and are based on mere recommendations and suggestions in the interim guidance

Azurity now argues on appeal that its claims are not precluded because they

are premised on Edge's purported failure to obtain specific documentation of

clinical difference. App. Br. at 28-32. There are, however, several reasons why this new argument is meritless.

To begin with, Azurity never pled its current clinical difference argument in the complaint. JA 7-51. Even now, Azurity does not actually point to any allegations or other factual predicate in the record for its speculative and conclusory contention that Edge failed to comply with some purported requirement to obtain documentation. For these reasons, too, the argument is unavailing.

Azurity also failed to present this documentation argument to the district court. JA 52-73, JA 338-63, 400-05. "It is a virtually ironclad rule that a party may not advance for the first time on appeal either a new argument or an old argument that depends on a new factual predicate." *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 11 (1st Cir. 2003). This Court has repeatedly held that "arguments not advanced before the district court are waived." *Rosaura Bldg. Corp. v. Municipality of Mayaguez*, 778 F.3d 55, 63 (1st Cir. 2015) (citing *Emp'r Ins. Co. of Wausau v. OneBeacon Am. Ins. Co.*, 744 F.3d 25, 29 (1st Cir. 2014)).

This argument likewise is based on the 2018 Essentially-a-Copy Guidance. Therefore, as discussed above, determination of this argument would require the Court to usurp the FDA's rule making authority by forecasting agency enforcement in the absence of binding and clearly defined regulations. The Court should decline

this invitation to involve itself with "complex issues of history, public safety, and administrative priorities that Congress has delegated exclusively to the FDA" before the agency has had an opportunity to formulate a final position. *JHP Pharm.*, 52 F. Supp. 3d at 1004.

Consistent with its interim nature, the 2018 guidance relied upon by Azurity further uses the term "should" repeatedly. For example, "the outsourcing facility ***should*** ensure that the determination is noted on the prescription or order (which may be a patient-specific prescription or a non-patient specific order) for the compounded drug." JA 108 (emphasis added); *cf.* App. Br. at 31. Similarly, the outsourcing facility "***should*** obtain a statement from the practitioner that specifies the change between the compounded drug and the comparable approved drug . . . ." *Id.* (emphasis added). Thus, as explained in the 2018 guidance, these statements indicate that "something is suggested or recommended, but not required." JA 100 ("The use of the words should in Agency guidelines means that something is suggested or recommended, ***but not required***.") (emphasis added).

For these reasons, too, Azurity's reliance on *Hope Medical Enterprises, Inc.* v. *Fagron Compounding Servs., LLC*, No. 2:19-CV-07748, 2021 WL 753566 (C.D. Cal. Jan. 25, 2021) is misplaced. That case was decided under state law preemption principles and turned on, among other factors, whether "there is a

parallel state law that renders the same noncompliant conduct independently unlawful," given "the historic primacy of state regulation of matters of health and safety." *Id*. at \*11-12. Indeed, Azurity acknowledges that state preemption standards are distinct from the preclusion analysis required here. App. Br. at 28. And, as at least one court has remarked, "[t]he term "clinical need" does not lend itself to a straightforward reading. It is not defined in the FDCA. Nor does it appear anywhere else in the United States Code." *Athenex Inc. v. Azar*, 397 F. Supp. 3d 56, 64 (D.D.C.), *appeal dismissed sub nom. Athenex Pharma Sols., LLC v. Azar*, No. 19-5223, 2019 WL 5394642 (D.C. Cir. Oct. 1, 2019) (deferring to FDA's interpretation of "clinical need" in case decided under Administrative Procedure Act).

So, contrary to Azurity's contentions, determining "clinical need" is not readily reduced to some "binary factual test" that can be readily applied in the absence of clearly defined regulations without infringing upon the FDA's exclusive enforcement responsibilities. App. Br. at 32. The Court should therefore reject Azurity's attempt to manufacture on appeal a purported issue that it never raised below, let alone pled, and for which there is no predicate in the record.

### d.    Azurity's Remaining Authority
### is Distinguishable or Inapposite

As discussed above, the defendant in *Imprimis* violated the FDCA by compounding with a bulk drug substance that was not on the FDA's Category 1 list. 2017 WL 10526121, at *7-8. *Imprimis* concerned a readily ascertainable fact. It did not involve the far "thornier" question presented here—whether Edge's use of a bulk drug substance that is on the Category 1 list somehow subjects it to liability under the Lanham Act, even though the FDA has made clear that it does not intend to take enforcement action against outsourcing pharmacies for compounding with Category 1 bulk substances.

Other cases cited by Azurity are of the same ilk. They turn on straightforward factual misrepresentations with "yes or no" answers that could be ascertained without resort to policy judgment or expert determinations reserved to the FDA. For example, the district court in Florida rejected multiple theories of Lanham Act liability based on alleged FDCA non-compliance, permitting only a single claim to proceed (namely, that the defendant misrepresented its product as an "AP-rated" and thus FDA-approved generic drug). *Belcher Pharms., LLC v. Hospira, Inc.*, No. 8:17-CV-2353-T-30JSS, 2018 WL 4643292, at *6 (M.D. Fla. Apr. 9, 2018). The FDA had also sent the defendant a warning letter instructing it to cease manufacturing and selling its product. *Id.* at *1. Here, in contrast, there is

40

no allegation that Edge ever marketed its vancomycin product as an "approved drug" or was advised by the FDA to stop manufacturing or marketing its product. JA 7-23.

Similarly, in another recent California case, the plaintiff challenged "the overall combination of [the defendants'] packaging as misleading consumers to believe that it is an FDA approved product." *Genus Lifesciences Inc. v. Lannett Co., Inc.*, No. 18-CV-07603-WHO, 2019 WL 4168958, at *6 (N.D. Cal. Sept. 3, 2019). The plaintiff further bolstered its claim with survey data showing that the defendants' website created the false impression that defendant was selling FDA-approved drug products, including by referring to the defendant as a generic drug manufacturer. *Id.* at *7. Likewise, the defendant represented that its nasal spray product had a "topical route of administration," when it did not. *Id.* Again, these type of readily determined factual allegations are not comparable to allegations at issue here.

The other cases relied on by Azurity fare no better. App. Br. at 22-23. In *Par Sterile Prod., LLC v. Fresenius Kabi USA LLC*, No. 14 C 3349, 2015 WL 1263041, at *4 (N.D. Ill. Mar. 17, 2015), the plaintiff "assert[ed] the specific, particularized claim that a competitor injuriously misrepresents its product as FDA–approved by offering it for sale in certain marketing channels alongside

41

FDA–approved generic drugs." And, in *World Nutrition Inc. v. Advanced Enzymes USA*, CV-19-00265-PHX-GMS, 2021 WL 632684, at *4 (D. Ariz. Feb. 18, 2021), the plaintiff alleged a "basic, fundamental failure to follow" good manufacturing practices that plausibly did not require the FDA's expertise to resolve given that the "federal regulations governing good manufacturing practices for dietary supplements are detailed and extensive."

So, these cases, too, bear little resemblance to the issues presented by the plaintiff's claims here. In some instances—such as with Azurity's bulk drug substance and the "identical or nearly identical" contentions—adjudication of Azurity's claims would require the Court to simply ignore FDA interim guidance. And, in other instances—such as with the documentation of clinical need contentions—adjudication of the claims would require the Court to treat suggested or recommended practices contained in interim guidance as if they were final agency policy choices set forth in binding regulations. Either way, the Court's involvement would "directly conflict[] with the agency's policy choice" or otherwise "undermin[e] an agency judgment." *POM Wonderful*, 573 U.S. at 120. If allowed to proceed, the determination of Azurity's claims would thus necessarily invade the exclusive enforcement regulatory and functions that Congress reserved to the FDA under the FDCA's comprehensive scheme.

## II.    The Complaint Fails to State a Lanham Act Claim, Even in the Absence of Preclusion

Even if Azurity were correct on the preclusion issue (and it is not), this Court can—and should—affirm on other grounds. "The district court's rationale is not binding on appeal, and its ruling may be affirmed on any basis apparent from the record." *Lister v. Bank of Am., N.A.*, 790 F.3d 20, 23 (1st Cir. 2015). This is especially appropriate where addressing issues of law—as is the case in a motion to dismiss—and where the parties have briefed the issue on appeal—as Azurity has done. *See Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 39 (1st Cir. 2020).

Azurity's false advertising allegations under the Lanham Act can be grouped into three categories. First, Azurity disagrees with Edge's puffery statements in which Edge advocates for the quality of its products and services. Second, Azurity disagrees with Edge's generalized comments regarding legal compliance. Third, Azurity identifies several indisputably true statements, which Azurity contends are impliedly false. None of the advertising statements challenged by Azurity is actionable.

### A.    Edge's So-called "Superiority" Statement and Other Statements About Product Quality Constitute Non-Actionable Puffery

On appeal, Azurity's Lanham Act briefing primarily focuses on the following language, which once appeared on Edge's website: "commercially

available options are not ideal for use in the hospital setting."[4] JA 14 (¶ 66). But

this is clearly non-actionable puffery, as are the following generalized claims and

subjective statements about the quality of Edge's products or services upon which

Azurity's other Lanham Act claims rely:

- "Edge Pharma is a pharmaceutical sterile and non-sterile 503B Outsourcing Facility offering high quality, innovative solutions for the health care community." JA 18 (¶ 61(a)).

- "As your compliance partner, we are dedicated to providing turnkey 503B outsourcing with the highest level of quality, easy ordering, simple logistics, and excellent customer support." JA 18 (¶ 61(b)).

- "As an FDA registered and inspected 503B Outsourcing facility, Edge has the ability to react quickly to customer requirements and deliver cost effective solutions." JA 19 (¶ 61(f)).

"Essential to any claim under section 43(a) is a determination of whether

the challenged statement is one of fact—actionable under section 43(a)—or one of

general opinion—not actionable under 43(a)." *Intermountain Stroke Ctr., Inc. v.*

*Intermountain Health Care, Inc*., 638 F. App'x 778, 786 (10th Cir. 2016) (quoting

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495-96 (5th Cir. 2000)). It

is a bedrock principle of the Lanham Act that "a statement of opinion by a

---

[4]    As a minor housekeeping matter, Azurity asserts that the district court did not directly address its superiority claim under the Lanham Act, and improperly dismissed it as precluded. Even if true, this is irrelevant. *See Yan*, 973 F.3d at 3; *Lister*, 790 F.3d at 23.

defendant about the nature and quality of goods and services sold by either a
competitor or by the defendant is not within § 43(a)." 5 J. THOMAS MCCARTHY,
MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §§ 27:67, 27:56 (5th Ed.
2021); *see also Gillette Co. v. Norelco Consumer Prods. Co.*, 946 F. Supp. 115,
136 (D. Mass. 1996) ("Section 43(a) . . . applies only to false or misleading
statements of fact."). In this Circuit, as in most courts, "the category of puffery
encompasses vague and general assertions that a product's superiority renders
competing products comparatively useless." *Euro-Pro Operating LLC v. TTI Floor
Care N. Am.*, No. 12-10568-DJC, 2012 WL 2865793, at *8 (D. Mass. July 11,
2012). And puffery, which includes "bald assertions of superiority or general
statements of opinion[,] cannot form the basis of Lanham Act liability." *Pizza Hut*,
227 F.3d at 496; *see also Conrad v. Russell*, No. 11-cv-570-bbc, 2011 WL
3877000, at *1 (W.D. Wis. Sept. 1, 2011) ("[C]ourts have held consistently that
general statements about quality are not 'facts' for the purpose of a claim of false
advertising, but are more appropriately classified as opinion or 'puffery,' neither of
which provides a basis for a claim.").

Following this settled law, courts have rejected Lanham Act claims based on
the following statements:

- "Better Ingredients. Better Pizza."[5]
- "Providing excellent care of the highest quality… [with the] best medical practices at the lowest available cost."[6]
- "Best technology, lower rates, and better customer service."[7]
- "All of the good dot com real estate is taken" and it is "impossible to find the domain name that you want."[8]
- "The purest salt on earth."[9]

In this case, Azurity is pursuing a Lanham Act false advertising claim for Edge's statement that "commercially available options are not ideal for use in the hospital setting," which Azurity describes as promoting Edge's product as a superior option. App. Br. at 15. This, and the other promotional statements, are

---

[5]    *Pizza Hut*, 227 F.3d at 498 (dismissing Pizza Hut's Lanham Act claims over Papa John's slogan and advertising campaign).

[6]    *Intermountain*, 638 F. Appx at 786 (holding that "general advertising claims of best practices and high-quality customer service" are non-actionable puffery in lawsuit between health care providers).

[7]    *Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990) (Lanham Act claim against collection agency by law firm engaged in collection services).

[8]    *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 302 (4th Cir. 2017) (affirming summary judgment for defendant in a lawsuit between url providers over advertising campaign).

[9]    *Sustainable Sourcing, LLC v. Brandstorm, Inc.*, No. 12-cv-30093-MP, 2016 WL 3064055, at *4 (D. Mass. May 31, 2016) (granting summary judgment in favor of party for use of its "boastful" tagline).

46

precisely the sort of non-actionable puffery that courts have always rejected. Azurity's belief that its product is ideal does not give rise to a Lanham Act claim.

Azurity cites several cases addressing superiority statements, all of which are distinguishable for reasons explained in the cases themselves. In *Castrol Inc. v. Pennzoil Co*., 987 F.2d 939, 946 (3d Cir. 1993), the court noted that Pennzoil's claim of superiority was not puffery because it was "specific and measurable by comparative testing." Pennzoil had claimed that it was superior in the metric of viscosity breakdown, something that was specifically testable and measurable according to industry standards. *Id*. In *Clorox Co. Puerto Rico v. Proctor & Gamble Com. Co*., 228 F.3d 24, 30 (1st Cir. 2000), the defendant claimed that its product "whitens better," which this Court held was not puffery because it was "a specific and measurable advertisement claim," and noted how it was testable. In *Ferring Pharmaceuticals, Inc. v. Braintree Laboratories, Inc*., 38 F. Supp. 3d 169, 179 (D. Mass. 2014), the court distinguished between measurable, actionable claims, such as "lowest volume," and non-measurable, non-actionable claims, such as "flexible dosing" and "helps achieve success." *See also Bracco Diagnostics, Inc. v. Amersham Health, Inc*., 627 F. Supp. 2d 384, 464 (D.N.J. 2009) (discussing establishment claims that specifically referred to tests, not product superiority statements).

47

Azurity provides no reason to conclude that the degree to which a product is "ideal in a hospital setting" is a specific measurable claim. Instead, Azurity argues that the implicit claim of superiority is actionable because Azurity's product is FDA approved, and Edge's is not. This is not a measurement, and Azurity does not cite any cases suggesting that FDA approval converts a generalized superiority statement into actionable non-puffery. Azurity may have reasons to disagree with Edge's assertions. But having reasons to disagree with an opinion—with puffery— do not convert that opinion into "a specific and measurable" claim. *Impact Applications, Inc. v. Concussion Management, LLC*, No. GJH-19-3108, 2021 WL 978823, at *7 (D. Md. Mar. 16, 2021).

Moreover, Azurity's FDA approval argument against superiority was recently rejected in *Impact Applications*, 2021 WL 978823, at *7. There, the court expressed skepticism at the idea "that a [product] that is not approved by the FDA can never be superior in any respect to an FDA-approved [product]." *Id*. After all, FDA approval is not contingent on product superiority to the field.

Azurity mentions that the "superiority statement" in question no longer appears on Edge's website. Although not developed in Azurity's brief on appeal, in its supplemental briefing before the District Court, Azurity argued that this change was indicative of falsity. JA 502-03. Any such argument would be mistaken. Modifications or deletions of prior statements are not, as a matter of law, evidence

of liability. *See Mobileye, Inc. v. Picitup Corp.*, 928 F. Supp. 2d 759, 776 n.15 (S.D.N.Y. 2013) (rejecting plaintiff's argument that the removal of allegedly false advertising statements from a website constituted a "tacit admission" of falsity and recognizing that "Federal Rule of Evidence 407 clearly prohibits the introduction of subsequent remedial measures to prove culpable conduct").

### B. Edge's Generalized Statements About Compliance with Administrative Law Are Not Actionable

Azurity's non-superiority Lanham Act claims primarily focus on Edge's statements about generally being in compliance with FDA requirements, including the following:

- "Our facility is compliant with the following state, local, and federal regulations and guidelines:

  USP 795, USP 797, USP 800
  Occupational Safety and Health Administration (OSHA)
  Food and Drug Administration (FDA)
  US Pharmacopeia (USP)
  Applicable Good Manufacturing Practice (GMP) Guidelines."

- "Edge Pharma is a USP 797 and cGMP compliant FDA-Registered 503B Outsourcing Facility that specializes in a wide array of sterile and non-sterile compounded medications."

JA 18-19 (Compl. ¶ 61(d)-(e)).

Azurity's claims require specific interpretations of FDA regulations that have not been endorsed in a clear and unambiguous ruling from a court or agency

49

of competent jurisdiction, and as a result, they are not viable under the Lanham Act. "Absent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) (holding that a statement opining on the legality of plaintiff's operations is an opinion that, as a matter of law, could not give rise to a Lanham Act claim); *see Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 948 F. Supp. 2d 538, 554 (D. Md. 2013) (finding "any statements made by [the Counterclaim-Defendants] regarding the copyrightability of MLS listing data were nonverifiable legal opinions that are not actionable under the Lanham Act"); *Language Line Servs., Inc. v. Language Servs. Assocs., LLC*, No. C 10-02605, JW, 2011 WL 5024281, at *11 (N.D. Cal. Oct. 13, 2011) ("Statements of opinion, including legal opinion, are not generally actionable as false statements under the Lanham Act.").

*Dial A Car, Inc. v. Transportation, Inc.*, 884 F. Supp. 584, 592-93 (D.C. 1995) is instructive. There, the plaintiff alleged that the defendant taxicab companies falsely represented their legal authority to offer corporate account transportation services. The court held that, in the absence of an administrative determination that the defendants did not have such authority, these statements were opinions, and not verifiably false representations of fact. Determining the

accuracy of the representations required the D.C. Taxicab Commission to interpret

municipal regulations, and the court would not "preempt" that analysis:

> The D.C. Taxicab Commission, which has authority to determine
> whether the provision of Corporate Account Services by Maryland- and
> Virginia-licensed taxicab companies is lawful, has not addressed in an
> adjudication or any other formal ruling whether the defendants'
> provision of said services with regular taxicabs in the District of
> Columbia violates the terms of Office Administrative Order No. 4. . . .
> In light of this uncertainty, the Court cannot say that defendants'
> statements that their services are legal were verifiably false
> representations of fact. . . .
>
> **It is generally inappropriate for a court in a Lanham Act case 'to
> determine preemptively how [an administrative agency] will
> interpret and enforce its own regulations' and thereby to usurp the
> agency's responsibility for interpreting and enforcing potentially
> ambiguous regulations.'**

*Id.* at 592-93 (emphasis added) (quoting *Sandoz*, 902 F.2d at 231). The district

court's decision was affirmed. *Dial A Car, Inc. v. Transp., Inc*., 82 F.3d 484 (D.C.

Cir. 1996).

    *Greenwich Taxi, Inc. v. Uber Technologies, Inc.*, 123 F. Supp. 3d 327,

335-336 (D. Conn. 2015) is also on point. In that case, the court dismissed some of

the plaintiff's Lanham Act claims because the allegedly false statements related to

the defendant's compliance with Connecticut laws and regulations governing

taxicabs: "[T]he circumstances here present the same issue as in *Dial A Car*—

namely, whether there exists a cause of action under the Lanham Act for making a

false or misleading statement when the falsity or misrepresentation hinges on a

regulatory authority's anticipated statutory interpretation. Therefore, the court concludes that to the extent that Count I is based on allegations that the defendant misrepresented to customers that it is complying with Connecticut laws and regulations governing taxicabs and livery vehicles, Count I is being dismissed." *Id.* at 335-36. The court further explained: "[A]s to Uber's representation that it operates legally, the plaintiffs assert that it is a misrepresentation on the theory that Uber must operate in compliance with Connecticut taxicab and livery vehicle laws and regulations. Under *Dial A Car*, this alleged misrepresentation is not an actionable claim under the Lanham Act." *Id.* at 336-37.

Further, the Court cannot determine Edge's FDA compliance without either creating a conflict with the FDA's policy choices or undermining the FDA's policy judgment. As the *Dial A Car* court reasoned, it would be inappropriate for a court in a Lanham Act case "to determine preemptively" how an administrative body will interpret and enforce its own regulations or guidance. 884 F. Supp. at 593. Edge is a registered 503B facility that is regularly inspected and audited by the FDA. JA 13 (¶ 31); *see also* www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding. Therefore, "absent a clear and ambiguous ruling" from the FDA regarding Edge's compliance with FDA laws and

registration requirements, the statements on Edge's website are not actionable under the Lanham Act.

### C.   Edge's Indisputably Truthful Statements Are Not Actionable

Azurity also relies on several statements on Edge's website that are unquestionably true based on publicly-available government records of which the Court can take judicial notice. The first of these is that "Edge Pharma is an FDA-registered and state-licensed, 503B Outsourcing Facility providing service to hospital pharmacies, outpatient surgery Centers, and clinics." JA 18 (¶ 61(c)). This is a true statement. The parties (and the FDA) all agree that Edge is an FDA-registered and state-licensed 503B outsourcing facility. JA 12-13 (¶¶ 28, 31); *see also* www.fda.gov/drugs/human-drug-compounding/registered-outsourcing-facilities. Azurity also appears to assert that Edge's marketing materials are false because they state that Edge is a "'Registered and Inspected FDA Outsourcing Facility.'" JA 19 (¶ 62). Again, it is undisputed that Edge is registered and regularly inspected. JA 12-13 (¶¶ 28, 31); JA 211-212 (¶¶ 5, 9-10). *See* www.fda.gov/drugs/human-drug-compounding/registered-outsourcing-facilities.

Azurity appears to argue that these truthful statements are implicitly false because they give the impression that, in addition to being registered, licensed, and inspected, Edge was in compliance with all relevant FDA regulations, or that the FDA had specifically approved Azurity's drug formulation. But, as Azurity's own

53

cases state, when an advertisement is alleged to be implicitly false, "an additional burden is placed upon the plaintiff to show that the advertisement … conveys a misleading message to the viewing public." *McGrath & Co. v. PCM Consulting, Inc.*, No. 11-10930-DJC, 2012 WL 503629, at *5 (D. Mass. Feb. 15, 2012) (quoting *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 310 (1st Cir. 2002)). Azurity pleads no facts to satisfy this burden. It simply concludes that the statements could give a misleading impression. App. Br. at 11-14. Azurity's naked assertion is not enough to support an implied falsity claim. *See Intermountain*, 638 F. App'x at 793 (affirming dismissal because "at no point during these proceedings have Plaintiffs explained how consumers might infer" the proposed implied falsehood). Azurity may wish that Edge "had included some sort of disclaimer," but they have never asserted one is necessary, and "the sparse extant caselaw would not support it." *Id*. (citing *Wellnx Life Scis. Inc. v. Iovate Health Scis. Research Inc*., 516 F. Supp. 2d 270, 286 (S.D.N.Y. 2007) (noting the unavailability of a § 43(a) claim for not disclosing facts)).

## <u>CONCLUSION</u>

Azurity's purported Lanham Act case requires proof of FDCA violations. The FDCA rules that Azurity relies upon are subject only to interim and non-binding guidance. The FDA has expressly declined to pursue enforcement action for Azurity's "bulk drug substance" contention, and the agency has cautioned against litigating Azurity's "essentially a copy" argument. Adjudication of these claims would undermine the FDA's policymaking judgment and regulatory authority. Preclusion clearly applies. This Court should affirm the district court's dismissal order.

**Attorneys for Edge Pharma, LLC**
**f/k/a Edge Pharmacy Services, LLC**

**ROBINSON & COLE LLP**
Linda L. Morkan (CA1#1134819)
William J. Egan
Julianna M. Charpentier
One Boston Place, 25th Floor
Boston, MA 02108
(617) 557-5900
lmorkan@rc.com

**HODGSON RUSS LLP**
By: /s/ *Robert J. Fluskey, Jr.* _____
Robert J. Fluskey, Jr. (*pro hac vice*)
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202-4040
(716) 856-4000
RFluskey@hodgsonruss.com

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,801words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(a) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ *Robert J. Fluskey, Jr.*
Robert J. Fluskey, Jr. (*pro hac vice*)

56

## CERTIFICATE OF SERVICE

On November 30, 2021, a copy of the foregoing brief was electronically filed with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the Court's appellate CM/ECF system, and that service will be accomplished by the appellate CM/ECF system.

/s/ *Robert J. Fluskey, Jr.*
Robert J. Fluskey, Jr. (*pro hac vice*